STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
WALTER M. GERALD, DEFENDANT–APPELLANT.

Argued May 5, 1987—Decided October 25, 1988.

41

44

*Lowell Espey* and *Kathryn A. Brock,* Designated Counsel, argued the cause for appellant (*Alfred A. Slocum,* Public Defender, attorney).

*James R. Wronko,* Deputy Attorney General, argued the cause for respondent (*W. Cary Edwards,* Attorney General of New Jersey, attorney; *James R. Wronko* and *Boris Moczula,* of counsel and on the briefs).

The opinion of the Court was delivered by

CLIFFORD, J.

Defendant was convicted of numerous offenses, including capital murder, surrounding an incident that resulted in the death of Paul Matusz. On the capital murder conviction defendant was sentenced to death, wherefore his appeal to this Court is as of right under *Rule* 2:2-1(a)(3). We affirm all of the judgments of conviction except the one for capital murder as charged in the thirteenth count of the indictment. On the capital murder charge the State acknowledges the necessity for a new penalty-phase proceeding, for the reasons expressed in the course of this opinion. Beyond that we have determined that defendant is entitled to a new trial on the question of guilt on that charge.

## I

## A

The evidence produced at trial fully supported the version of the facts that follows.

John Matusz, eighty-nine years old, lived with his son Paul, age fifty-five, at the Matusz home in Pleasantville, in Atlantic County. Their home was located on a dark wooded corner in a secluded area. The elder Matusz, disabled because of a stroke, could walk only with the aid of a cane. Inasmuch as neither John nor Paul was self-sufficient, two of John's daughters, Helena Gaw and Lottie Wilson, took turns staying in the home, cooking, cleaning, and caring for both men.

On Friday, August 13, 1982, Lottie Wilson was staying at her father's home. At approximately 6:30 p.m., John Matusz retired for the evening to his first floor bedroom. Paul Matusz went to his upstairs bedroom where he watched television and later retired. In the living room Mrs. Wilson watched a baseball game on a new color television set, which sat atop an old console television set that no longer functioned. At approximately 9:30 she went to bed in her father's bedroom. Soon thereafter she heard a noise in the other first floor bedroom and went to investigate. As she opened the door to that room, she was struck in the eye by someone standing behind the door. Mrs. Wilson was then attacked by two black males, one of whom she later described as husky, tall, with a round face and a mustache or beard. One of the intruders had a knife or blade, although Mrs. Wilson was unable to recall which of the two it was. She was thrown to the floor, punched and kicked in the face, and then hurled into the bathroom. Mrs. Wilson recalled lying on the bathroom floor being stomped on a number of times about the face and chest by someone wearing a white-soled shoe. This man told her, "Shut up or I'll kill you." When he asked where the money was kept, she revealed the location of her purse. When her brother Paul heard Mrs. Wilson's screams, he came downstairs to investigate, whereup-

on two black males attacked him at the foot of the staircase. One of the men struck Paul in the face with a television set.

Shortly after the foregoing events, and not knowing whether the intruders were still in the house, Mrs. Wilson arose and went to the kitchen, where she telephoned her sister and the local police. Then Mrs. Wilson entered the living room where she saw her brother Paul lying on the floor with the old console TV overturned on his face. After succeeding in lifting the set from his face and turning it upright, Mrs. Wilson found Paul's face cold to her touch. John Matusz had been beaten and dragged from his bed into the hallway. He was leaning against the wall, bleeding profusely, still clutching the top portion of his cane, which was broken in half. Missing were Mrs. Wilson's purse with about $60 in cash, the new color television set, and an old black and white portable television set from Paul's upstairs bedroom.

Officer John Calcerano and Detective Henry Frank of the Pleasantville Police Department arrived at the Matusz home within minutes of Mrs. Wilson's telephone call. Although hysterical, Mrs. Wilson described the perpetrators and the events generally as recited above. Mrs. Wilson's face was swollen and beaten. Paul Matusz was unconscious and bleeding from the nose and mouth. On checking for signs of life, Detective Frank found that Paul was not breathing and had no pulse. Frank cleared Paul's air passage and began cardio-pulmonary resuscitation. A third officer who arrived soon afterwards found Paul's pulse to be very weak. The officer continued the efforts to revive the victim. In the meantime Officer Calcerano applied bandages to John's wounds. All three victims were then taken to the hospital by ambulance. Other law-enforcement personnel arrived on the scene. The house was dusted for fingerprints none of which, as it was later determined, matched any of the defendants' prints. The officers concluded that the attackers' point of entry was a window in the first-floor bedroom in which Mrs. Wilson first was assaulted. The wood-

framed screen had been pried off from the outside to permit access.

Paul Matusz, who suffered two fractured ribs, a broken nose, and multiple contusions of the face, sides of the head and brain resulting from blows to the head, died in the emergency room at Shore Memorial Hospital at about 10:48 p.m. He did not regain consciousness before death, and therefore made no statement regarding the identity of his assailant or assailants. When Dr. Donald Jason, Atlantic County Medical Examiner, examined Paul Matusz that night at the morgue, he noticed bruises across his face in three patterns. On Paul's forehead there were four imprints of a circular pattern, consisting of four concentric circles. Second, there was a herringbone-type pattern on the forehead next to the circular patterns. On the victim's face, below the right eye and to the left of the nose, there was a third pattern bruise, consisting of multiple rectangles. These bruises were photographed the next day at the autopsy, and according to Dr. Jason and various police witnesses the pictures accurately depicted the victim's appearance. Dr. Jason also observed a patterned bruise, consisting of four concentric circles, on Mrs. Wilson's face.

According to Dr. Jason, Paul's death was caused by blunt-force injuries to the head, specifically, cerebral concussions and a fractured nose, inflicted by blows of the fists and feet. These injuries resulted, respectively, in contusions and swelling of the brain, and aspiration of blood into the airway and lungs. Together, these conditions produced Paul's death. Because no blood was found in the victim's stomach, Dr. Jason concluded that Paul's nose was fractured after he lost consciousness. Had he been conscious, his gag reflex would have forced him to swallow the blood rather than inhale it into his lungs. Dr. Jason observed on Paul's nose a discernible sneaker print that could have been produced by the same force as caused the broken nose. He acknowledged as well that the console television set falling on Paul's face could "possibly" have fractured

his nose, thereby resulting in the aspiration of blood as he lay unconscious on the floor.

Concerning the blows to the head, Dr. Jason concluded that a single first blow could have fractured the nose and simultaneously caused unconsciousness, but he pointed out that at least some of the blows to the head, especially on the left side where the most severe contusions of the head and brain were found, were delivered after Paul was unconscious. Finally, Dr. Jason determined that a single blow could not have caused the brain injury or the other injuries that he observed. Rather, the doctor surmised that the sum of the numerous blows and resultant various injuries caused the death; that it was medically impossible for him to differentiate the "fatal" blow from all others, and that this would have been so even had he watched the beating take place; and that while some of the blows might not have contributed to death, he could not specifically identify which ones had and which had not.

John Matusz suffered bruises and lacerations of the face from blunt-force injuries. There were indications that he had probably been beaten with a lamp. Those injuries required continued hospital care and convalescence treatment. He died on October 3, 1982, without ever having returned home. Lottie Wilson suffered a broken nose, abrasions, lacerations and contusions of the face, neck, and chest due to several blows, as well as smaller contusions on the rest of her body. She was hospitalized until August 25, 1982; her jaws were wired together for six weeks following the attack.

B

On August 16, 1982, Detective Frank received a call at home from an unknown informant who said that Walter Gerald, Jody Reese, and Nelson Drakeford had committed the Matusz murder. The informant reported that Gerald had offered to sell the informant stolen television sets and had told the informant how easy the burglary had been. The informant further told Detec-

tive Frank where Gerald lived and the type of car he drove. Finally, the informant stated that he wanted to be paid. Detective Frank told him to call Crime Stoppers, an organization that pays for information leading to the arrest and indictment of criminals.

Detective Frank immediately went to the Pleasantville Police Department. While he was there, the follow-up call came in from Crime Stoppers, repeating the information summarized above and providing additional information. The police learned that there were two outstanding arrest warrants for Gerald, both for failure to appear in municipal court on traffic tickets.

That same afternoon Detective Frank and Investigator McIntyre of the Atlantic County Prosecutor's Office drove in an unmarked car to Gerald's home, where over a period of about one hour they observed Gerald sitting on his car, talking with his friends, and driving to and from a nearby store. As Gerald, who knew Detective Frank, drove by, he waved at the detective. The informant's description of the car matched Gerald's automobile. The authorities having decided to arrest Gerald on the outstanding warrants, Detective Frank and Investigator Raymond Bolis of the Prosecutor's Office executed the warrants by arresting Gerald at his home later that evening. At the time of the arrest Frank informed Gerald of the outstanding warrants, and also indicated that the police wanted to speak with him in connection with another matter. The police also questioned Drakeford and Reese, whom they released after the two denied any involvement. Both men indicated, however, that they had been importuned by Gerald, John Bland, and Eddie Walker to participate in the robbery.

After arresting Gerald, Detective Frank and Investigator Bolis drove him to police headquarters where Gerald was held in lieu of $85.00 cash bail on the arrest warrants. Detective Frank informed Gerald of his *Miranda* rights (*Miranda v. Arizona*, 384 *U.S.* 436, 444, 86 *S.Ct.* 1602, 1612, 16 *L.Ed.*2d 694, 707 (1966)), whereupon Gerald indicated that he understood

those rights. He signed a waiver, witnessed by Detective Frank and Investigator Bolis, and agreed to talk to the police.

Although the discussion initially focused on the outstanding traffic tickets, Detective Frank eventually told Gerald about the Matusz murder and that he was a suspect. Gerald denied any involvement, offered two different stories about his whereabouts on the evening of August Thirteenth, and said he wanted to cooperate. The officers told him they did not believe his story. Gerald continued to deny his involvement in the burglary and murder for the next two hours while the police persisted in their questioning. During this time Gerald was allowed to go the bathroom (accompanied by a police officer), eat dinner, and drink soda; he was not free to leave, however, on the theory that he was under arrest for the contempt-of-court warrants and was awaiting admission to bail. During this time, according to the police officers, Gerald showed no signs of intoxication or influence of drugs. He neither asked for an attorney nor requested that questioning cease. During "casual conversation" with Investigator Bolis, Gerald indicated that he did not use drugs because he was an athlete and harbored a concern that drugs would ruin his body.

After approximately two hours of questioning, Gerald agreed to submit to a polygraph examination, whereupon Bolis left the room to find a qualified examiner. During Bolis's absence Gerald sat with his legs extended and crossed in such a way that Detective Frank was able to see the tread design on the sole of the suspect's sneakers. Part of the tread consisted of a design similar to the concentric circular bruises found on Paul Matusz's forehead. When Frank asked if he could take a closer look at the sneakers, Gerald agreed and took them off. The detective put the sneakers on the desk, and both he and Gerald took a close look at them. There were a few red spots on the top of the sneakers. When asked what the red spots were, Gerald said that he did not know. Detective Frank pointed out the similarity between the tread design and the bruises on Paul Matusz's forehead, face, and nose, Gerald replied, "Well, I

wonder how many pair of sneakers like that Converse made." Detective Frank responded that Converse probably made thousands. Investigator Martella brought into the room a set of "contact sheets" (sheets containing negative-size prints of photographs) depicting the patterned bruises on Paul Matusz. Martella gave Frank and the defendant his magnifying glass, and all three examined and compared the photographs with the sneakers. Gerald did so with great interest. Detective Frank then told Gerald that he was going to keep the sneakers as evidence.

Investigator Bolis returned to the detective bureau. George Dix, the town's mayor and a retired New Jersey State Trooper, had agreed to administer the polygraph examination. Dix, who was in the municipal building for a town council meeting, initially did not want to test Gerald because he had known him for years and had been Gerald's football coach. Dix's daughter and Gerald were friends and had attended high school together, and Dix saw Gerald every Saturday at football games. As recently as a year before, Dix had written Gerald a letter of recommendation. As he was taking Gerald to Mayor Dix for the polygraph exam, Bolis noticed that Gerald was not wearing any shoes. Gerald indicated that some new evidence had been found, and that the pattern on his sneakers matched the bruises on the deceased.

Prior to administering the polygraph examination, Mayor Dix, who admitted that he hoped Gerald would "pass," stressed that Gerald did not have to submit to the exam, and in fact told Gerald that if he was in any way involved, he should not take the test. Gerald said he was not involved and could pass the test. Dix gave Gerald a rights form, which he read and signed. The test lasted about ninety minutes. When it was completed, Dix informed the detectives, who were awaiting the results, that in his opinion Gerald was not being truthful in denying involvement in the burglary-murder. Detective Frank and Mayor Dix informed Gerald of the results of the polygraph, and Dix told Gerald that if he did not commit the murder, he had

better say who did. Gerald responded by saying he wanted to "straighten the whole thing out," and asked to speak with Chief of Police Ralph Peterson, who, it happened, was also was in the building for the town council meeting.

Peterson and Gerald had been friends since Gerald was nine or ten years old. They had known each other primarily through a youth athletic organization started by Peterson and known as "Pete's Boys" (now Pleasantville Police Athletic League) to help keep Pleasantville youngsters out of trouble. Chief Peterson's family also saw the Gerald family socially.

Detective Frank told Chief Peterson that Gerald wanted to speak with him and that Gerald was involved in the Matusz matter. Chief Peterson and Gerald went into an office alone, where Gerald said that he had driven by Chief Peterson's house a couple of times since the crime and had tried to tell him what happened, but had lost his nerve. Chief Peterson recalled having seen Gerald drive by his home a couple of afternoons previously, when both men waved. Chief Peterson asked Gerald whether he was involved, and Gerald said, "I was there." Realizing that the suspect was about to confess, the Chief stopped Gerald and asked Mayor Dix to come into the office as a witness. Once Dix arrived, Chief Peterson advised Gerald of his *Miranda* rights, whereupon Gerald gave a statement.

Gerald said that he, Eddie Walker, and John Bland had entered the Matusz house, intending to steal a television set that they previously had seen from outside the house. Gerald "had" the woman, and admitted striking her a couple of times. Walker had the younger man (Paul), while Bland aroused the old man (John) from bed. The younger man was giving Walker a lot of trouble, so Gerald and Bland went to assist Walker. They beat the younger man with their hands, then left him alone. Gerald went back to the woman, and Bland returned to the old man. Bland beat the old man with a lamp and a cane, or both. Gerald said that Walker "just went off" on the younger man, hitting him with a trophy, punching him, and

throwing a television set on his face. Gerald also stated that on his way out of the house, he stepped on the younger man. Chief Peterson asked, "What do you mean, you stepped on him? Did you stomp the man?" After hesitating, Gerald replied that he did step on him, did put his foot in the man's face, but did not stomp on him. He then began telling the Chief where the television sets were, but Peterson, by now very upset, did not want to hear any more. He told Gerald, "I'm going to bring the other fellows [detectives] in. You cooperate with them and tell them all your involvement."

The conversation between the Chief and Gerald then continued on a personal level. Gerald, who was remorseful—crying and sobbing during the confession—said he did not know what had gotten into him. During the discussion the Chief noticed that Gerald's eyes looked "funny," and he appeared to be high and tired. Gerald said that he was tired, that he had not slept since the crime, that he had been high ever since, and that he had taken drugs earlier that day, August Sixteenth.

Chief Peterson turned Gerald over to Detective Frank and Investigator Bolis, assuring them that Gerald would direct them to the location of the television sets. The Chief also informed Frank, who was waiting outside, that Gerald needed to use the bathroom. Gerald told Frank, who accompanied him to the bathroom: "I can see by the sneaker prints that you have me. When we get back in there, I'll tell you what happened." Investigator Bolis indicated that they wanted a taped statement. Gerald said he would answer all their questions but would not give a taped statement until he had retained an attorney. He said that once he had retained an attorney, he would tell the attorney of his desire to cooperate and give a statement. Bolis and Frank offered to cease the questioning, but Gerald said no, that he would feel better talking about it. The testimony at trial and the suppression hearings is in conflict on whether Gerald was then advised of his *Miranda* rights a fourth time. He did, at that point, give a similar but more detailed oral account of the burglary. Gerald again

admitted to assisting in beating Paul Matusz and accidentally stepping on him a couple of times while running around the house.

Based on Gerald's confession, Pleasantville police and investigators from the Prosecutor's Office arrested John Bland, whose statement recounted the same events, with but minor variations. Bland also reported that one day after the murder, Gerald told Walker and Bland that he thought he had killed Paul Matusz because he had "stomped him real bad." Eddie Walker, who had turned sixteen a few days before the murder, fled to Canada and Florida. He surrendered to the Pleasantville Police on October 18, 1982. Walker's pretrial statement did not implicate defendant.

## II

On December 16, 1982, an Atlantic County Grand Jury returned an indictment charging Gerald with conspiracy to commit second-degree burglary, contrary to the provisions of *N.J.S. A.* 2C:5-2 and *N.J.S.A.* 2C:18-2 (count one); second-degree burglary, contrary to the provisions of *N.J.S.A.* 2C:18-2 (count two); conspiracy to rob John Matusz, Paul Matusz, and Lottie Wilson, contrary to the provisions of *N.J.S.A.* 2C:5-2 and *N.J.S. A.* 2C:15-1 (count three); three counts of second-degree robbery of the same victims, contrary to the provisions of *N.J.S.A.* 2C:15-1(a)(1) (counts four, five, and six); three counts of second-degree aggravated assault on the same victims, contrary to the provisions of *N.J.S.A.* 2C:12-1(b)(1) (counts seven, eight, and nine); felony murder of Paul Matusz, contrary to the provisions of *N.J.S.A.* 2C:11-3(a)(3) (count eleven); and knowing or purposeful murder of Paul Matusz, contrary to the provisions of *N.J.S.A.* 2C:11-3(a)(1) or *N.J.S.A.* 2C:11-3(a)(2) (count thirteen). The indictment also charged John Bland with the same crimes. Jurisdiction over Edward Walker, who was a juvenile, was waived from juvenile court to Superior Court, and he too was charged with those same crimes.

The State gave timely written notice that it would seek to prove three aggravating factors under *N.J.S.A.* 2C:11-3(c): first, defendant purposefully or knowingly created a grave risk of death to another person in addition to the victim during the commission of the murder ((4)(b)); second, the murder was outrageously or wantonly vile, horrible, or inhuman ((4)(c)); and third, the offense was committed during the commission of, or attempt to commit, or flight after attempt to commit or commission of robbery, sexual assault, arson, burglary, or kidnapping (felony-murder) ((4)(g)), thus making this a capital case.

Several pretrial motions were made in late 1983. First, the court denied a motion by Gerald and Bland to close the pretrial hearings from press coverage and the public in order to prevent prospective jurors from being tainted by exposure to inadmissible evidence through the press.

Gerald also filed motions challenging the legality of his arrest and seeking to suppress both his oral statements and evidence seized while he was in custody. Bland joined in the suppression motions. Those hearings were conducted over a two-month period. The State called thirteen witnesses, primarily police officers, whose recitations of the events corresponded with the version described above. Gerald and Bland testified as well.

Gerald said that when he was arrested on August 16, 1982, there was no discussion of bail for the traffic tickets. He claimed that during the interrogation, Investigator Bolis constantly threatened him and called him foul names. He also claimed that he was under the influence of alcohol and drugs during the questioning, and that he had asked the officers if he could rest, or come back when he was "normal," but they refused. Gerald contended that he had been taking drugs (cocaine and heroin) and drinking all day (three to four pints of Southern Comfort and three to four six-, eight-, or twelve-packs of beer). He also related that he had a beer in his hand when he was arrested at his front door. On cross-examination,

Gerald admitted that he had been taking that quantity of drugs and alcohol for about a month, but claimed that he was not accustomed to it and that he had stumbled a lot. He conceded that he was in control of his faculties to a certain extent, that he was capable of answering questions to a certain extent, that he knew he could ask for an attorney (he later said that he did make such a request), and that he never asked that questioning cease.

Concerning the waiver of his rights, Gerald said that Detective Frank threw the *Miranda* card at him, told him to sign it, and indicated that if he told him the truth, he could go home. Gerald said that he did not read the card. Moreover, he claimed to have asked for an attorney more than once, but that Detective Frank told him that if Gerald told him what he wanted to know, he would not need a lawyer. Gerald did not recall being informed of his rights by Mayor Dix or Chief Peterson.

In arguing against Gerald's and Bland's various motions, the State asserted that Gerald's arrest and detention were valid under *State v. Bruzzese*, 94 *N.J.* 210 (1983), *cert.* den., 465 *U.S.* 1030, 104 *S.Ct.* 1295, 79 *L.Ed.*2d 695 (1984), and that defendant's sneakers had been properly seized as incident to his arrest. The State further contended that Gerald was mentally alert, was informed of his rights and was cognizant of them, and voluntarily waived those rights. The defense responded that the arrest was illegal because of the absence of probable cause, wherefore the fruits of the arrest should be suppressed. Further, Gerald contended that ill treatment by the police, coupled with defendant's intoxication, rendered the confession invalid as involuntary.

The trial court ruled against both Gerald and Bland on all motions. The court found that Gerald's arrest fell well within the *Bruzzese* ruling and further determined that defendant had been informed of his rights and voluntarily waived them. Although the court acknowledged that it might appear that there had been some overreaching by the police when Chief Peterson

told Gerald that it would be best to cooperate and to tell the detectives everything that Gerald had told the Chief, the court ruled that the totality of circumstances demonstrated that Gerald's free will had not been overborne, especially because immediately after giving a statement, Gerald refused to make one that would be taped. The court further determined that defendant's erroneous belief that his oral statement was somehow less damaging than a taped or written statement was irrelevant. In addition, the court found that the defendant never asked for an attorney. Finally, the court concluded that the evidence showed that Gerald *wanted* to talk, and that the seizure of the sneakers after police observance of the tread design was authorized as incident to the arrest.

Gerald also moved to strike the death penalty law as unconstitutional on both federal and state grounds; to secure an evidentiary hearing on the issue of disproportionality of sentencing; to have the grand jury consider only the evidence of murder and not of the lesser crimes; to require that the grand jury determine whether the aggravating factors existed; to have an evidentiary hearing for the purpose of determining whether a death-qualified jury is unrepresentative or not impartial (conviction-prone); to obtain separate juries in the guilt and sentencing phases; and to foreclose the prosecution on the grounds that it was selective and in violation of the equal-protection guarantee. The trial court denied all motions.

On March 1, 1984, the trial court accepted a plea arrangement between the State and John Bland. Although the details of the agreement are somewhat unclear, the State promised to recommend a sentence of life imprisonment in return for Bland's guilty plea on the felony murder charge and in consideration of Bland's agreement to testify against Gerald at the latter's trial. On April 2, 1984, Edward Walker entered pleas of guilty to burglary and robbery of the three victims. The State dismissed the balance of the indictment and recommended a thirty-five-year term of imprisonment with a sixteen-year period of parole ineligibility. Walker too agreed to testify

against Gerald. Neither co-defendant had been sentenced at the time of Gerald's trial.

The State offered defendant a recommended term of life imprisonment in return for a guilty plea to felony-murder, which Gerald rejected. During the two-week guilt phase trial, the State called twenty-four witnesses, including both Bland and Walker. Walker testified that Gerald and he beat Paul Matusz, that Gerald knocked Paul unconscious, and that Gerald continued thereafter to strike the victim. According to Walker, when he tried to remove the new color television set in the living room, the old console set on which it sat fell over onto Paul's face. When Walker asked Gerald whether he should pick up the console television, Gerald replied, "leave it there." On cross-examination Walker, whose pretrial statement did not implicate Gerald, admitted that he had lied in that statement because he did not want to "snitch" on Gerald, and because he wanted to exculpate himself. Bland testified that before entering the house, Gerald told Walker, "you don't have to worry about anything physical. I will take care of that." Both Bland and Walker testified that all three had consumed large quantities of alcohol and drugs on the day of the murder.

Both the Medical Examiner and a State Police forensic chemist testified that the patterned bruises on Paul Matusz's face— the concentric circles—were consistent with the tread design on the soles of Gerald's sneakers. The forensic chemist further testified that the patterned bruises were inconsistent with the tread design on other sneakers admitted into evidence, belonging to the co-defendants. In addition, the Medical Examiner stated that the bruises could not have been caused by someone simply stepping once on Paul's face; rather, Dr. Jason distinguished four separate footprints, each inflicted with a significant amount of force behind it.

Defendant neither testified nor presented any witnesses, relying solely on cross-examination of the State's witnesses. The trial court denied defendant's motion for dismissal or judgment

of acquittal on the third count—conspiracy to rob—and for a judgment of acquittal of purposeful or knowing murder.

The jury found defendant guilty of conspiracy to commit burglary (count one); burglary (count two); conspiracy to commit robbery (count three); three counts of robbery (counts four, five, and six); two counts of aggravated assault on Paul Matusz and Lottie Wilson (counts eight and nine); felony murder (count eleven); and purposeful or knowing murder (count thirteen). It acquitted Gerald on the seventh count, charging an aggravated assault on John Matusz.

At the sentencing phase, in light of the acquittal on the seventh count, the State withdrew aggravating factor (4)(b) (creating a grave risk of death to a person other than the victim), and sought to prove aggravating factors (4)(c) (outrageously and wantonly vile murder), and (4)(g) (murder during a felony, to wit, robbery). The defense sought to establish the following mitigating circumstances: (5)(a) (extreme mental or emotional disturbance); (5)(c) (age); (5)(d) (impairment of capacity to appreciate wrongfulness of conduct or conform conduct to requirements of law); (5)(f) (no significant history of prior criminal activity); and (5)(h) (any other factor that is relevant to the defendant's character or record or to the circumstances of the offense).

The State called two witnesses. Dr. Jason, the Medical Examiner, provided testimony directed at establishing aggravating factor (4)(c), and Investigator Bolis testified to the robbery and confession to establish the felony-murder factor. The court denied a defense motion to strike factor (4)(c).

The defense called six witnesses. One psychiatrist diagnosed Gerald as severely depressed and drug-dependent. A second psychiatrist furnished a diagnosis of severe personality disorder and drug addiction. He also offered the view that Gerald's obsessive preoccupation with the need for drugs either rendered him unable to control his behavior or impaired his control. An anthropology and sociology professor testified about the

"failure syndrome" and correspondent depression and alcohol and drug dependence in poor urban subcultures.

Defendant testified, expressing his sorrow for what had happened to the Matusz family and to his own family. On cross-examination, he admitted that he punched Paul Matusz a few times but denied ever stomping him. He also denied making certain statements to the police. Two of Gerald's sisters testified, describing their family life, the effect that their father's death had had on Gerald, and defendant's use of alcohol and drugs. The court charged the jury that if it found, beyond a reasonable doubt, that any mitigating factor did not outweigh any aggravating factor or factors, the defendant would be sentenced to death. The court also charged the jury that in reaching its verdict it was not to consider any bias, prejudice, or sympathy.

The jury returned a verdict finding both aggravating factors beyond a reasonable doubt. It also determined that Gerald was suffering from extreme mental or emotional disturbance; that his capacity to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of the law was impaired; and that he had no significant history of prior criminal activity. The jury did not find that defendant's age was a mitigating factor. Although the verdict form indicates that the jury did find mitigating factor (5)(h) (any other factor relevant to the defendant's character or record or the circumstances of the offense), it is not clear what factor, if any, was considered. The jury further found that the mitigating factors neither outweighed the aggravating factors nor were they of equal weight. The court sentenced Gerald to death.

### III

Several issues raised by defendant have been resolved by our decisions in *State v. Biegenwald,* 106 *N.J.* 13 (1987), and *State v. Ramseur,* 106 *N.J.* 123 (1987). With some important qualifications, we concluded in *Ramseur* that neither capital punish-

ment *per se* nor New Jersey's death-penalty statute, *N.J.S.A.*
2C:11–3(c) (the Act), violates the prohibition against cruel and
unusual punishment contained in the U.S. Constitution, amendments VIII and XIV, and in Article I, paragraph 12 of the New
Jersey Constitution of 1947. See *Ramseur, supra*, 106 *N.J.* at
166–97.

■ The trial court, in compliance with the statutory provisions then in force, instructed the jury in the penalty phase to
determine whether the totality of mitigating factors outweighed or equalled the totality of the aggravating factors
beyond a reasonable doubt. The charge requires reversal.
Under the charge given, a finding that the aggravating and
mitigating factors were in equipoise would have resulted in a
death sentence, a result proscribed by *Biegenwald, supra*, 106
*N.J.* at 62. Nor is *Biegenwald*'s requirement that the aggravating factors outweigh the mitigating factors beyond a reasonable doubt satisfied by a finding, as here, that the aggravating
factors were neither equal to nor outweighed by the mitigating
factors. As we stated in *Biegenwald:*

> [W]e believe that the phrasing of the question is more disadvantageous to the
> defendant than is suggested by the logical analysis wherein the only difference
> results where the factors are "in equipoise." It is not a very substantial
> change in a juror's mind that is required to transform "you must find, beyond a
> reasonable doubt, that the aggravating factors are not outweighed by the
> mitigating factors" to "you must find, beyond a reasonable doubt, that the
> mitigating factors outweigh the aggravating factors."
>
> [*Id.* at 61.]

Thus, as the State concedes, the absence of a specific finding
that the aggravating factors outweigh the mitigating factors
beyond a reasonable doubt requires vacation of the death
sentence and a resentencing hearing to determine whether the
death penalty should be imposed.

■ Defendant further contends that the Act unconstitutionally promotes irrational sentencing because felony-murder can
be considered either as an aggravating factor to capital murder,
*N.J.S.A.* 2C:11–3(c)(4)(g), or a homicide of a lesser degree,
*N.J.S.A.* 2C:11–3(a)(3), punishable by a term of thirty years to

life imprisonment. We rejected that argument in *Ramseur*, concluding that Section (c)(4)(g) is "unquestionably constitutional." 106 *N.J.* at 189–90 n. 21 (citing *Calhoun v. State*, 297 *Md.* 563, 625–26, 468 *A.*2d 45, 75 (1983), *cert.* den., 466 *U.S.* 993, 104 *S.Ct.* 2374, 80 *L.Ed.*2d 846 (1984)). We reaffirmed that conclusion in *State v. Bey*, 112 *N.J.* 123, 172–173 (1988) (*Bey* II), and do so again today.

In a like manner, we observed in *Ramseur* that aggravating factor (4)(c)—the "murder was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim"—was "troublesome because of its obvious vagueness." 106 *N.J.* at 198. However, in line with the Supreme Court's pronouncements in *Furman v. Georgia*, 408 *U.S.* 238, 92 *S.Ct.* 2726, 33 *L.Ed.*2d 346 (1972), and *Gregg v. Georgia*, 428 *U.S.* 153, 96 *S.Ct.* 2909, 49 *L.Ed.*2d 859 (1976), we adopted a narrow construction of that language in order to guide the jury's discretion in applying that factor. Accordingly, we concluded that the first part of the provision—the "murder was outrageously or wantonly vile, horrible or inhuman"—was "[n]either an independent requirement [n]or a qualitative modification of what follows." *Ramseur, supra*, 106 *N.J.* at 200. In respect of the second part of the provision—the murder "involved torture, depravity of mind, or an aggravated battery to the victim"—we determined that in adopting this language, the Legislature was concerned with the defendant's state of mind: "society's concern, the community's concern, the Legislature's concern, is to punish most harshly those who *intend* to inflict pain, harm and suffering—in addition to intending death." *Id.* at 207–08. We summarized our interpretation of the statutory language as follows:

> Torture or aggravated battery to the victim shall be found if the defendant intended to cause, and did in fact cause, severe physical or psychological pain or suffering to the victim prior to the victim's death, "severity" measured either by the intensity of the pain, or the duration of the pain, or a combination of both. Where the murder was not the product of greed, envy, revenge, or another of those emotions ordinarily associated with murder, and served no purpose for the defendant beyond his pleasure of killing, the court shall instruct

the jury on the meaning of depravity in this specific context. For the defendant who killed for the enjoyment of it, because the victim just happened to be in the area, or for no reason at all, just to kill, society must be able to reserve its most extreme sanction.

[*Id.* at 211 (footnotes omitted).]

Without the benefit of our opinion in *Ramseur*, the trial court in this case first construed the introductory portion of Section (c)(4)(c) as a requirement independent of the second portion. Second, the court improperly defined torture and aggravated battery to focus on the state of mind and physical experiences of the victim. Third, the court erroneously defined depravity of mind as "a complete indifference to human dignity and a total and senseless disregard for human life." The State concedes that the charge was improper under the standard stated above. However, the defendant and the State disagree on whether the evidence produced was sufficient to sustain a jury finding that this factor existed even under the *Ramseur* definitions. Defendant contends that the evidence did not demonstrate a purposeful infliction of pain in addition to death, and that therefore there was no torture or aggravated battery. Further, defendant argues that "depravity of mind," as defined in *Ramseur*, cannot be proven because the murder was not motiveless but rather was the product of "greed, or anger at the victim's resistance." The State counters that the extensiveness of the beating after the victim was unconscious evidenced the fact that defendant beat the victim "for no reason other than the joy of it or because the victim was there." The "depravity" definition provided in *Ramseur* was designed to isolate those for whom the murder "served no purpose for the defendant beyond his pleasure of killing." 106 *N.J.* at 211. Given *Ramseur*'s intention to include within the reach of the term "depravity" only those murders that are entirely without motive, we hold that where, as here, greed, anger, revenge, or other similar motive is present, the depravity aspect of Section (c)(4)(c) should not be submitted to the jury. In respect of the statutory requirement of torture or aggravated battery, we cannot agree with defendant that this record is insufficient to

sustain a finding that the defendant intended to and did cause "severe physical or psychological pain or suffering to the victim prior to the victim's death." *Ibid.*

Defendant next acknowledges that under *Ramseur,* the jury need not make a specific finding that "death is an appropriate punishment." 106 *N.J.* at 316 n. 80. However, defendant further argues that the jury's sense of responsibility for its verdict in this case was so diluted that it prejudiced defendant's right to a fair trial. On remand and, if appropriate, on sentencing after those proceedings, the trial court should instruct the jury in accordance with this Court's opinion in *Bey* II, *supra,* 112 *N.J.* at 161–164.

As defendant concedes, we have rejected on both federal and state constitutional grounds the argument that the process of "death qualifying" a jury denies the defendant a fair and impartial panel. See *Ramseur, supra,* 106 *N.J.* at 248–54 (citing *Lockhart v. McCree,* 476 *U.S.* 162, 106 *S.Ct.* 1758, 90 *L.Ed.*2d 137 (1986)).

■ Finally, defendant argues that fundamental fairness requires that the defendant be allowed to make the initial opening statement and the final summation during the penalty phase of a capital trial. We rejected that argument in *Ramseur, supra,* 106 *N.J.* at 318 n. 81 and reaffirmed that conclusion in *Bey* II, *supra,* 112 *N.J.* at 183–184 as we do again today.

■ An additional argument raised by defendant was addressed recently by this Court in *Bey* II. Defendant contends that the trial court improperly instructed the jury on "how [it] should collectively weigh the aggravating and mitigating factors." The court first charged the jury that it "must *unanimously* agree that the State has proven beyond a reasonable doubt the existence of an aggravating factor." (Emphasis added). Concerning the existence of mitigating factors, however, the court instructed the jury that

[t]he defendant has the burden of coming forward with evidence of mitigating factors. The defendant is not required to prove mitigating factors beyond a

reasonable doubt. However, the defendant is obligated to place before you credible evidence of the factors which he alleges to exist. It is up to you to accept or reject these factors depending upon your evaluation of the defendant's evidence. *Unlike the situation with aggravating factors, your verdict does not have to be unanimous. If any one of you finds a mitigating factor exists, check "Yes" in the appropriate space on the verdict sheet. If none of you so find, check "No" next to the mitigating factor on your verdict sheet.*

 \* \* \* \* \* \* \* \*

If you have found beyond a reasonable doubt that an aggravating factor or factors exist, and you also find that no mitigating factors exist, then make the appropriate markings on your verdict sheet and proceed no further. That will be your verdict in the case and your duties will be at an end. Simply return the verdict sheet to the Court with your foreperson's signature. Keep in mind, however, that merely because one or more of you finds that a mitigating factor exists, this does not require all of you to find that the mitigating factor exists. If, for example, four of you find that a mitigating factor exists and eight do not so find, then the four may consider the mitigating factor in their deliberations. However, the eight who found that the mitigating factor does not exist should not consider that mitigating factor in their deliberations.

 [Emphasis added.]

The charge complies with the requirements stated in *Bey* II, wherein we concluded, *inter alia*, that the jury must be unanimous in finding the existence of an aggravating factor or factors. 112 *N.J.* at 159. A "lack of unanimity suggests that the factor has not been established beyond a reasonable doubt as required by *N.J.S.A.* 2C:11-3(c)(2)(a)." *Id.* at 139, 548 *A.*2d 887. In contrast, "the defendant bears only 'the burden of *producing evidence* of any mitigating factor,'" and does not bear the burden of *proving* the existence of that factor. *Id.* at 160 (emphasis added) (quoting *N.J.S.A.* 2C:11-3(c)(2)(a)). We concluded that the legislative intent was that the jurors need not unanimously find the existence of a mitigating factor, but that

[a]s long as one juror perceives any mitigating factor relating to the defendant or to the crime that is not outweighed beyond a reasonable doubt by the aggravating factors, the jury must not sentence the defendant to death. Each juror, therefore, should individually determine the existence of mitigating factors and then individually decide whether the aggravating outweigh the mitigating factors beyond a reasonable doubt. Only after such independent weighing by each juror may the unanimous agreement of all jurors lead to the imposition of the death penalty.

[*Id.* at 162 (citation omitted).]

We conclude that the charge given in this case was in keeping with *Bey* II's requirements and therefore proper.

## IV

We turn now to a question that has been neither raised nor argued by the parties, but one that nevertheless demands consideration because of its importance to a just resolution of this appeal. As the South Carolina Supreme Court has declared, "where the death penalty is involved, it is the duty of this Court to examine the record for any errors affecting the substantial rights of the accused, even though not made a ground of appeal." *State v. Taylor,* 213 *S.C.* 330, 331, 49 *S.E.*2d 289 (1948); *see also Biegenwald, supra,* 106 *N.J.* at 62 ("In no proceeding is it more imperative to be assured that the outcome is fair than in [capital] cases"); *cf. Ramseur, supra,* 106 *N.J.* at 260 (in capital case, Court considered *sua sponte* whether there was plain error in *voir dire* of juror); *Biegenwald, supra,* 106 *N.J.* at 53 ("while defendant did not raise the issue either at trial or on appeal, we find that the trial court's instructions in the sentencing proceeding constituted plain error of a nature to warrant our consideration *sua sponte.*"); *State v. Mount,* 30 *N.J.* 195, 213 (1959) ("where a life is at stake, this court does not hesitate in the interests of justice to invoke the plain error rule and to reverse where the trial errors were impregnated with the likelihood of having harmed the substantial rights of the defendant." (citation omitted)). We hold, on state constitutional grounds, that a defendant who is convicted of purposely or knowingly causing "serious bodily injury resulting in death" under *N.J.S.A.* 2C:11–3(a)(1) and (2), or either of them—as opposed to one who is convicted of purposely or knowingly causing death under those same provisions—may not be subjected to the death penalty. Because the jury in this case did not specify which of the foregoing offenses defendant was convicted of, and because it is possible, on this record, that the jury could have determined that the defendant had the purpose or knowledge to cause only

serious bodily injury but not death, we conclude that the judgment of conviction on the thirteenth count must be reversed and the cause remanded for retrial.

We have considered, and rejected, a result that would modify so much of the judgment on the thirteenth count as declares defendant guilty of *capital* murder, permitting the conviction of murder to stand and remanding the cause for further proceedings to determine defendant's death-eligibility, to be followed, if eligibility be found, by a new sentencing proceeding. We have rejected that outcome because it would in effect be asking a second jury to accept—indeed, to be bound by—the findings of the first jury but then guess at precisely what the first jury meant. Such a piecemeal approach to guilt-innocence is unacceptable as a general proposition in *any* criminal prosecution. We repeat our commitment to the principle, albeit expressed in a different context, that

"[t]he requirement that 12 persons reach a unanimous verdict is not met unless those 12 reach their consensus through deliberations which are the common experience of all of them. It is not enough that 12 jurors reach a unanimous verdict if 1 juror has not had the benefit of the deliberations of the other 11. Deliberations provide the jury with the opportunity to review the evidence in light of the perception and memory of each member. Equally important in shaping a member's viewpoint are the personal reactions and interactions as any individual juror attempts to persuade others to accept his or her viewpoint. The result is a balance easily upset if a new juror enters the decision-making process after the 11 others have commenced deliberations. The elements of number and unanimity combine to form an essential element of unity in the verdict. By this we mean that a defendant may not be convicted except by 12 jurors who have heard all the evidence and argument and who together have deliberated to unanimity."

[*State v. Trent,* 79 *N.J.* 251, 256 (1979) (quoting *People v. Collins,* 17 *Cal.*3d 687, 693, 552 *P.*2d 742, 746, 131 *Cal.Rptr.* 782, 786 (1976)).]

*See also State v. Ingenito,* 87 *N.J.* 204, 212 (1981) ("[The] duties inherent in the jury function include determining the facts in the case, considering all of the relevant admissible evidence bearing upon the charges, evaluating the credibility of witnesses, assessing the weight and worth of evidence, and deciding the ultimate guilt or innocence of a defendant in light of the

underlying evidence."), *quoted in State v. Ragland*, 105 *N.J.* 189, 203 (1986).

## A

In pertinent part, *N.J.S.A.* 2C:11–3 provides as follows:

a. * * * [C]riminal homicide constitutes murder when:

(1) The actor purposely causes death or serious bodily injury resulting in death; or

(2) The actor knowingly causes death or serious bodily injury resulting in death * * *.

 \* \* \* \* \* \* \* \*

c. Any person convicted under subsection a.(1) or (2) who committed the homicidal act by his own conduct or who as an accomplice procured the commission of the offense by payment or promise of payment, of anything of pecuniary value shall be sentenced [in accordance with the Act's capital punishment provisions] * * *.

The death-penalty statute clearly exposes to the death penalty one who purposely or knowingly causes serious bodily injury resulting in death. Justice Handler, dissenting in *Ramseur*, found this aspect of the Act indicative of the "extraordinary breadth" of the class of murderers potentially subject to capital punishment. 106 *N.J.* at 387; *see also Bey* II, *supra*, 112 *N.J.* at 131 (Handler, J., dissenting) (Act "does not even require that a capital defendant have intended to kill"). In support of his conclusion in *Ramseur*, Justice Handler looked to the criminal law as it existed prior to the adoption of the New Jersey Code of Criminal Justice (the Code) in 1978. Under the earlier statute, murder was of either the first or second degree, and only those convicted of first-degree murder were subject to capital punishment. *Id.* 106 *N.J.* at 387–88. Justice Handler summarized first degree murders under the former statute, *N.J.S.A.* 2A:113–2, as follows: "murders accomplished by poison or lying in wait, murders during the course of certain named felonies and the murder of a law enforcement officer," and those other murders in which the State proved premeditation, deliberation, and willful execution of the plan. *Id.* at 388 (citing *State v. Anderson*, 35 *N.J.* 472, 496–97 (1961)). All other murders were presumptively of the second degree, and

were therefore non-capital crimes. *Ibid.* The *Ramseur* dissent noted that although the current Act "includes, as capital murder, death that results solely from the intentional infliction of serious bodily harm[,] [i]t was clear under the former law that the intent only to do serious bodily harm was insufficient for a first degree murder conviction." *Id.* 106 *N.J.* at 388-89 (citing *State v. Thomas,* 76 *N.J.* 344 (1978); *State v. Madden,* 61 *N.J.* 377 (1972); *State v. Anderson, supra,* 35 *N.J.* at 497; *State v. Wynn,* 21 *N.J.* 264 (1956)).

The *Ramseur* majority responded to the dissent's "overbreadth" argument not only by agreeing that an intent to inflict serious bodily harm was not sufficient to sustain a first degree murder conviction under the former statute, but also by acknowledging that "it may similarly be insufficient to support a capital sentence today because of the constitutionally required culpability standards regarding a capital defendant's intent to kill." 106 *N.J.* at 194. Support for that statement was found in the Supreme Court's decision in *Enmund v. Florida,* 458 *U.S.* 782, 102 *S.Ct.* 3368, 73 *L.Ed.*2d 1140 (1982).

In *Enmund,* the defendant was the driver of a getaway car. His two colleagues killed the two intended robbery victims. Defendant was sentenced to death on his conviction for murder, based on felony-murder and accomplice-liability theories. See *id.* at 786, 102 *S.Ct.* at 3371, 73 *L.Ed.*2d at 1144–45. The Supreme Court held that death is a disproportionate penalty "for one who neither took life, attempted to take life, nor intended to take life." *Id.* at 787, 801, 102 *S.Ct.* at 3371, 3378, 73 *L.Ed.*2d at 1145, 1154. Applying federal proportionality principles found in *Lockett v. Ohio,* 438 *U.S.* 586, 605, 98 *S.Ct.* 2954, 2965, 57 *L.Ed.*2d 973, 990 (1978), and *Woodson v. North Carolina,* 428 *U.S.* 280, 304, 96 *S.Ct.* 2978, 2991, 49 *L.Ed.*2d 944, 961 (1976), the *Enmund* Court focused its inquiry on Enmund's personal culpability. *Enmund, supra,* 458 *U.S.* at 798, 102 *S.Ct.* at 3377, 73 *L.Ed.*2d at 1152. The Court concluded that

Enmund did not kill or intend to kill and thus his culpability is plainly different from that of the robbers who killed; yet the State treated them alike and attributed to Enmund the culpability of those who killed the [victims]. This was impermissible under the Eighth Amendment.

[*Ibid.*]

Our statement in *Ramseur,* quoted *supra* at 72, was rooted in the *Enmund* Court's federal proportionality analysis. However, shortly after our decision in *Ramseur,* the Supreme Court decided *Tison v. Arizona,* 481 *U.S.* 137, 107 *S.Ct.* 1676, 95 *L.Ed.*2d 127 (1987), substantially restricting the scope of *Enmund.*

In *Tison,* defendants were brothers who had helped to arrange the escape from prison of their father and his cellmate, both convicted murderers. When their getaway car broke down in the desert, the group decided to flag down a passing motorist to steal another car. One of the brothers stood in front of their disabled car, while the others armed themselves and lay in wait. When a family stopped to render assistance, the group emerged and forced the family down a dirt road off the highway. The father of the family begged for their lives; the defendants' father reportedly said he was "thinking about it." *Id.* at 140, 107 *S.Ct.* at 1679, 95 *L.Ed.*2d at 133. The defendants' father then told his sons to return to the car for some water for the family. While the defendants fulfilled that mission, their father and his cellmate shotgunned the family to death. In due course defendants were captured and were tried, convicted, and sentenced to death under Arizona's felony-murder and accomplice liability statutes. See *id.* at 140, 107 *S.Ct.* at 1679, 95 *L.Ed.*2d at 134.

Defendants' principal argument before the Supreme Court was that their death sentences were disproportionate under the eighth amendment as construed in *Enmund v. Florida, supra,* 458 *U.S.* 782, 102 *S.Ct.* 3368, 73 *L.Ed.*2d 1140. Justice O'Connor, who had dissented in *Enmund,* wrote for the majority, reading the *Enmund* decision narrowly. *Enmund,* she wrote, dealt with only

two distinct subsets of all felony murders * * *. At one pole was * * * the minor actor in an armed robbery, not on the scene, who neither intended to kill nor was found to have had any culpable mental state. * * * The Court held that capital punishment was disproportional in these cases. *Enmund* also clearly dealt with the other polar case: the felony murderer who actually killed, attempted to kill, or intended to kill.

[*Tison, supra,* 481 *U.S.* at 149–150, 107 *S.Ct.* at 1684, 95 *L.Ed.*2d at 139.]

According to the *Tison* majority, *Enmund* left open "the intermediate case of the defendant whose participation is major and whose mental state is one of reckless indifference to the value of human life." *Id.* at 152, 107 *S.Ct.* at 1685, 95 *L.Ed.*2d at 141. The majority argued that the "substantial and recent legislative authorization of the death penalty for the crime of felony murder regardless of the absence of a finding of an intent to kill * * * suggests that our society does not reject the death penalty as grossly excessive under these circumstances." *Id.* at 154, 107 *S.Ct.* at 1686, 95 *L.Ed.*2d at 142. Addressing, finally, defendants' contention that they did not, in *Enmund*'s terms, "kill, attempt to kill, or intend to kill," the Court stated:

A narrow focus on the question of whether * * * a given defendant "intended to kill," however, is a highly unsatisfactory means of definitively distinguishing the most culpable and dangerous of murderers. Many who intend to, and do, kill are not criminally liable at all—those who act in self-defense or with other justification or excuse. * * * On the other hand, some nonintentional murderers may be among the most dangerous and inhumane of all—the person who tortures another not caring whether the victim lives or dies, or the robber who shoots someone in the course of the robbery, utterly indifferent to the fact that the desire to rob may have the unintended consequence of killing the victim as well as taking the victim's property. This reckless indifference to the value of human life may be every bit as shocking to the moral sense as an "intent to kill." * * * [W]e hold that the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state, a mental state that may be taken into account in making a capital sentencing judgment when that conduct causes its natural, though also not inevitable, lethal result.

[*Id.* at 157–158, 107 *S.Ct.* at 1687–88, 95 *L.Ed.*2d at 144.]

Because the Tisons' participation in the crime was "substantial" —each was "actively involved in every element of the kidnapping-robbery and was physically present during the entire sequence of criminal activity culminating in the murder," *id.* at 157, 107 *S.Ct.* at 1688, 95 *L.Ed.*2d at 144—and because actual

armed escape and kidnapping involved a "reckless indifference to human life," the Court held that the Tisons' conduct did not fall within the proscription of *Enmund*. *Id.* at 157, 107 *S.Ct.* at 1688, 95 *L.Ed.*2d at 145. The *Tison* Court thus rejected the "intent to kill" requirement on which the majority of this Court in *Ramseur* had relied to limit the breadth of the death-eligible class under *N.J.S.A.* 2C:11-3.

It is now clear, as a matter of federal proportionality principles, that capital punishment may be imposed on one who commits a homicide without the purpose or knowledge that death will result, at least to the extent that the defendant's conduct can be characterized as "recklessly indifferent to human life." Defendant's conduct in this case appears (or so a jury could find) to fall within the *Tison* category of nonintentional murders that manifest a reckless indifference to human life: "the person who tortures [or beats] another not caring whether the victim lives or dies, or the robber * * * utterly indifferent to the fact that the desire to rob may have the unintended consequence of killing * * *." *Id.* at 157, 107 *S.Ct.* at 1688, 95 *L.Ed.*2d at 144. Indeed, defendant also qualifies as death-eligible under the *Tison* Court's analysis of *Enmund*'s "other polar case"—"*the felony murderer who actually killed,* attempted to kill, or intended to kill," *id.* at 150, 107 *S.Ct.* at 1684, 95 *L.Ed.*2d at 139 (emphasis added)—in which capital punishment is deemed clearly appropriate.

The federal constitutional analysis, of course, does not end the inquiry. *E.g., State v. Hunt,* 91 *N.J.* 338, 344 (1982). Indeed, given this Court's reliance on *Enmund*'s intent-to-kill requirement to limit the class of death-eligible murderers, the *Tison* Court's retreat from that requirement raises anew, as a matter of state constitutional law, the issue of the adequacy of the definition of capital murder in *N.J.S.A.* 2C:11-3.

### B

As we acknowledged in *Ramseur*, it is appropriate to analyze the death penalty statute not only under the federal

constitution but under state-constitutional standards as well. 106 *N.J.* at 167. The Supreme Court also has observed that in capital cases, as in other constitutional contexts, the states "are free to provide greater protections in their criminal justice system than the Federal Constitution requires." *California v. Ramos,* 463 *U.S.* 992, 1013–14, 103 *S.Ct.* 3446, 3460, 77 *L.Ed.*2d 1171, 1188–89 (1983). Resort to a state-constitutional analysis is especially appropriate in light of the fact that "capital punishment is a matter of particular state interest or local concern and does not require a uniform national policy * * *." *Ramseur, supra,* 106 *N.J.* at 167 (citing *State v. Hunt, supra,* 91 *N.J.* at 366 (Handler, J., concurring)). As we have done in other areas of constitutional law, we conclude that Article 1, paragraph 12 of our state constitution—"cruel and unusual punishments shall not be inflicted"—affords greater protections to capital defendants than does the eighth amendment of the federal constitution. *Cf., e.g., State v. Novembrino,* 105 *N.J.* 95, 145 (1987) (Article 1, paragraph 7 of our state constitution "affords our citizens greater protection against unreasonable searches and seizures than does the fourth amendment"), and the authorities cited therein.

The question to be addressed here is whether a sentence of death is disproportionate for a defendant who had no intent to kill his or her victim, but rather intended only to inflict serious bodily injury, even though the injury did in fact result in death. For purposes of this analysis, we use the terms "intend" or "intent" to refer collectively to both mental states provided for in the murder statute, *i.e.,* purpose, *N.J.S.A.* 2C:11–3a(1), and knowledge, *N.J.S.A.* 2C:11–3(a)(2), as those terms are defined in *N.J.S.A.* 2C:2–2(b)(1) and (2), respectively.

We sometimes look to aspects of the Supreme Court's constitutional analysis, where persuasive, for guidance in establishing principles under our state constitution. *E.g., Ramseur, supra,* 106 *N.J.* at 168. We observe at the outset that the death penalty statute must "limit imposition of the penalty to what is assumed to be the small group for which it is appropriate

* * *." *Id.* at 183 (citing *Furman v. Georgia, supra,* 408 *U.S.* at 310, 92 *S.Ct.* at 2763, 33 *L.Ed.*2d at 390 (White, J., concurring)). We also record our agreement with the *Tison* Court's statement that "[d]eeply ingrained in our legal tradition is the idea that the more purposeful the conduct, the more serious is the offense, and, therefore, the more severely it ought to be punished." 481 *U.S.* at 156, 107 *S.Ct.* at 1687, 95 *L.Ed.*2d at 143. As we stated in *Ramseur, supra,* 106 *N.J.* at 207–08 "[o]ur system of criminal laws is predicated usually on the imposition of punishment based on the defendant's intent. Indeed, our Code's ranking of crimes by degree places those crimes committed with intentional conduct as the highest degree of crime, for which the defendant is most severely punished."

We observe initially that the death-penalty statute is relatively narrow in its scope. First, by its very terms, *N.J.S.A.* 2C:11–3(c) is limited in its application to those persons who are convicted of murder under *N.J.S.A.* 2C:11–3(a)(1) or (2), thereby rendering non-death-eligible those defendants who are convicted of felony murder under *N.J.S.A.* 2C:11–3(a)(3). Second, not all murderers convicted under *N.J.S.A.* 2C:11–3(a)(1) or (2) are subjected to capital punishment, inasmuch as the legislature has further restricted the scope of the statute by subjecting only two classes of murderer to the death penalty: (1) one "who committed the homicidal act by his own conduct," see *infra* at 92–101, and (2) one "who as an accomplice procured the commission of the offense by payment or promise of payment, of anything of pecuniary value * * *." *N.J.S.A.* 2C:11–3(c). Under these provisions, then, New Jersey does not impose the death penalty on those who are convicted solely of felony-murder pursuant to *N.J.S.A.* 2C:11–3(a)(3). With the exception of those who hire another to commit the murder, the statute's provision for capital punishment does not reach those who are convicted, on a theory of vicarious liability under *N.J.S.A.* 2C:2–6, of purposeful or knowing murder pursuant to *N.J.S.A.* 2C:11–3(a)(1) and (2). Under this limited statutory scheme, the

Tison brothers—who were convicted on felony-murder and accomplice-liability theories, see 481 *U.S.* at 141, 107 *S.Ct.* at 1679, 95 *L.Ed.*2d at 134—could not have been subjected to capital punishment had they been tried and convicted under New Jersey law.

In addition, the legislature clearly has rejected the *Tison* Court's conclusion that one who causes death while acting with a "reckless indifference to human life" can be subjected to the death penalty. See *id.* at 152, 107 *S.Ct.* at 1685, 95 *L.Ed.*2d at 141. In *N.J.S.A.* 2C:11–4(a) the legislature has defined aggravated manslaughter, a non-capital crime, as "recklessly caus[ing] death under circumstances manifesting extreme indifference to human life." Therefore, the least opprobrious mental state that would sustain imposition of the death penalty under the eighth amendment is insufficient to support even a conviction for non-capital murder under our Code. It is thus apparent that New Jersey has adopted a death-penalty statute that is narrower in its scope than is required by the eighth amendment. Our task here is to define one of the limits of that scope under the state constitution.

As we stated in *Ramseur*,

[t]he test to determine whether a punishment is cruel and unusual under Article I, paragraph 12, of our Constitution is generally the same as that applied under the federal Constitution. Three inquiries are required. First, does the punishment for the crime conform with contemporary standards of decency? Second, is the punishment grossly disproportionate to the offense? Third, does the punishment go beyond what is necessary to accomplish any legitimate penological objective? *Gregg v. Georgia, supra,* 428 *U.S.* at 173, 96 *S.Ct.* at 2925, 49 *L.Ed.*2d at 874–75; *State v. Des Marets,* 92 *N.J.* 62, 82 (1983); *State v. Hampton,* 61 *N.J.* 250, 273–74 (1972).

[106 *N.J.* at 169.]

If the punishment fails any one of the three tests, it is invalid. *See Coker v. Georgia,* 433 *U.S.* 584, 592, 97 *S.Ct.* 2861, 2866, 53 *L.Ed.*2d 982, 989 (1977) (plurality opinion).

For purposes of our discussion, we will assume that the first and third criteria have been satisfied. In *Ramseur,* we held that capital punishment *per se* conforms with contemporary

standards of decency. See 106 *N.J.* at 169–74. Although it is not so readily apparent that the imposition of the death penalty on one who did not intend the death of his or her victim conforms with those same standards, we need not consider that question further. We also concluded in *Ramseur* that capital punishment accomplishes the legitimate penological objectives of retribution and deterrence. *Id.* at 175–81. *But see Lockett v. Ohio, supra,* 438 *U.S.* at 625, 98 *S.Ct.* at 2984, 57 *L.Ed.*2d at 1003 (White, J., concurring in part and dissenting in part) ("The value of capital punishment as a deterrent to those lacking a purpose to kill is extremely attenuated. Whatever questions may be raised concerning the efficacy of the death penalty as a deterrent to intentional murders—and that debate rages on—its function in deterring individuals from becoming involved in ventures in which death may unintentionally result is even more doubtful.").

Our inquiry focuses on the second test, namely, whether the death penalty is grossly disproportionate to the offense. In *Ramseur,* we concluded that capital punishment is not a disproportionate penalty to the crime of purposeful or knowing murder. 106 *N.J.* at 174–75. That statement was made in the context of a factual situation drastically different from that presented in this case. Prior to the actual murder, Ramseur had on more than one occasion threatened to kill his victim and her grandchildren, as well as having assaulted her. On the day of the murder, Ramseur walked up to his victim on the street and began to stab her. After stabbing her several times, Ramseur started to walk away, only to return to inflict additional wounds. "He told his victim as she lay there, * * * 'If I see your kids again I'm going to kill them too.' " *Id.* at 162. The victim had a number of "major stab wounds in the face and chest, including two chest wounds about eight and one-half inches deep that pierced the lung." *Ibid.* She also suffered a number of wounds on her arms, inflicted as she tried to defend herself from her assailant. On such a record, there can be no question that Ramseur intended the death of his victim. Sim-

ilarly, in *Biegenwald, supra,* 106 *N.J.* 13, it is apparent that the defendant intended to kill his victim, shooting her in the head after luring her to his house. *Id.* at 20. We adhere to our belief that under such circumstances punishment by death is not disproportionate to the crime. We are satisfied that a different conclusion must be reached, however, when the defendant does not intend the death of his or her victim.

Were we to agree with our concurring colleague Justice O'Hern's conclusion, reached on a statutory-construction basis, that a murder conviction under *N.J.S.A.* 2C:11–3(a)(1) or (2) requires that the defendant have either the "purpose (conscious object or design) or knowledge (practical certainty) that death will result [,]" *post* at 144, there would be no need for us to pursue a constitutional analysis. See, *e.g., Ocean Pines Ltd. v. Borough of Point Pleasant,* 112 *N.J.* 1, 10–11 (1988); *In re Baby M,* 109 *N.J.* 396, 450–51 (1988). Our discussion must therefore begin with the question of how broad is the definition of purposeful and knowing murder under *N.J.S.A.* 2C:11–3(a)(1) and (2).

Under *N.J.S.A.* 2C:1–14(h), the "element[s] of an offense" include a combination of (1) conduct, (2) attendant circumstances, and/or (3) the result of such conduct. Under the Code, a person cannot be guilty of an offense "unless he acted purposely, knowingly, recklessly or negligently as the law may require, with respect to each material element of the offense." *N.J.S.A.* 2C:2–2(a). The Code further provides that "[w]hen the law defining an offense prescribes the kind of culpability sufficient for the commission of an offense without distinguishing among the material elements thereof, such provision shall apply to all material elements of the offense, unless a contrary purpose plainly appears." *N.J.S.A.* 2C:2–2(c)(1).

In *N.J.S.A.* 2C:2–2(b), the Code defines the four possible grades of culpability that the actor might have in respect of each element of the offense, distinguishing among the three

possible elements. Our concern here is with only two degrees of culpability, namely, purpose and knowledge:

(1) *Purposely.* A person acts purposely with respect to the nature of his conduct or a result thereof if it is his conscious object to engage in conduct of that nature or to cause such a result. A person acts purposely with respect to attendant circumstances if he is aware of the existence of such circumstances or he believes or hopes that they exist. "With purpose," "designed," "with design" or equivalent terms have the same meaning.

(2) *Knowingly.* A person acts knowingly with respect to the nature of his conduct or the attendant circumstances if he is aware that his conduct is of that nature, or that such circumstances exist, or he is aware of a high probability of their existence. A person acts knowingly with respect to a result of his conduct if he is aware that it is practically certain that his conduct will cause such a result. "Knowing," "with knowledge" or equivalent terms have the same meaning.

Turning to the definition of "murder" contained in *N.J.S.A.* 2C:11–3(a), we see that only two elements are included: conduct and the result of that conduct. Limiting our inquiry to the latter element, under *N.J.S.A.* 2C:11–3(a)(1) a defendant may be convicted of purposeful murder when he or she possessed either (a) the "conscious object * * * to cause" death, or (b) the "conscious object * * * to cause" serious bodily injury resulting in death. See *N.J.S.A.* 2C:2–2(b)(1). Similarly, a defendant may be convicted of knowing murder under *N.J.S.A.* 2C:11–3(a)(2) when he or she is either (a) "aware that it is practically certain that his conduct will cause" death, or (b) "aware that it is practically certain that his conduct will cause" serious bodily injury resulting in death. See *N.J.S.A.* 2C:2–2(b)(2). The legislature has defined "serious bodily injury" as "bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ * * *." *N.J.S.A.* 2C:11–1(b).

It is apparent that the statutory provisions for purposeful and knowing murders contemplate two distinct intended results as possible elements of the crime: the actor may intend to cause either (a) death, or (b) "serious bodily injury resulting in death." The *actual* result in both instances is the same: the

defendant's conduct has caused the victim's death. We look, then, for the distinguishing feature between the two *possible* results, striving, as we must, to give effect to the language of the statute as a whole. *See, e.g., Peper v. Princeton Univ. Bd. of Trustees,* 77 *N.J.* 55, 68 (1978) ("A construction of a legislative enactment that would render any part thereof superfluous is disfavored."); *Monmouth Lumber Co. v. Township of Ocean,* 9 *N.J.* 64, 77 (1952) ("It is settled that statutes should be accorded that construction which will give effect to every word expressed by the Legislature therein."). We believe that the answer lies in the actor's state of mind at the time that the crime was committed and in the harm that he or she intended to inflict. The legislative intent is clear: an actor may be convicted of murder both (1) when he or she acted with the purpose or knowledge that the victim's death would follow, and (2) when he or she acted with the purpose or knowledge to inflict only serious bodily injury, but the injury resulted in the victim's death. Stated otherwise, it is not a defense to a charge of purposeful or knowing murder that the actor intended only to inflict serious bodily injury on the victim. In accordance with the Code's general principles of causation, the actual result— death—need not be within the design or contemplation of the actor. It is sufficient that the actor have the purpose or knowledge to cause serious bodily injury.

Our conclusion in this regard is supported by the history of *N.J.S.A.* 2C:11–3(a). As it was originally enacted, that statute did not contain the "serious bodily injury resulting in death" language at issue here. Instead, the original enactment limited the relevant definition of murder to those criminal homicides that are committed purposely or knowingly. See *L.*1978, *c.* 95, § 2C:11–3(a)(1) and (2). Prior to the Code's effective date, this section was amended by *L.*1979, *c.* 178, § 21 to include the current "serious bodily injury" provision. Because the original enactment included within its proscription all murders in which the defendant acts with the purpose or knowledge that death result, the 1979 amendment must be read to reach a class of

defendants in addition to those included within the original enactment. *See, e.g., Evans v. Ross,* 57 *N.J.Super.* 223, 229 (App.Div.1959) (courts should not construe a statute in such a manner as "would render * * * amendments futile and abortive."), certif. den., 31 *N.J.* 292 (1959); *see also* 104 *N.J.L.J.* 457 (1979) (an article by a former Senator and a Senate Judiciary Committee aide explaining that by the 1979 amendment, *"the concept of murder under the Code is expanded* to include, in addition to those persons who 'knowingly' or 'purposely' cause the death of another, those who 'knowingly' or 'purposely' cause serious bodily injury which results in death." (emphasis added)); *Senate Judiciary Committee Statement to S. 3203* (1979) (same). Clearly the crimes of purposeful and knowing murder include not only those actors who intend their victim's deaths, but also those actors who intend to inflict only serious bodily injury, and death unintentionally results. Thus, to be convicted of murder under those provisions, the actor need have no mental state in respect of the actual result—death—but need act only with the purpose or knowledge that serious bodily injury result.

We are not persuaded by the contrary arguments so well articulated in Justice O'Hern's concurrence. For example, Justice O'Hern observes that the conclusion that the crimes of purposeful and knowing murder include those instances in which the defendant intended to inflict only serious bodily injury—without intending to cause death—conflicts with the general definition of homicide contained in *N.J.S.A.* 2C:11–2. *Post* at 136–137. We acknowledge that such a conflict exists but are nevertheless satisfied that resolution of that discord favors the conclusion that there *is* such a category of murder, for two reasons. First, it is a well-established rule that where two statutes appear to be in conflict, and one is general in nature and the other specific, the conflict is resolved in favor of the more specific statute "as a more precise manifestation of legislative intent." *In re: Salaries for Probation Officers of Hudson County,* 158 *N.J.Super.* 363, 366 (App.Div.1978); *ac-*

*cord Kingsley v. Wes Outdoor Advertising Co.*, 55 *N.J.* 336, 339 (1970); *State ex rel. State Highway Comm'r v. Dilley*, 48 *N.J.* 383, 387 (1967); *State v. Hotel Bar Foods, Inc.*, 18 *N.J.* 115, 128 (1955). Hence the general definition of murder at *N.J.S.A.* 2C:11–2 should yield to the more specific definition of purposeful and knowing murder at *N.J.S.A.* 2C:11–3(a)(1) and (2). Second, it should be noted that *N.J.S.A.* 2C:11–2 was originally adopted as part of the Code's enactment. See *L.* 1978, *c.* 95, § 2C:11–2. The 1979 amendments deleted only the word "negligently" from that section, see *L.*1979, *c.* 178, § 20, leaving the language at issue here unchanged. The "serious bodily injury" language of *N.J.S.A.* 2C:11–3(a) was added by the 1979 amendment, *see L.*1979, *c.* 178, § 21, and was, as Justice O'Hern puts it, enacted in an attempt to fill a "gap" in the Code. Thus, as amended, *N.J.S.A.* 2C:11–3(a) is not only more specific but more recent, and therefore should control over *N.J.S.A.* 2C:11–2. *See, e.g., Maressa v. New Jersey Monthly*, 89 *N.J.* 176, 195 (1982); *State v. One 1976 Pontiac Firebird*, 168 *N.J.Super.* 168, 176 (App.Div.1979).

In addition, Justice O'Hern looks to notions of "some common understanding about culpability," *post* at 138, and of "our common culture," *post* at 140, in support of his conclusion that the crime of aggravated manslaughter "is *more* culpable than this putative non-capital murder * * *." *Post* at 138. Such "common understanding" in respect of relative degrees of culpability cannot provide an adequate basis for Justice O'Hern's result. The legislature has decided on a gradation of offenses, and absent a conclusion that such a gradation violated the state or federal constitutions (a conclusion expressly disavowed by Justice O'Hern, see *post* at 139–140), the wisdom of the policy chosen by the legislature is not for us to decide. *See, e.g., Aetna Ins. Co. v. Gilchrist Bros*, 85 *N.J.* 550, 566 (1981) ("it is not for us to rewrite the statute to comport without judgment of what we may consider to be a wiser course."); *White v. Township of N. Bergen*, 77 *N.J.* 538, 554–55 (1978) ("It goes without saying that the wisdom, good sense, policy and

prudence (or otherwise) of a statute are matters within the province of the Legislature and not of the Court. * * * We take this occasion again to foreswear any illusion that this Court, or any court, 'sits as a superlegislature to determine the wisdom, need or propriety of statutory law.' "); *Two Guys from Harrison, Inc. v. Furman,* 32 *N.J.* 199, 229 (1960) ("a judge would usurp authority if his personal view of policy intruded upon his deliberations.").

As the statute is written, all defendants convicted of purposeful or knowing murder under *N.J.S.A.* 2C:11–3(a)(1) and (2) are exposed to the death penalty under *N.J.S.A.* 2C:11–3(c), provided that they either committed the homicidal act by their own conduct or hired another to commit that act. All such defendants, including those who did not intend the death of their victim, face the death penalty as a potential punishment. The failure to distinguish, for purpose of punishment, those who intend the death of their victim from those who do not does violence to the basic principle stated above that "the more purposeful the conduct, the more serious is the offense, and, therefore, the more severely it ought to be punished." *Supra* at 77 (quoting *Tison, supra,* 481 *U.S.* at 156, 107 *S.Ct.* at 1687, 95 *L.Ed.*2d at 143). The failure to make that distinction also creates gross disproportionality in light of the penalties imposed on conviction for crimes such as aggravated assault, *N.J.S.A.* 2C:12–1(b)(1), aggravated manslaughter, *N.J.S.A.* 2C:11–4(a), and felony-murder, *N.J.S.A.* 2C:11–3(a)(3). As such, the infliction of capital punishment on one who does not intend his or her victim's death is a violation of our state constitutional prohibition against cruel and unusual punishment. *N.J. Const. of 1947* art. I, para. 12.

In *N.J.S.A.* 2C:12–1(b)(1), the Code defines aggravated assault to include the purposeful or knowing infliction of "serious bodily injury" as that term is defined in *N.J.S.A.* 2C:11–1(b). The only difference between that crime and a serious-bodily-injury murder such as that at issue here is the fact that in the latter case the victim has died, while in the former the victim

has survived. In all other material respects, *e.g.*, the nature of the actor's conduct and his or her mental state in respect of the result of that conduct, the crimes are identical. Stated differently, the purposeful or knowing infliction of "serious bodily injury resulting in death," *N.J.S.A.* 2C:11–3(a), is an aggravated assault from which death results. Because the *actual* result represents the essential difference between the two crimes, it is appropriate to punish the actor who has caused death more severely than the actor who has inflicted only serious bodily injury. We disagree in this regard with Justice O'Hern's concurring opinion wherein he concludes that such a result would "ascrib[e] an almost outrageous intent" to the legislature. *Post* at 138. On the contrary, that result is not only entirely logical, it is also well-founded in the law. As the drafters of the Model Penal Code (MPC) explained in their commentary to MPC § 211.1(2), which is substantially identical to our aggravated-assault statute, *N.J.S.A.* 2C:12–1(b)(1),

> existing law uniformly punished assaultive behavior more seriously where death of another actually occurs. This result obtains even though survival of the victim may have been due to circumstance or to medical technology rather than any restraint by the actor. Thus, two persons who create identical risks and who do so with the same culpable mental state will be subject to different penalties if one victim lives and the other dies. * * * [T]he Model Code follows existing law in escalating the penalty for assaultive behavior where death of another results.
>
> [American Law Institute, Part II, *Model Penal Code and Commentaries*, § 211.1, comment 4 at 189 (1985).]

The legislature has made an aggravated assault, such as we have in this case, a second-degree crime, *see N.J.S.A.* 2C:12–1(b), and a defendant convicted of that crime faces a term of imprisonment ranging from five to ten years, with a presumptive term of seven years. See, respectively, *N.J.S.A.* 2C:43–6(a)(2) and *N.J.S.A.* 2C:44–1(f)(1)(c). Where an actor commits an offense that is identical in all material respects except for the victim's unintended death, it is grossly disproportionate to subject that actor to the death penalty. Because the actor's conduct, mental state, and intended result in both instances are virtually identical, the victim's fortuitous survival in one case

and unfortunate demise in the other cannot provide an adequate basis for subjecting one actor to a term of imprisonment and executing the other.

A comparison with the crime of aggravated manslaughter is also instructive. Under *N.J.S.A.* 2C:11-4(a), "[c]riminal homicide constitutes aggravated manslaughter when the actor recklessly causes death under circumstances manifesting extreme indifference to human life." As pointed out *supra* at 78 aggravated manslaughter is not a capital offense but rather a crime of the first degree, *N.J.S.A.* 2C:11-4(c). On conviction a defendant faces a term of imprisonment ranging from ten to thirty years, *ibid.* (as amended by *L.*1986, *c.* 172, § 1), with a presumptive term of twenty years. *N.J.S.A.* 2C:44-1(f)(1)(a) (as amended by *L.*1986, *c.* 172, § 4). Without attempting to state definitively all of the differences between the crimes of aggravated manslaughter and the purposeful or knowing infliction of serious bodily injury resulting in death, we note that the most significant difference lies in the nature of the actor's conduct, which is either, respectively, reckless, purposeful, or knowing. It is beyond dispute that that distinction is important in terms of the severity of the sanction to be imposed. *See State v. Ramseur, supra,* 106 *N.J.* at 208, 524 *A.*2d 188 ("our Code's ranking of crimes by degree places those crimes committed with intentional conduct as the highest degree of crime, for which the defendant is most severely punished."). Regardless of the nature of the conduct, however, in none of the crimes at issue has the actor *intentionally* caused the victim's death. In all three instances, death is the unfortunate but *unintended* result. Absent an intent to kill, the distinction between an actor's reckless, knowing, or purposeful conduct is not significant enough to warrant imposition of the death penalty where the conduct is purposeful or knowing, compared to a term of imprisonment where it is reckless. Furthermore, inasmuch as the intentional infliction of serious bodily injury can occur without a high risk of death, even with the actor justifiably believing that death will *not* occur, that actor's state of mind

might, under some circumstances, be less culpable than that of the actor whose mind exhibits "an extreme indifference to human life."

In *N.J.S.A.* 2C:11-3(a)(3), the Code defines the crime of felony murder as follows:

> It is committed when the actor, acting either alone or with one or more other persons, is engaged in the commission of, or an attempt to commit, or flight after committing or attempting to commit robbery, sexual assault, arson, burglary, kidnapping or criminal escape, and in the course of such crime or of immediate flight therefrom, any person causes the death of a person other than one of the participants * * *.

Limiting our discussion to a felony murder in which the defendant has caused another's death by his own actions, *see, e.g., State v. Smith*, 210 *N.J.Super.* 43 (App.Div.), certif. den., 105 *N.J.* 582 (1986), it is significant that a conviction for that crime does not require an intent to kill, but only an intent to commit the underlying crime. *E.g., State v. Madden*, 61 *N.J.* 377, 384 (1972); *State v. Stenson*, 174 *N.J.Super.* 402, 407 (Law Div.1980), aff'd, 188 *N.J.Super.* 361, 457 *A.*2d 841 (App.Div. 1982), certif. den., 93 *N.J.* 268 (1983). "[A] wholly unintended killing is murder if it results from the commission of the underlying felony. * * * A felony murder * * * is by definition not a result which is purposely planned." *State v. Darby*, 200 *N.J.Super.* 327, 331 (App.Div.1984), certif. den., 101 *N.J.* 226 (1985); (citing *Darby*). In that respect felony-murder is strikingly similar to the crime at issue here, the purposeful or knowing infliction of serious bodily injury resulting in death. Such similarities notwithstanding, a felony-murderer is not exposed to the death penalty, but faces instead a term of imprisonment ranging from thirty years without parole to a life sentence with a thirty-year parole disqualifier. *N.J.S.A.* 2C:11-3(b).

Like a defendant convicted of aggravated manslaughter or felony-murder, a defendant convicted of purposely or knowingly inflicting serious bodily injury resulting in death has unintentionally taken the life of another. Reprehensible as that conduct surely is, we can discern no rational justification for the

conclusion that on conviction for the former crimes a defendant should face a term of imprisonment, while on conviction for the latter he or she should face execution. Our society's ultimate sanction—the death penalty—is properly imposed on those who act with the most culpable state of mind, namely, the purpose or knowledge that their victims will die. For those who act with a less culpable state of mind, *i.e.*, an intent to inflict only serious bodily injury with no intention that death be the result, a lesser sanction is mandated by our state constitution. For the latter class of murderers, as well as for all other murderers who are not subjected to the death penalty—be they felony murderers, or those purposeful or knowing murderers not charged with *capital* murder because of a perceived absence of statutory aggravating factors, or because the murder was not committed by their own conduct, or those capital-murder defendants for whom a penalty-phase jury or judge has concluded that execution is not warranted—the Code should reserve its most severe sanction short of death: a custodial term ranging from thirty years without parole to life imprisonment with a thirty-year parole disqualifier. *N.J.S.A.* 2C:11-3(b).

We therefore conclude that imposition of the death penalty on one who is convicted under *N.J.S.A.* 2C:11-3(a)(1) and (2), or either of them, of the purposeful or knowing infliction of serious bodily injury resulting in death is not permissible under Article I, paragraph 12 of our state constitution.

The foregoing result comports with the Legislature's intent in restoring the death penalty. At the time the Code was enacted in 1978, capital punishment was not included in its sentencing provisions. It was only by the passage of *L.* 1982, *c.* 111, that the death penalty was provided for. In essence, the Act was grafted onto a murder statute that did not contemplate capital punishment at the time it was drafted.

According to Senator John Russo, the legislation's chief sponsor and Chairman of the Senate Judiciary Committee, the statute was intended to be "not as broad" as capital legislation

in other states, in that "[i]t does not cover as many people as some of the other [states'] legislation does." *Capital Punishment Act: Hearings on S. 112 Before the Senate Judiciary Committee* (1982) at 1 (hereinafter *Committee Hearing*). Senator Russo gave some indication of the intended scope of the enactment. For example, he explained that the statute contemplates a two-tier procedure, under which a defendant faces death penalty proceedings only after having been "found guilty unanimously and beyond a reasonable doubt of *first degree murder, willful, premeditated murder." Ibid.* (emphasis added). Further, "[t]he bill deals only with a conviction of first degree murder * * *." *Id.* at 2; *see also Senate Judiciary Committee Statement to S-112* (1982) ("only a person who actually commits an intentional murder * * * would stand in jeopardy of the death penalty.").

Although understandably mistaken in terminology, in that at the time of these hearings the adoption of the Code recently had done away with first- and second-degree murder, Senator Russo's comments, and the history they invoke, are both instructive. As noted *supra* at 71, under the prior law only those defendants convicted of first-degree murder could be subjected to the death penalty. Distinguishing features of first-degree murder included, *inter alia,* the fact that the crime was accomplished by poison or by lying in wait, or proof of premeditation, deliberation, and willful execution of the plan. *Ramseur, supra,* 106 *N.J.* at 388 (Handler, J., dissenting) (citing *State v. Anderson, supra,* 35 *N.J.* at 496–97). It is thus apparent that the actor's intention to cause the victim's death was a significant factor in determining whether a murderer could be executed. When the defendant possessed only the intent to do serious bodily harm, however, he or she could be convicted only of second-degree murder and was subject only to a term of imprisonment. We are persuaded that that same distinguishing feature—the defendant's state of mind—is important in analyzing the current statute.

## C

Having concluded that the Act is unconstitutional to the extent that it exposes to the death penalty some defendants who kill without intending to do so, we turn to the question of what result should follow from that conclusion. As we have stated, "[i]t is our duty to save a statute if it is reasonably susceptible to a constitutional interpretation." *Right to Choose v. Byrne*, 91 *N.J.* 287, 311 (1982). Our inquiry focuses on whether the legislature would prefer that the statute survive with an appropriate constitutional construction, or whether it would prefer that the statute "succumb to constitutional infirmities." *Ibid.; accord New Jersey State Chamber of Commerce v. New Jersey Election Law Enforcement Comm'n*, 82 *N.J.* 57, 75 (1980); *Schmoll v. Creecy*, 54 *N.J.* 194, 202 (1969). We have no doubt that the legislature would prefer that the Act be subjected to a narrowing construction that would free it from constitutional defect, a construction that comports with the legislature's stated intent in originally adopting the Act. See *supra* at 85–87. As such it is incumbent on us to "engage in 'judicial surgery' to excise [the] constitutional defect * * *." *Right to Choose, supra*, 91 *N.J.* at 311, 450 *A.*2d 925; *accord State v. Ramseur, supra*, 106 *N.J.* at 200 (collecting cases); *New Jersey Chamber of Commerce, supra*, 82 *N.J.* at 75 (collecting cases). Accordingly, we hold that when a defendant is convicted under *N.J.S.A.* 2C:11–3(a)(1) or (2) of purposely or knowingly causing serious bodily injury resulting in death, imposition of the death penalty is irrational and grossly disproportionate to the crime charged. Any person so convicted shall not be subjected to the penalty-phase proceedings of *N.J.S.A.* 2C:11–3(c), but rather shall be sentenced to a term of imprisonment in accordance with *N.J.S.A.* 2C:11–3(b).

## D

Applying the foregoing principles to the matter now before us, we are unable to discern from the record whether Gerald was convicted of purposely or knowingly causing death, or

purposely or knowingly causing serious bodily injury resulting in death. Count Thirteen of the indictment charges simply that Gerald "did purposely or knowingly cause the death of, or serious bodily injury resulting in the death of Paul Matusz * * *," and the jury, following a charge that did not ask it to draw the distinctions or apply the principles that are enunciated in this opinion, convicted Gerald on the thirteenth count without specifying for which of the four distinguishable offenses he was convicted. From our reading of the record we are satisfied the jury rationally could have convicted Gerald not only of purposely or knowingly causing death, but also—and equally rationally—of purposely or knowingly causing serious bodily injury resulting in death. If the latter, defendant would not be death-eligible. Without a determination of the basis for the jury's verdict, we cannot sustain the imposition of the death penalty, nor, for the reasons expressed earlier in this opinion, can we permit a second jury to pick up the thread at some point in the first jury's deliberations. Hence the guilt phase of the capital murder charge must be retried from the beginning.

## V

## A

*N.J.S.A.* 2C:11-3(c) provides, in pertinent part, that "[a]ny person convicted under [*N.J.S.A.* 2C:11-3(a)(1) or (2) ] *who committed the homicidal act by his own conduct* or who as an accomplice procured the commission of the offense by payment or promise of payment, of anything of pecuniary value shall be sentenced" in accordance with the Act's capital punishment provisions. (Emphasis added). Referring to the statutory language highlighted above, defendant argues that execution is proper only for an actor who "directly causes death by his own conduct, without reference to the acts of co-defendants." He contends that the single relevant concern is whether the defendant's conduct, standing alone, caused the victim's death. Accordingly, defendant posits that because the evidence revealed

that at least Walker, and possibly Bland, also struck the victim, the inability of the medical examiner to isolate the fatal blow dictates that defendant is outside the death-eligible class. Based on our reading of the legislative history, we reject that argument.

For purposes of determining an actor's guilt, both the Code and the statutory and common law that preceded it abolished the distinction between principal and accomplice. *See N.J.S.A.* 2C:2–6 ("Liability for conduct of another"); *State v. Cooper,* 10 *N.J.* 532, 568 (1952) ("The distinction between principal and accomplice or aider and abettor has been abolished in our jurisdiction"). The legislative history of the Act makes it clear, however, that in enacting *N.J.S.A.* 2C:11–3(c), the Legislature intended to distinguish, for purposes of punishment only, a murderer who actually killed—the "triggerman"—from one whose conviction rests on a theory of vicarious liability under *N.J.S.A.* 2C:2–6. An accomplice who neither takes part in the infliction of the fatal wounds nor hires another to commit the murder may properly be convicted of murder but may not be sentenced to death for his or her conduct. For this limited purpose the legislature has chosen to resurrect the distinction between a principal and an accomplice.

The phrase "committed the homicidal act by his own conduct" was not part of the bill's original language but was included in the statute by a Senate amendment adopted on March 29, 1982. As originally proposed, S–112 provided in pertinent part as follows: "Any person convicted under [*N.J.S.A.* 2C:11–3(a)(1) or (2)] as a perpetrator or an accomplice pursuant to [*N.J.S.A.*] 2C:1–6c.(1)(a) shall be sentenced to death or life imprisonment * * *." In his introductory remarks at the Senate Judiciary Committee's hearing on the bill, Senator Russo stated his understanding, as the bill's chief sponsor, that there were only two classes of murderers who were exposed to the death penalty:

[ (1) ] the actual perpetrator of the murder, the one who wields the gun or the knife * * * that results in the death * * * [and (2) ] the one who hires one to

commit murder, and the bill in that regard refers to a section of our law that deals specifically with that, [*N.J.S.A.*] 2C:2–6c.(1)(a). * * * That is one instance where one other than the actual perpetrator would be subjected to the death penalty, the contract for hire, one who hires another to commit murder.
[*Committee Hearing, supra,* at 2.]

Despite Senator Russo's stated intention to limit the application of the bill to those two relatively narrow groups, the bill's reference to *N.J.S.A.* 2C:2–6(c)(1)(a) would have subjected a much larger group to the death penalty. Under that section of the statute, one is considered an accomplice of the actual perpetrator, and therefore may be convicted of murder, if one "[s]olicits such other person to commit" the murder. Thus, as originally drafted, the bill included within its scope those defendants who had merely solicited another to commit murder, without payment or promise of payment, despite the stated intention to limit its applicability to the actual perpetrator and to those who hire another to commit murder.

During his appearance before the Committee, Edwin Stier, then the Director of the Division of Criminal Justice, perceived the actual breadth of the bill and suggested that the Committee adopt a proposed mitigating factor (g): "The defendant was an accomplice to a murder committed by another person and his participation in the murder was relatively insubstantial." *Committee Hearing, supra,* at 16. Senator Russo immediately expressed his belief that such a mitigating factor was unnecessary, in that an accomplice whose participation in the murder was "relatively insubstantial" was not death-eligible under the bill: "Wait a minute, now. He didn't pull the trigger. If he didn't pull the trigger, aren't you dealing with maybe a felony murder situation here which we don't have in this bill?" *Ibid.* Mr. Stier noted in response that the bill's reference to *N.J.S.A.* 2C:2–6(c)(1)(a) included within its scope certain defendants convicted on a theory of accomplice liability, a class of capital murderers to whom the proposed mitigating factor would apply. *Id.* at 16–17. Stating that such a result was not intended, Senator Russo indicated that the bill's language would have to

be amended in order to restrict death-eligibility to the two limited groups originally intended.

Further discussion at the hearing focused on the bill's inclusion of those defendants convicted under *N.J.S.A.* 2C:11–3(a)(1) or (2) "as a perpetrator." For example, several members of the Committee expressed their concern that if a team were hired to commit a murder, only one member of the team—the actual perpetrator—could be subjected to the death penalty. Other members of the team, *e.g.*, the driver and the stake-out, who received payment for their role in the murder and whose participation made the crime possible, would be subjected only to a term of imprisonment. *Id.* at 17–18. Noting the "unevenness * * * of the death penalty applying to one person and not applying to other persons who are equally involved" in such a situation, some Committee members argued that all team members are equally guilty, and that all therefore should receive equal punishment for their participation. *Ibid.* Senator Russo, whose position was subsequently deferred to by the Committee, indicated in response that only the actual triggerman should be subjected to the death penalty in such a murder. The triggerman's participation in the crime is distinct from that of the other participants, inasmuch as "[w]e may plan a murder, but until the trigger is pulled, the murder has not been consumated [sic]." *Id.* at 18. Because the triggerman "is the fellow that ended somebody's life," he alone should face a possible death sentence. *Ibid.*

It is apparent that the language ultimately included—"committed the homicidal act by his own conduct"—reflects the same concerns as did the original bill's language: "Any person convicted * * * as a perpetrator * * *." Indeed, the very language "by his own conduct" is identical to that contained in the vicarious liability statute, *N.J.S.A.* 2C:2–6(a). In that section, the legislature has provided that "[a] person is guilty of an offense if it is *committed by his own conduct* or by the conduct of another person for which he is legally accountable, or both." (Emphasis added). *See also Senate Judiciary Com-*

*mittee Statement to S.112* (1982) ("only a person who actually commits an intentional murder, the perpetrator, and a person convicted as an accomplice who hired the perpetrator, the procurer, would stand in jeopardy of the death penalty. Persons convicted under the felony-murder doctrine and persons convicted as accomplices other than as procurers would not be eligible for capital punishment.").

Thus, in adopting the "own conduct" requirement, the legislature reinstated for purposes of capital punishment the distinction between principal and accomplice. While the imputation of liability for the conduct of another suffices for a murder conviction, the defendant's "own conduct" in the commission of the murder is a prerequisite to imposition of the death penalty.

Our inquiry is not ended, however, for as indicated above, defendant contends that he may be subjected to the death penalty only if his conduct, standing alone, resulted in Paul Matusz's death. Defendant argues that where, as here, more than one person inflicted blows that were potentially fatal, imposition of the death penalty is not proper under the statute.

We agree with the State that defendant's contention runs counter to established principles of causation, and we therefore reject the argument. There is no requirement under either the statutory or common law that the actor's conduct be the *exclusive* cause of the result. To the contrary our courts consistently have rejected the argument that a defendant may be absolved from liability for murder simply because his or her actions were not the sole cause of death. *See, e.g., State v. Loray*, 41 *N.J.* 131, 140 (1963) (sufficient that injuries inflicted by defendant were participatory and contributory causes of victim's death); *State v. Lassiter*, 197 *N.J.Super.* 2 (App.Div. 1984) (affirming defendant's murder conviction where victim, after being severely beaten by defendant, jumped out of an eleventh-floor window to escape further beatings; defendant's

active contribution to the victim's death sustained conviction for murder).

We are not persuaded that the Legislature intended to change these long-standing principles of causation. The "own conduct" standard seeks to distinguish, for purposes of punishment, guilt premised on defendant's own actions from guilt based on the actions of another for whom the defendant is legally responsible. Accordingly, the focus on the actions of the defendant, as required by the "own conduct" language, does not necessitate a specific finding that the defendant's actions standing alone caused the victim's death. The relevant inquiry is whether or not the defendant *actively and directly participated* in the homicidal act, *i.e.*, in the infliction of the injuries from which the victim died. The critical elements are that defendant in fact acted, and the immediacy of his conduct to the victim's demise.

## B

The trial court gave the following instruction to the jury in respect of the requirement that the defendant's own conduct cause the victim's death:

When the offense requires that the defendant purposely or knowingly cause a particular result, the actual result must be within the design or contemplation as the case may be of the person acting, or, if not, the actual result must involve the same kind of injury or harm as that designed or contemplated and not be too remote, too accidental in its occurrence or too dependent on another person's volitional act to have a just bearing on the actor's liability or gravity of the offense. That is to say under the circumstances that I have just stated there can be more than one cause of a particular result. *The essential determination for you to make in regard to the charge of murder in this case is whether the defendant committed the killing purposely or knowingly.*
[Emphasis added.]

Defense counsel made no objection at the time the instruction was given. Ordinarily, then, our inquiry would have to focus on whether the charge constituted plain error under *Rule* 2:10-2. *See, e.g., State v. Hock*, 54 *N.J.* 526, 538 (1969) (defining plain error in jury charge as a "legal impropriety * * *

prejudicially affecting the rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result."), *cert.* den., 399 *U.S.* 930, 90 *S.Ct.* 2254, 26 *L.Ed.*2d 797 (1970). Although we need not resolve the question, we nonetheless discuss it in order to provide some guidance on remand.

The portion of the charge quoted above tracked verbatim the language of *N.J.S.A.* 2C:2–3(b). That section of the Code is concerned with principles of causation in those instances in which the defendant has acted purposely or knowingly but the actual result varies from the intended result. We pause only to express our concern that such a charge did little to increase the jury's understanding on this crucial and complex issue. *See State v. Bey* II, *supra,* 112 *N.J.* 123 at 171 ("Jurors are untrained in statutory interpretation, and instructions that merely repeat verbatim the language of the Act generally are inadequate.").

However, our principal concern is with the extent to which the charge discussed—or did not discuss—the distinction to be drawn between a principal and an accomplice. As noted, the Act has reinstated this distinction, but only for purposes of punishment. In the portion quoted, as well as in other portions of the charge, the trial court essentially defined the "by his own conduct" requirement to mean that the killing was committed by the defendant himself. After charging the jury in respect of the elements of the crimes alleged in the indictment, the court instructed the jury about the legal theories of vicarious liability set forth in *N.J.S.A.* 2C:2–6. The court specifically charged the jury that it could convict defendant on an accomplice theory on all but one count, namely, the thirteenth, alleging the purposeful or knowing murder of Paul Matusz. As the court stated, "that count requires just what it says, his own conduct," thereby precluding the jury from convicting defendant of purposeful or knowing murder on an accomplice theory. The charge was erroneous in that regard, in that one may, as an

accomplice, be guilty of purposeful or knowing murder but not be death-eligible inasmuch as the defendant neither committed the homicidal act by his or her own conduct nor hired another to commit that act.

Consistent with the statute's language, this Court has provided in *Rule* 3:7–3(b) that an indictment for murder must specify, *inter alia*, "whether the defendant is alleged to have committed the [homicidal] act by his own conduct \* \* \*." As Judge Newman has observed, that allegation "is not an element of the offense of murder. It is merely a triggering device for the death penalty phase of the trial." *State v. Moore*, 207 *N.J.Super.* 561, 576 (Law Div.1985). The elements of the crimes of purposeful and knowing murder, as set forth in *N.J.S.A.* 2C:11–3(a), do *not* require

> that the defendant must have committed the homicidal act by his own conduct before he can be convicted of murder. The factual determination that the defendant committed the murder by his own conduct only becomes important after the defendant is found guilty of murder.
>
> [*Ibid.*]

There is no question that a defendant may be convicted of purposeful or knowing murder on a theory of vicarious liability under *N.J.S.A.* 2C:2–6. *See, e.g., State v. Sanchez*, 224 *N.J.Super.* 231, 244 (App.Div.1988); *State v. Micheliche*, 220 *N.J.Super.* 532, 544 (App.Div.1987). However, in the event of such a conviction, the defendant may not be sentenced to death, because he neither committed the homicidal act by his own conduct nor hired another to do so. In *Moore*, for example, the victim died as a result of several beatings inflicted by three defendants. The jury convicted one defendant, Adams, of purposeful and knowing murder under *N.J.S.A.* 2C:11–3(a)(1) and (2), but was unable to reach a verdict on whether or not Adams had committed that murder by his own conduct. *Id.* at 567. The trial court properly concluded that under those circumstances, "[t]he fact that the jury was unable to reach a conclusion on whether or not Adams committed the murder by his own conduct is not fatal to the murder conviction. It

merely precludes the State from seeking the death penalty under *N.J.S.A.* 2C:11-3(c)." *Id.* at 577.

We agree with Judge Newman's analysis in *Moore*. The requirement that the homicidal act be committed by the defendant's own conduct is simply irrelevant to the question of whether defendant is guilty of purposeful or knowing murder. During guilt-phase proceedings, the jury first must determine whether defendant should be convicted of murder, considering, where appropriate, principles of vicarious liability under *N.J.S. A.* 2C:2-6. Only after it has unanimously found defendant guilty of purposeful and knowing murder should the jury turn to the question of whether defendant committed the homicidal act by his or her own conduct. With the sole exception of a murder for hire, see *N.J.S.A.* 2C:11-3(c), a defendant whose conviction is based on a theory of vicarious liability cannot be subjected to death-penalty proceedings. Only those murderers whose conviction rests on their status as principals—those who have committed the homicidal act by their own conduct—or on the fact that they have hired another to commit the crime may face the death penalty.

It is clear that a charge such as that given in this case has the capacity to visit substantial prejudice on a defendant. For example, even on this record, it is possible—however remotely—that the jury could have disbelieved the testimony of Eddie Walker and John Bland, believing instead the substance of the confession initially given by defendant to Chief Peterson and Mayor Dix. In that confession defendant admitted to hitting Paul Matusz and to stepping on him while running about the house. However, according to defendant, Walker "went off" on the victim, hitting him with a trophy, punching him, and throwing a television set on his face. Accepting as true that factual outline, it is conceivable that the jury could have concluded that Walker's conduct independently "caused" the victim's death, thereby rendering Gerald an accomplice who had not committed the homicidal act by his own conduct. Nevertheless, Gerald clearly could have been convicted of a purposeful

and knowing murder as an accomplice pursuant to *N.J.S.A.* 2C:2–6. In effect, the trial court's instructions took away from the jury the possibility of returning that verdict—a significant deprivation. Had he been convicted under an accomplice theory, defendant would not have been exposed to a penalty-phase proceeding but would have been sentenced instead to a term of imprisonment. On remand the jury will have to determine whether defendant caused Paul Matusz's death "by his own conduct." If so, he is death-eligible if, as we have explained above, death was the intended result. If not, he is not death-eligible.

## VI

Because the question may arise on the remand, we now address defendant's contention that in its penalty phase deliberations, the jury should have been allowed to consider the sentences received by his codefendants as a mitigating factor under *N.J.S.A.* 2C:11–3(c)(5)(h). We reject the argument.

We note at the outset that Gerald's co-defendants apparently were not sentenced until June 8; 1984, which was several weeks after the conclusion of this trial. At best, defendant's argument must be limited to the contention that the jury should have been allowed to consider sentences that had been *recommended* by the State, namely, life imprisonment with a thirty-year parole disqualifier for John Bland on his plea to a felony-murder charge, and a thirty-five-year term of imprisonment with a sixteen-year parole disqualifier for Eddie Walker on his plea to one count of burglary and three counts of second-degree robbery. The flaw in defendant's argument becomes apparent when one considers that the sentencing court is not bound by the recommended sentence. *E.g., State v. Howard,* 110 *N.J.* 113, 123 (1988), and authorities cited therein; *see also R.* 3:9–3(e) ("If at the time of sentencing the judge determines that the interests of justice would not be served by effectuating the agreement reached by the prosecutor and defense counsel, the

defendant shall be permitted to withdraw his plea."). In light of the tenuous nature of such recommended sentences, we cannot agree that the jury should be allowed to consider them in its penalty-phase deliberations.

Moreover, even had Walker and Bland actually been sentenced prior to Gerald's trial, defendant's argument would still be without merit. The section at issue, *N.J.S.A.* 2C:11–3(c)(5)(h), provides that in addition to the mitigating factors enumerated in sections (5)(a) through (5)(g), the sentencer may find "[a]ny other factor which is relevant to the defendant's character or record or to the circumstances of the offense." The Supreme Court has mandated

> that in capital cases the fundamental respect for humanity underlying the Eighth Amendment requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.
>
> This conclusion rests squarely on the predicate that the penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.
>
> [*Woodson v. North Carolina, supra*, 428 *U.S.* at 304–05, 96 *S.Ct.* at 2991, 49 *L.Ed.*2d at 961 (plurality opinion) (citation and footnote omitted).]

In accordance with that mandate, we previously have adopted an expansive scope of the factors that may be submitted and considered under section (5)(h). In *State v. Davis*, 96 *N.J.* 611 (1984), we stated that in a capital case, "the sentencing process should embrace an evidential inquiry 'broad in scope, largely unlimited either as to the kind of information that may be considered, or the source from which it may come.'" *Id.* at 620 (quoting *United States v. Tucker*, 404 *U.S.* 443, 446, 92 *S.Ct.* 589, 591, 30 *L.Ed.*2d 592, 596 (1972)). In *Davis*, we allowed the introduction under Section (5)(h) of expert testimony regarding the defendant's potential for rehabilitation, to be demonstrated through the use of statistical evidence of the rehabilitative potential of similarly situated defendants.

That section (5)(h) is broad in its scope does not mean, however, that that scope is unlimited. In *Lockett v. Ohio, supra,* 438 *U.S.* 586, 98 *S.Ct.* 2954, 57 *L.Ed.*2d 973, the Court stated that the eighth amendment requires that the sentencer in a capital case be allowed to consider as a mitigating factor evidence of "any aspect of a defendant's character or record and * * * any of the circumstances of the offense * * *." *Id.* at 604, 98 *S.Ct.* at 2965, 57 *L.Ed.*2d at 990. The proffered evidence, then, must be relevant to one or more of those three categories, *i.e.,* defendant's character or record, or the circumstances of the offense. *See id.* at 608, 98 *S.Ct.* at 2966, 57 *L.Ed.*2d at 992; *see also Franklin v. Lynaugh,* —— U.S. ——, ——, 108 *S.Ct.* 2320, 2327, 101 *L.Ed.*2d 155, 166 (1988) (plurality opinion) (rejecting defendant's argument that capital juries should be allowed to consider, in sentencing phase, "their 'residual doubts' over a defendant's guilt. Such lingering doubts are not over any aspect of [defendant's] 'character,' 'record,' or a 'circumstance of the offense.' ").

Consistent with this constitutional requirement, the legislature has limited the scope of section (5)(h) to any factor that is "relevant to the defendant's character or record or to the circumstances of the offense." In *Davis,* we determined that the proffered evidence of defendant's potential for rehabilitation was relevant to his "character," stating,

> "character," within the context of *N.J.S.A.* 2C:11–3c(5)(h), can and should embrace those individual qualities that distinguish a particular person. An individual's capacity to reform—his potential for rehabilitation—pertains to his character. Consequently, evidence that is reasonably related to this potential is relevant as a mitigating factor under the statute.
>
> [96 *N.J.* at 618.]

The evidence proffered by defendant in this case—the sentences received by his co-defendants—plainly is not relevant to either Gerald's character or his record. If it is to be admitted, it must be relevant to "the circumstances of the offense." We conclude that the evidence does not satisfy that requirement.

■ We are satisfied that the phrase "circumstances of the offense" is limited in its application to the circumstances surrounding the commission of the crime itself. The sentencing jury or court may consider such factors as the relative magnitude of the defendant's participation in the crime. For example, was he or she the "ringleader," or was his or her participation relatively minimal compared to that of the co-defendants?

In contrast, the sentences imposed on the co-defendants result from the sentencing court's reasoned consideration of factors that are peculiar to those co-defendants. Under *N.J.S. A.* 2C:44–1, the court may consider nine aggravating circumstances and thirteen mitigating circumstances in determining the appropriate sentence. The balancing of those aggravating and mitigating circumstances requires a consideration of factors that may be completely extraneous to the circumstances of the offense itself. *See, e.g., N.J.S.A.* 2C:44–1(a)(6) (considering as an aggravating circumstance "[t]he extent of the defendant's prior criminal record and the seriousness of the offenses of which he has been convicted"), and *N.J.S.A.* 2C:44–1(b)(7) (considering as a mitigating circumstance the fact that "[t]he defendant has no history of prior delinquency or criminal activity or has led a law-abiding life for a substantial period of time before the commission of the recent offense."). It is thus apparent that the co-defendants' sentences are determined after a consideration of factors that are unique to them and that do not necessarily implicate the circumstances of the offense itself. Although the co-defendants' comparative participation in the crime might be relevant to the circumstances of the offense—and therefore properly considered as a mitigating factor in sentencing the defendant—the sentences that the co-defendants receive are not. Allowing the jury to consider those sentences would necessarily mean that its determination would be influenced, albeit indirectly, by considerations beyond "the character and record of the individual offender and the circumstances of the particular offense * * *." *Woodson v. North Carolina,*

*supra*, 428 *U.S.* at 304, 96 *S.Ct.* at 2991, 49 *L.Ed.* 2d at 961. The fact that Gerald's co-defendants received lesser sentences could no more be considered as a mitigating factor than could the fact that both received the death penalty be considered as an aggravating factor. We hold that the sentencing court or jury may not consider the co-defendants' sentences as a mitigating factor under *N.J.S.A.* 2C:11–3(c)(5)(h). Moreover, we are convinced that the legislature would not want to inhibit a prosecutor's ability to persuade a defendant to become a State's witness by offering a lenient plea bargain. Allowing a jury to consider a co-defendant's sentence would surely be an inhibiting factor.

Other jurisdictions apparently have divided on this question. *Compare, e.g., Brogdon v. Blackburn*, 790 *F.*2d 1164, 1169 (5th Cir.1986) (under Louisiana statute, co-defendant's sentence not a mitigating factor, inasmuch as it is not relevant to the defendant's own "character, prior record, or the circumstances of his offense"), *cert.* den., 481 *U.S.* 1042, 107 *S.Ct.* 1985, 95 *L.Ed.* 2d 824 (1987) *and State v. Williams*, 305 *N.C.* 656, 687, 292 *S.E.*2d 243, 261–62 (1982) ("The fact that the defendant's accomplices received a lesser sentence is not an extenuating circumstance. * * * The accomplices' punishment is not an aspect of defendant's character or record nor a mitigating circumstances of the particular offense.") *with Riley v. State*, 496 *A.*2d 997, 1026 (Del.1985) (in context of determining inter-case proportionality, noting without explanation that evidence that co-defendant had received a lesser penalty had been admitted as a mitigating circumstance), *cert.* den., 478 *U.S.* 1022, 106 *S.Ct.* 3339, 92 *L.Ed.*2d 743 (1986). We record our agreement with the conclusions reached in the first two cases.

## VII

Defendant argues that his arrest was invalid, wherefore his subsequent confession and the physical evidence seized, namely, his sneakers, should have been suppressed. He also urges

that his confession should have been suppressed because it was obtained in violation of his right to counsel and his right to remain silent. We reject each of those contentions.

## A

■ Defendant's first argument is that his arrest was invalid and that the fourth amendment requires the suppression of all evidence obtained as a result of that arrest as fruits of an illegal arrest. *See generally Wong Sun v. United States,* 371 *U.S.* 471, 83 *S.Ct.* 407, 9 *L.Ed.*2d 441 (1963) (direct and indirect fruits of unlawful invasion excluded from evidence). Specifically, defendant argues that his illegal arrest requires the suppression of the following evidence: his sneakers, his confession, and, because his statement to the police led to the arrest of his co-defendants, the trial testimony of Bland and Walker. Defendant further submits that without the stated evidence a reasonable jury could not have found him guilty beyond a reasonable doubt and that therefore his convictions for all of the various offenses, including murder, must be reversed.

Resolution of the question whether defendant's arrest on the two outstanding municipal court warrants was valid is necessarily governed by our decision in *State v. Bruzzese, supra,* 94 *N.J.* 210, whose facts on the "arrest" issue are remarkably similar to those in this case. Bruzzese was a suspect in the burglary of his former employer's business. On a panel of a rear door that had been kicked in during the burglary police found a distinctive imprint from the sole of a boot. Having run a routine check to determine whether Bruzzese had a criminal record, the police learned that an outstanding arrest warrant had been issued against defendant for contempt of court, on account of his failure to appear in municipal court on an unrelated matter. Four officers went to Bruzzese's residence to arrest him on the outstanding warrant. The officers concededly had a second purpose, namely, to question Bruzzese about the burglary. When he was arrested on the warrant,

defendant asked to go to his bedroom to put on shoes and a jacket. Two officers accompanied him to his bedroom where they found and seized a pair of boots with soles that corresponded to the impression left on the door panel.

The Court phrased the issue before it as follows:

whether incriminating boots seized by police from defendant's bedroom in the course of arresting him on an unrelated contempt of court charge were admissible to prove defendant's involvement in a burglary. Subsumed within this issue is the fundamental question of whether the court should consider the subjective motives and intent of a law enforcement officer in determining the reasonableness of a search and seizure under the Fourth Amendment and under Article I, paragraph 7 of the New Jersey Constitution.

[*Id.* at 213.]

The Court held that "the proper inquiry * * * is whether the conduct of the law enforcement officer who undertook the search *was objectively reasonable, without regard to his or her underlying motives or intent." Id.* at 219 (emphasis added). The holding was based on both federal and State constitutional grounds. See *id.* at 216–17.

Defendant in this case argues that his arrest on the municipal court warrants was merely a pretext for taking him to police headquarters to interrogate him about the Matusz murder. Relying on the opinion of a single dissenting Justice in *Bruzzese,* defendant contends that *Bruzzese* was wrongly decided under the fourth amendment and that his arrest was therefore invalid under the federal constitution. Defendant's suggested analysis is unpersuasive: the majority opinion in *Bruzzese* remains the law, and we decline any invitation to reconsider our opinion in that case.

Under *Bruzzese,* then, the police officers' subjective intent in arresting Gerald—to question him in connection with the homicide—is not relevant to resolution of this question. *See* 94 *N.J.* at 219. Rather, our inquiry focuses on whether the officers' conduct was "objectively reasonable." *Ibid.* The standard is whether "the facts available to the officer at the moment of the seizure or search [would] 'warrant a man of reasonable caution in the belief' that the action taken was appropriate." *Terry v.*

*Ohio,* 392 *U.S.* 1, 22, 88 *S.Ct.* 1868, 1880, 20 *L.Ed.*2d 889, 906 (1968), *quoted in Bruzzese, supra,* 94 *N.J.* at 220.

We agree with the trial court that under that test the conduct of Detective Frank and Investigator Bolis in arresting defendant was objectively reasonable. The officers had information that implicated defendant in the crime. Investigation by Detective Frank and Investigator MacIntyre confirmed some of the information provided. A routine check of Gerald's criminal record revealed that two valid municipal court warrants for his arrest were outstanding. As we observed in *Bruzzese, N.J.S.A.* 2A:10-8 empowers police officers to serve contempt warrants and "to produce the person subject to punishment for contempt" before the court issuing the warrant. 94 *N.J.* at 228. The police may execute a lawful arrest warrant by arresting the defendant at his or her home. *Id.* at 228-29 (citing *Rule* 3:3-3(b)).

In this case, unlike the situation in *Bruzzese,* the officers made no search of defendant's home when they executed the arrest warrants. There was conflicting testimony at the suppression hearing regarding whether the arresting officers showed Gerald the arrest warrants, whether bail was discussed, and whether defendant was allowed to make a telephone call after his arrest. The court entertaining the suppression motion found the testimony of the officers involved to be more credible than that of the defendant, and our own review of the record provides us with no basis to overturn that determination. *See, e.g., State v. Johnson,* 42 *N.J.* 146, 162 (1964). We therefore conclude that defendant's arrest was valid.

### B

Although the question is not directly raised by defendant, we conclude that the seizure of defendant's sneakers was valid even though no search warrant had been issued. Ordinarily in the absence of a search warrant, the State must establish one of the recognized exceptions to warrantless

search and seizure. See, e.g., *State v. Alston*, 88 *N.J.* 211, 230 (1981), and the authorities therein cited. In this case, however, there was no need for the police to have obtained a search warrant prior to the seizure of the sneakers, inasmuch as no "search" was involved. In *State v. Speciale*, 96 *N.J.Super.* 1 (App.Div.), certif. den., 50 *N.J.* 291 (1967), the issue on appeal was whether the seizure of defendants' shoes constituted an unlawful search. *Id.* at 3–4. The court held that it did not, concluding that "the taking of defendants' shoes * * * entailed no search but merely the temporary appropriation of articles necessary for further investigation of defendants' suspected implication in the crime." *Id.* at 7; *see also Bruzzese, supra*, 94 *N.J.* at 239 n. 10 ("had defendant chosen to *wear* the boots down to headquarters, the police would have had the authority to appropriate them from him temporarily for further investigation of his suspected involvement in the burglary" (citing *State v. Speciale, supra* )); *State v. Moller*, 196 *N.J.Super.* 511, 515 (App.Div.1984) (observation of evidence in plain view does not constitute a search). The seizure of the sneakers was valid.

### C

We now turn to the arguments raised by defendant in respect of alleged violations of his right to remain silent and his right to counsel. Defendant presents four distinct claims: (1) that his invocation of the right to silence was not "scrupulously honored"; (2) that his assertions of the right to counsel were not respected; (3) that his waivers of his *Miranda* rights were not knowing and intelligent; and (4) that his waivers of his *Miranda* rights were not voluntary. In accordance with the approach adopted by this Court in *State v. Hartley*, 103 *N.J.* 252, 260–61 (1986), we consider first the question of whether the defendant asserted his rights, and, if so, whether those assertions were scrupulously honored.

### 1.

The principle that a defendant's invocation of his rights to remain silent and to the assistance of counsel must be honored

scrupulously is a corollary of the prophylactic protections afforded in *Miranda v. Arizona,* 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966). Under *Miranda,* the fifth-amendment privilege against self-incrimination—first applied to the states through the fourteenth amendment in *Malloy v. Hogan,* 378 *U.S.* 1, 84 *S.Ct.* 1489, 12 *L.Ed.*2d 653 (1964)—requires that a suspect be apprised of his rights to remain silent and to have an attorney present. The premise of this prophylactic rule is the inherently coercive nature of custodial interrogation: "without proper safeguards," the *Miranda* Court held, "the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Miranda, supra,* 384 *U.S.* at 467, 86 *S.Ct.* at 1624, 16 *L.Ed.*2d at 719. Because custodial interrogation is presumptively coercive, any statements given in the absence of explicit warnings are inadmissible; conversely, silence after the issuance of explicit warnings requires an end to interrogation:

> Once warnings have been given, the procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. * * * [A] statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise.
>
> [*Id.* at 473–74, 86 *S.Ct.* at 1627–28, 16 *L.Ed.*2d at 723.]

*Miranda* left open, however, the question of "under what circumstances, if any, the authorities may resume interrogation" when the rights to silence or counsel are asserted. *State v. Hartley, supra,* 103 *N.J.* at 263.

The United States Supreme Court has adopted an approach that varies with the right asserted. If the defendant asserts the right to counsel, then under the *per se* rule adopted in *Edwards v. Arizona,* 451 *U.S.* 477, 101 *S.Ct.* 1880, 68 *L.Ed.*2d 378, reh'g den., 452 *U.S.* 973, 101 *S.Ct.* 3128, 69 *L.Ed.*2d 984 (1981), all interrogation must cease until a lawyer has been provided, "unless the accused himself initiates further communication, exchanges, or conversations with the police." *Id.* at

484–85, 101 *S.Ct.* at 1885, 68 *L.Ed.*2d at 386; *see State v. Kennedy*, 97 *N.J.* 278, 285 (1984); *State v. Wright*, 97 *N.J.* 113, 122–23, 125–26 (1984); *State v. McCloskey*, 90 *N.J.* 18, 25–28 (1982). If, on the other hand, defendant asserts his right to silence, then under *Michigan v. Mosley*, 423 *U.S.* 96, 96 *S.Ct.* 321, 46 *L.Ed.*2d 313 (1975), "the admissibility of statements obtained after the person in custody has decided to remain silent depends * * * on whether his 'right to cut off questioning' was 'scrupulously honored.'" *Id.* at 104, 96 *S.Ct.* at 326, 46 *L.Ed.*2d at 321; *see State v. Hartley, supra,* 103 *N.J.* at 265. Here, defendant argues that he invoked both protections, that is, that he invoked his right to silence shortly after interrogation began, and that he invoked his right to counsel both before the polygraph examination and after his conversation with Chief Peterson. Accordingly, both the *Mosley* "scrupulously honor" test and the *Edwards per se* rule are implicated.

2.

■■■ Defendant's argument that the invocation of the right to cut off questioning was not scrupulously honored is predicated on the absence of a finding of fact at the suppression hearing. Gerald testified at the hearing that he told Detective Frank early in the questioning that he was under the influence of alcohol and drugs and could not answer Frank's questions; specifically, he testified that he had told Detective Frank that he had drunk three to four pints of liquor and three or four "cases" (*i.e.,* six-packs) of beer, and had taken heroin and cocaine that day. Gerald testified that he asked to lie down and talk to the police later, but that Frank refused that request.

Defendant argues that "[t]here is simply no factual finding as to the defendant's statement that he asked Det. Frank to cease questioning so he could rest for a while due to his condition, a condition denied flatly by the interrogating officer but corroborated * * * by Chief Peterson, in whose testimony the trial court put great stock." Defendant notes that when a confession has been admitted at trial, appellate review of the

record "must be 'wide and penetrating' to assure that the fundamental fairness requirement of due process is met." *State v. Cook,* 47 *N.J.* 402, 416 (1966) (quoting *State v. Smith,* 32 *N.J.* 501, 544 (1960), *cert.* den., 364 *U.S.* 936, 81 *S.Ct.* 383, 5 *L.Ed.*2d 367 (1961)). In the absence of a finding of fact at the suppression hearing, the defendant contends, this Court "cannot conclude by a preponderance of the record or beyond a reasonable doubt that the defendant's request to cut off the questioning was scrupulously honored * * *."

Although it is true that appellate review of the record must be "wide and penetrating" when a confession has been admitted into evidence, *State v. Cook, supra,* it is also true—and acknowledged in *State v. Cook* itself—that "weigh[ing] the credibility of the various witnesses who testified at the [hearing is] a task best left to the trial judge * * *." 47 *N.J.* at 416. It is also beyond question that this Court has the power to make findings of fact on the basis of the record before it, a power properly invoked "where the sound administration of justice calls for appellate 'intervention and correction.' " *State v. Yough,* 49 *N.J.* 587, 596 (1967) (quoting *State v. Johnson, supra,* 42 *N.J.* at 162). The exercise of this power is particularly appropriate where, as here, "the findings [are] not exclusively factual but [are] intertwined with legal implications * * *." *Ibid.*

The trial court's suppression ruling did not address the specific issue of whether defendant had in fact attempted to cut off questioning; defendant's claim that he had so attempted is predicated, however, on his claim that his mental condition was impaired because of alcohol and drug use, a claim that the trial court discounted: "There was evidence adduced by the defense that he was under the influence of intoxicants, that he was under the influence of drugs. It is not credible, when I consider all of testimony in the case, including the testimony of the police officers and including the testimony of Mr. Dicks [sic] and Mr. Peterson * * *."

That conclusion finds abundant support in the record. Gerald's assertion that he told Detective Frank he was intoxicated, could not answer his questions, and wished to rest is belied by (1) his signing of the waiver form, (2) his acknowledgements that he understood his rights, (3) his statement that he wished to cooperate in the investigation, (4) his denial of drug use to Mayor Dix two hours later, (5) the testimony of Detective Frank, Investigator Bolis, Mayor Dix, and Chief Peterson that Gerald appeared alert and coherent, and (6) the testimony of Frank and Bolis that the defendant never tried to cut off questioning. Beyond Gerald's own testimony, the only corroboration offered by the defense is Detective Frank's admission that *he*, not Gerald, checked off the waiver form (although Gerald signed it), and the statement of Chief Peterson, who noticed that Gerald looked tired and his eyes looked "funny." Even Chief Peterson testified, however, that defendant appeared alert and coherent. We agree with the trial court that defendant's claim that his mental condition at the time of questioning was impaired by drug and alcohol use is not credible. Having rejected that claim, we necessarily reject defendant's further claim that because of that alleged mental impairment, he attempted to cut off questioning.

3.

We next consider defendant's assertion that he twice asserted his right to counsel—once prior to the administration of the lie-detector test, and again after he had confessed to Chief Peterson, when Detective Frank and Investigator Bolis asked if he would be willing to confess on tape—and that these invocations were not honored. In respect of his first claimed request for counsel, defendant relies on his testimony at the suppression hearing that he asked for an attorney prior to the polygraph but that Detective Frank turned him down, telling defendant that he would not need a lawyer if (a) he told Frank what Frank needed to know, and (b) he was not directly involved. Frank also allegedly stated that it was too late at night to obtain counsel.

Defendant again argues that "there is simply no factual finding on the issue of whether * * * the defendant requested an attorney prior to the polygraph. If the court below had found that he had, the questioning would clearly have had to terminate under the *per se* rule of *Edwards* * * *." The State counters that "[t]he record below clearly illuminates the fallacy of these contentions * * *. [D]efendant neither requested an attorney nor asked that questioning cease." Again, the trial court's findings of fact do not address the question of whether defendant invoked his right to counsel prior to the polygraph; that court's findings are premised, instead, on a general disbelief in defendant's testimony. In other words the fact that defendant did not request counsel before the polygraph was presumed by the trial court, for otherwise it would not have reached the question of whether defendant had requested counsel a second time after his confession to Chief Peterson.

■ From our reading of the testimony, we conclude that Gerald did not invoke his right to counsel before the polygraph examination. Quite apart from the flat denials of Detective Frank and Investigator Bolis, we are struck by the fact that such a request is utterly inconsistent with defendant's subsequent conduct. Why, for instance, if he had invoked his right to counsel, did he undergo the polygraph test, when Mayor Dix both urged him not to take it and reminded him of his right to counsel? Defendant asks this Court to believe, moreover, that officers Frank and Bolis, who would later offer to cease questioning when the defendant indicated that he wanted a lawyer before making a taped statement, would have completely disregarded his desire for counsel earlier. In light of these facts defendant's testimony is not credible.

■ A more difficult issue, however, is posed by the defendant's second alleged invocation of the right to counsel. This occurred after he had confessed to Chief Peterson and after he had been asked to make a taped statement. Defendant replied that he was willing to answer the officers' questions but that he

wanted to consult with counsel before making a taped statement. The officers then offered to cease questioning, but the defendant indicated that he would feel better if he talked about the incident. These facts raise two possible issues: first, whether defendant's statement constituted an assertion of the right to counsel, and if so, whether the police properly honored that assertion.

As this Court recognized in *State v. Kennedy, supra,* 97 *N.J.* at 285, "access to counsel is regarded as so essential to the vindication of the fifth-amendment privilege * * * that '[i]f the individual states that he wants an attorney, the interrogation must cease until an attorney is present.'" (quoting *Miranda, supra,* 384 *U.S.* at 474, 86 *S.Ct.* at 1628, 16 *L.Ed.*2d at 723). This *per se* rule applies "unless the accused himself initiates further communication, exchanges or conversations with the police." *Edwards v. Arizona, supra,* 451 *U.S.* at 484–85, 101 *S.Ct.* at 1885, 68 *L.Ed.*2d at 386; *see also Oregon v. Bradshaw,* 462 *U.S.* 1039, 1044, 103 *S.Ct.* 2830, 2834, 77 *L.Ed.* 2d 405, 411–12 (1983) (plurality opinion) (accused must initiate dialogue *and* validly waive right).

The threshold inquiry, however, is whether the defendant's statement rose to the level of an invocation of his right to counsel. The trial court held that "clearly he had not * * * requested an attorney. He had, in fact, indicated that only if they wished a taped statement would he decline to do that and that at some point in the future he might do that if he had an attorney * * *." As this Court has stated, however, "because the right to counsel is so fundamental, an equivocal request for an attorney is to be interpreted in the light most favorable to defendant." *State v. Wright, supra,* 97 *N.J.* at 119 (citing *State v. McCloskey, supra,* 90 *N.J.* at 26 n. 1); *see also Maglio v. Jago,* 580 *F.*2d 202, 205 (6th Cir.1978) ("Maybe I should have an attorney" sufficient to invoke right); *United States v. Clark,* 499 *F.*2d 802, 805 (4th Cir.1974) ("I had better talk to a lawyer" is sufficient). In *State v. Wright, supra,* the Court

noted the proper procedure to be followed by police where an assertion of *Miranda* rights is equivocal:

[W]here a suspect makes a statement which arguably amounts to an assertion of his *Miranda* rights and the interrogating agent recognizes that the statement is susceptible of that construction, his questioning with regard to the crime he is investigating should immediately cease and he should then inquire of the suspect as to the correct interpretation of the statement. Only if the suspect makes clear that he is not invoking his *Miranda* rights should substantive questioning be resumed.

[97 *N.J.* at 120 n. 4 (quoting *United States v. Riggs*, 537 *F*.2d 1219, 1222 (4th Cir.1976), *quoted in State v. Fussell*, 174 *N.J.Super.* 14, 21 (App.Div.1980)).]

In our view the defendant's statement was equivocal at best. His indication that he would answer all questions, but would not make a taped statement unless he had seen a lawyer, was unclear regarding his invocation of his right to counsel.

Under those circumstances, the officers' conduct conformed strictly with the procedure noted in *State v. Wright, supra.* They ceased questioning and offered to cease the interrogation, asking, in effect, for defendant to clarify his intention. Only when his answer—that he wished to discuss the crime, that it would make him feel better—made "clear that he [was] not invoking his *Miranda* rights [did] substantive questioning * * * resume[ ]." *State v. Wright, supra*, 97 *N.J.* at 120 n. 4. This view is consistent with that recently taken by the Supreme Court. In *Connecticut v. Barrett*, 479 *U.S.* 523, 107 *S.Ct.* 828, 93 *L.Ed.*2d 920 (1987), the Court rejected the Connecticut Supreme Court's view that an "expressed desire for counsel before making a written statement served as an invocation of his right for all purposes." *Id.* at 526, 107 *S.Ct.* at 831, 93 *L.Ed.*2d at 926. The Court reasoned that "Barrett made clear his willingness to talk about the crime * * *. Nothing in our decisions, however, requires authorities to ignore the tenor or sense of a defendant's response to * * * warnings." *Id.* at 527–28, 107 *S.Ct.* at 831, 93 *L.Ed.*2d at 927. Likewise, in this case defendant made clear his willingness to talk about the crime; his "limited requests for counsel * * * were accompanied by affirmative announcements of his willingness to speak with authorities." *Id.* at 529, 107 *S.Ct.* at 832, 93 *L.Ed.*2d at

928. We therefore affirm the conclusion of the trial court that defendant did not invoke his right to counsel.

4.

Once it is determined that there was no invocation of *Miranda* rights that was not accorded respect by the authorities, the question then becomes whether the defendant's waivers of his rights were (1) knowing and intelligent, and (2) voluntary. *See, e.g., Hartley, supra,* 103 *N.J.* at 260. The trial court in this case held that Gerald's waivers of his rights were knowing and intelligent, notwithstanding defendant's argument that his request for counsel only in the event of a taped statement indicated that he did not understand his rights. The court also held that the statements were voluntary, despite defendant's contention that he was pressured by his friends Dix and Peterson (and, to a lesser extent, Frank) to confess. The court stated: "The testimony is quite clear and, perhaps, because of the fortuitous event that Chief Peterson happened to be the Chief of Police of Pleasantville, the defendant wanted to speak to him * * * but that was voluntary on his part: It was not coerced." The court found that "there was no plot * * * to deceive the defendant because of the fact that they were friends."

The standards for a valid waiver of *Miranda* rights were discussed by this Court in *State v. Kennedy, supra,* 97 *N.J.* 278:

When * * * the accused is advised of his rights and * * * "the interrogation continues without the presence of an attorney and a statement is taken," a heavy * * * burden rests on the government "to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel."

[*Id.* at 286 (quoting *Miranda, supra,* 384 *U.S.* at 475, 86 *S.Ct.* at 1628, 16 *L.Ed.*2d at 724).]

The inquiry is "whether, as an individual, case-by-case matter, a waiver * * * has been knowing, voluntary, and intelligent." *Ibid.* (citing *Johnson v. Zerbst,* 304 *U.S.* 458, 464, 58 *S.Ct.* 1019, 1023, 1461, 1466 (1938)). The court should consider "the particular facts and circumstances" of the case, "including the back-

ground, experience and conduct of the accused." *North Carolina v. Butler*, 441 *U.S.* 369, 374–75, 99 *S.Ct.* 1755, 1758, 60 *L.Ed.*2d 286, 293 (1979) (quoting *Johnson v. Zerbst, supra,* 304 *U.S.* at 464, 58 *S.Ct.* at 1023, 82 *L.Ed.*2d at 1466). The United States Supreme Court has stated that the prosecutor need prove waiver by only a preponderance of the evidence. *E.g., Colorado v. Connelly*, 479 *U.S.* 157, 168, 107 *S.Ct.* 515, 523, 93 *L.Ed.*2d 473, 485 (1986). In New Jersey, however, we have long adhered to the view that as a matter of state law, the waiver must be proven beyond a reasonable doubt. *See Bey* II, *supra,* 112 *N.J.* at 134; *State v. Miller*, 76 *N.J.* 392, 404–05 (1978); *State v. Kelly*, 61 *N.J.* 283, 294 (1972); *State v. Yough, supra,* 49 *N.J.* at 600–01; *State v. Whittington*, 142 *N.J.Super.* 45, 49–50 (App.Div.1976).

a

 Defendant's claim that those waivers of his rights before Detective Frank and Investigator Bolis, Mayor Dix, and Chief Peterson were not knowing and intelligent are premised on (1) defendant's alleged intoxicated state and (2) his equivocal assertion of his right to counsel only in the event his statement were to be taped. As discussed above, the question of intoxication was directly addressed by the trial court, which found that defendant was not so impaired as to cloud his understanding. We "see no reason to dispute these conclusions, based as they are on the trial court's first-hand observation of the witnesses * * * and adequately supported by the evidence." *State v. Kennedy, supra,* 97 *N.J.* at 287.

With regard to the his allegedly equivocal invocation of the right to counsel, defendant relies on *Edwards v. Arizona, supra,* 451 *U.S.* 477, 101 *S.Ct.* 1880, 68 *L.Ed.*2d 378. In *Edwards*, the defendant was afforded his *Miranda* warnings and invoked his right to counsel, after which interrogation ceased. The next morning, however, he was told that he "had to" talk with a detective. The detectives informed him of his *Miranda* rights, and played a taped statement of an alleged

accomplice. Edwards stated "I'll tell you anything you want to know, but I don't want it on tape." *Id.* at 479, 101 *S.Ct.* at 1882, 68 *L.Ed.*2d at 383. Although Gerald, like Edwards, indicated his unwillingness to speak on tape, the analogy to *Edwards* is at best tenuous, for the dispositive fact in *Edwards* was that the defendant had earlier clearly asserted his right to counsel, an assertion that was not honored when the authorities initiated further questioning without affording counsel. See *id.* at 482, 101 *S.Ct.* at 1883, 68 *L.Ed.*2d at 384–85. In this case there was no prior invocation of the right to counsel. There is, it is true, some suggestion in *Edwards* that the defendant's "waiver" was not "knowing and intelligent"; the Court upbraided the lower courts because "neither the trial court nor the Arizona Supreme Court undertook to focus on whether Edwards understood his right to counsel and intelligently and knowingly relinquished it." *Id.* at 484, 101 *S.Ct.* at 1884, 68 *L.Ed.*2d at 386. That suggestion is undermined, however, by the Court's decision in *Connecticut v. Barrett, supra,* 479 *U.S.* 523, 107 *S.Ct.* 828, 93 *L.Ed.*2d 920, in which the accused indicated his willingness to talk, but said that he wished to consult with counsel before making a written statement. The Court rejected the argument that this "distinction * * * between oral and written statements indicates an understanding * * * so incomplete that we should deem his limited invocation * * * effective for all purposes. This suggestion ignores Barrett's testimony * * * that [he] fully understood the *Miranda* warnings." *Id.* at 530, 107 *S.Ct.* at 832–33, 93 *L.Ed.*2d at 929; *see also id.* at 533–34, 107 *S.Ct.* at 834–35, 93 *L.Ed.*2d at 931 (Brennan, J., concurring) (respondent's testimony that he understood his rights overcame suggestion that he did not). Likewise, in this case Gerald testified that he understood his rights, at least by the time he talked to Chief Peterson, and he otherwise made clear his willingness to talk. *Cf. State v. McKnight,* 52 *N.J.* 35, 55 (1968) ("if a defendant was given the *Miranda* warnings * * * his 'waiver' was no less * * * 'knowing' and 'intelligent' because he misconceived the inculpatory

thrust of the facts he admitted, or because he thought that what he said could not be used because it was oral * * *."). The trial court's holding that his waiver was "knowing" and "intelligent" is unassailable.

b

There is no bright-line test for determining the voluntariness of a waiver of rights; rather, "[i]n determining the issue of voluntariness, and whether a suspect's will has been overborne, a court should assess the totality of all the surrounding circumstances." *State v. Miller, supra,* 76 *N.J.* at 402. The circumstances, for this purpose, include "the characteristics of the suspect and the details of the interrogation." *Id.* at 402–03. In this case the trial court concluded "that the defendant was handled in a fair and proper manner * * *. I find here that the statements were voluntary, that his will was not overborne. In fact, he wanted to talk. It had been on his mind. It had been bothering him." Defendant argues, however, that Mayor Dix and Chief Peterson used their status as Gerald's friends to manipulate him into confessing. Specifically, defendant points to Mayor Dix's admonition, after the polygraph, that the defendant had better "get himself straightened out," and to Chief Peterson's instruction to Gerald to "sit down" with the detectives "and go over the facts again." The trial court acknowledged that although the described conduct might appear to be coercion, it did not overbear the will of defendant, as demonstrated by the fact that defendant did not cooperate entirely with the detectives (*i.e.,* he refused to give a taped statement).

In *State v. Miller, supra,* 76 *N.J.* at 403, the inquiry was "whether an interrogating officer can appeal to a suspect by telling him that he is the suspect's friend and wants to help him * * *." This Court held that the procedure was permissible, but cautioned that "this technique moves into a shadowy area and if carried to excess in time and persistence, can cross that intangible line and become improper." *Id.* at 404. The *Miller*

Court stressed that the defendant had had previous exposure to *Miranda* warnings (*i.e.*, prior arrests), and that "[h]e was in no way deluded or misled into believing that the state trooper was acting in any capacity other than as an interrogating police officer in the investigation of a serious crime." *Ibid.* In this case Gerald continually waived his rights, and both Mayor Dix and Chief Peterson interjected their official capacities into the process by reminding defendant of his rights. Furthermore, the defendant told Chief Peterson that he had wanted to tell the Chief about the incident, and had, in fact, driven by the Chief's house a few times with that intention, but had lost his nerve. Moreover, neither friend's coercion was implicated in defendant's first waiver of his rights, executed shortly after he was taken into custody. Therefore, the State has met its burden, and we agree with the trial court's conclusion that the defendant's waivers were voluntary.

## VIII

 Defendant alleges for the first time on appeal that the trial court's failure to include instructions on voluntary intoxication in its supplemental jury charges constituted plain error under *Rule* 2:10-2. In *State v. Hock, supra,* 54 *N.J.* at 538, we defined plain error in a jury charge as a "legal impropriety * * * prejudicially affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result." Applying this standard we disagree with defendant that the supplemental instructions require reversal.

The trial court's initial charge properly instructed the jury that if it had a reasonable doubt on the question of whether defendant's intoxication rendered him incapable of acting purposely or knowingly, then it must acquit defendant on those counts of the indictment alleging purposeful and knowing conduct, including murder. In so doing, the court correctly cau-

tioned the jury that intoxication is a defense to such crimes only if it produces a prostration of defendant's faculties. See *State v. Cameron*, 104 *N.J.* 42, 54–56 (1986), and authorities cited therein. Defendant's contentions focus on the fact that the jury twice requested additional instructions from the court regarding the distinction between purposeful and knowing murder on the one hand, and aggravated manslaughter on the other. Defendant did not object to the supplemental instructions, but now argues that the trial court committed plain error when it failed to re-instruct the jury *sua sponte* on those two occasions concerning the intoxication defense.

First, it is apparent that when read as a whole, the trial court's initial and supplemental instructions adequately explained the intoxication defense to the jury. *State v. Freeman*, 64 *N.J.* 66, 69 (1973). Second, even assuming that the court below erred in its supplemental instructions, we are convinced that any such error was harmless. Although there was testimony regarding alcohol and drug use by Gerald and his co-defendants on the day of the crime, the record belies any claim that defendant was so intoxicated that his faculties were prostrated. We therefore reject defendant's argument that there was plain error in this regard.

IX

Defendant argues that the sentences imposed are excessive in light of our decision in *State v. Yarbough*, 100 *N.J.* 627 (1985), *cert.* den., 475 *U.S.* 1014, 106 *S.Ct.* 1193, 89 *L.Ed.*2d 308 (1986), which was announced more than one year after the date of sentencing in this case. We decline defendant's invitation to modify his sentence.

The court below merged the related offenses and sentenced defendant on the remaining counts as follows: on the fourth count, alleging a second-degree robbery of John Matusz, the court imposed a ten-year term with a five-year parole disqualifier. On the sixth count, alleging a second-degree robbery of

Lottie Wilson, the court imposed a ten-year sentence with a five-year parole disqualifier to run consecutively to the sentence imposed on the fourth count. On the second count, alleging a second-degree burglary, the court imposed a five-year sentence to run concurrently with the sentence imposed on the fourth count. The court also concluded that if the sentence of death imposed on Gerald's murder conviction were ever reduced to a term of imprisonment, then the cumulative sentence noted above was to be served consecutively to the term imposed on the murder count. Defendant argues that such a result violates one of the sentencing guidelines stated in *Yarbough*, namely, that "there should be an overall outer limit on the cumulation of consecutive sentences for multiple offenses not to exceed the sum of the longest terms * * * that could be imposed for the two most serious offenses." 100 *N.J.* at 644. As we understand it, defendant's contention seems to be that he *potentially* faces a term of life imprisonment plus aggregated consecutive terms of twenty years, whereas under the passage just quoted from *Yarbough* he should face only a term of life imprisonment for the most serious offense (murder), with a consecutive sentence of ten years for the second most serious offense (second-degree robbery).

We need not address the question of the retrospective application of *Yarbough, see, e.g., Coons v. American Honda Motor Co.,* 96 *N.J.* 419 (1984), because of our conclusion that defendant's argument is, at best, premature in light of our disposition of this case. If defendant were again sentenced to death after remand, his argument in this respect would be mooted. Even assuming *Yarbough* 's applicability, we recall our statement in that case that "even within the general parameters that we have announced there are cases so extreme and so extraordinary that deviation from the guidelines may be called for." 100 *N.J.* at 647.

For all of the foregoing reasons we reject defendant's "excessive sentence" argument.

## X

We turn now to defendant's contention that he was denied a fair trial by reason of the assistant prosecutor's alleged misrepresentation to the jury of the plea agreement entered into by his codefendant John Bland. Again, we are unable to conclude that there was any plain error under *Rule* 2:10–2.

Before the trial in Gerald's case, Bland entered a *retraxit* plea of guilty to the felony murder of Paul Matusz. In exchange for the plea the State agreed to dismiss the remaining counts of the indictment against him and to recommend the maximum sentence of life imprisonment with a thirty-year parole disqualifier. The record does not inform us of any discussion at that time concerning Bland's testifying on behalf of the State against Gerald.

When Bland first appeared for sentencing, the court indicated its concern that the plea bargain was neither fair to the State nor in the "interest of justice." Although the record is not entirely clear, it appears that the court was concerned with the possible issuance of a superseding indictment charging Bland in connection with the death of John Matusz, who had died approximately two-and-a-half months after his assault. The question of whether the elder Matusz's death was causally related to the assault was the subject of dispute between the victim's personal physician and the Atlantic County Medical Examiner. The trial court adjourned the sentencing hearing pending clarification of that issue.

Within hours, Bland and the State again appeared before the court with an amended plea agreement under which the State agreed not to seek a superseding indictment against Bland in connection with John Matusz's death. For the first time, the assistant prosecutor indicated that Bland had agreed to testify against Gerald. Defendant now contends that Bland's decision to testify was additional consideration offered in exchange for the State's promise not to seek the superseding indictment,

whereas the State's position is that there was no link between those decisions.

Defendant moved before trial for an order *in limine* barring any reference in the jury's presence to the elder Matusz's death, apparently fearing that such testimony might be unduly prejudicial to him. The trial court granted the motion. On his direct examination, Bland stated that his decision to testify against Gerald was motivated not by any new concessions offered by the State during plea negotiations, but rather by the fact that because Gerald had "snitched" on him, he was going to spend at least the next thirty years in prison. On his cross-examination of Bland, defense counsel made no attempt to inquire into the possibility that the decision to testify was prompted by the promise not to prosecute in connection with John Matusz's death.

During his guilt-phase summation, the assistant prosecutor commented that Bland had received no benefit in exchange for his decision to testify. Although defense counsel made no objection to that comment, defendant argues on appeal that because of the court's prior order barring reference to John Matusz's death, he was "hamstrung" and could not explore the true terms of Bland's agreement. Defendant urges that the assistant prosecutor's failure to characterize accurately the terms of the agreement in his summation was a violation of his right to due process.

Assuming for purposes of this discussion that the assistant prosecutor did in fact breach a duty to disclose in full the terms of the plea agreement (*see State v. Taylor*, 49 *N.J.* 440, 448 (1967)), we are satisfied that his conduct did not infect the proceedings with plain error that was "clearly capable of producing an unjust result * * *." *R.* 2:10–2; *see also State v. Higglewith*, 33 *N.J.* 300, 314 (1960) ("not every suspected deviation from perfection on the part of a prosecutor will justify a reversal of a conviction. Before such a result ensues, his infraction must be clear and unmistakable and must substan-

tially prejudice the defendant's fundamental right to have the jury fairly evaluate the merits of his defense." (quoting *State v. Bucanis*, 26 *N.J.* 45, 56 (1958)).

To the extent that the terms of the plea agreement were relevant, they affected only Bland's credibility. From our review of the record, it is apparent that the jury was made aware of Bland's bias against Gerald, given Bland's testimony that he was angry at Gerald for having "snitched." In addition, the trial court adequately instructed the jury that it must give "careful scrutiny" to the testimony of Gerald's codefendants "and consider whether they * * * have a special interest in the outcome of the case and whether their testimony was influenced by the hope or expectation of any favorable treatment or reward or any feelings of revenge or reprisal." We therefore reject defendant's argument.

## XI

Defendant next argues that his death sentence is disproportionate. His claim rests on two independent grounds: (1) given the extent of his participation in the crimes, his sentence is excessive when compared to the sentences received by his accomplices (intra-case disproportionality); and (2) his sentence is excessive when compared with that imposed in other death-penalty-eligible cases throughout the state (inter-case disproportionality). We need not consider these claims in light of our decision to remand the matter for further proceedings relating to defendant's death-eligibility.

## XII

We now turn to defendant's grand and petit jury challenges as set forth in his supplemental brief. Defendant did not file a motion in the trial court challenging the array of the grand jury that indicted him. He did, however, file a motion challenging the petit jury array. This motion was withdrawn by defense counsel on May 1, 1984, the first day of trial. On May 19, 1984,

defendant was sentenced to death. In the original appellate briefs filed on March 25, 1985, on direct appeal to this Court, defendant did not raise any challenges to the grand or petit jury arrays that indicted, tried, and convicted him.

Meanwhile, on May 30, 1984, jury selections had begun in the trial of Ronald E. Long, another Atlantic County capital defendant. On that day, Long challenged the petit jury array on the basis of insufficient minority representation. His pretrial challenge to the grand jury array had previously been withdrawn. Although the trial court summarily rejected Long's petit jury claim because it was untimely, it was subsequently determined that the number of available jurors on the special panel selected for capital cases in Atlantic County was insufficient under *Rule* 1:8–5. Thereafter, the existing panel was excused and the trial was rescheduled for July 24, 1984. Long reinstituted his grand and petit jury challenges on June 21, 1984. Despite the untimely nature of Long's subsequent attack on the jury array, the Law Division held evidentiary hearings and concluded that the Atlantic County jury selection system "did not rise to the task of providing juries that were representative of a fair cross section of the community in which all had an equal chance of selection." *State v. Long*, 204 *N.J.Super.* 469, 490 (1985).

Almost one year after his conviction, Gerald moved to have this Court take judicial notice of the record of the *Long* jury challenge proceedings. At the same time, Gerald sought permission to file supplemental briefs on the following issues: (1) whether defendant waived his right to object to the jury array under *Rules* 3:10–2, 1:8–3, 3:10–1, and 3:10–5, and (2) whether the grand and petit jury selection process in use at the time of Gerald's indictment and conviction violated *N.J.S.A.* 2A:71–2, the jury selection statute. We granted both motions.

A

We first address the waiver issue. The Rules governing grand and petit jury challenges, as well as the more general

provisions governing pretrial motions, impose a thirty-day time limitation on challenges to the jury arrays. These Rules, however, allow enlargement of that period at the court's discretion, generally on a showing of good cause. *R.* 3:6–2, *R.* 3:10–3, *R.* 3:10–5, *R.* 1:8–3. Our courts have strictly enforced the time limitations on pretrial jury challenges, reasoning that to do otherwise would impede the orderly administration of our criminal justice system. *See State v. Laws,* 50 *N.J.* 159, 183 (1967) (where counsel had "many months to investigate," they could not move belatedly for "a general investigation as to the manner in which Grand Juries in [the] [c]ounty were chosen. * * * Under the circumstances, any other course would have grossly disserved the orderly administration of justice."), modified on other grounds, 51 *N.J.* 494, *cert.* den., 393 *U.S.* 971, 89 *S.Ct.* 408, 21 *L.Ed.*2d 384 (1968); *State v. Tucker,* 143 *N.J.Super.* 69, 72 (App.Div.1976) ("defendant's alleged unawareness that 'he might have been able to successfully challenge the Grand Jury array,' * * * affords no basis for granting [leave to make a post-conviction challenge] * * *. Absent a showing of actual prejudice * * * a defendant who has failed to make a timely challenge * * * may not, after his conviction, attack the grand jury's composition in a proceeding for post-conviction relief."); *State v. Robinson,* 128 *N.J.Super.* 525 (Law Div.1974) (challenge to grand jury array made on day of trial, when defendants' counsel had many months to investigate and when petitioner provided no facts to support allegations that they were deprived of opportunity to challenge jury system, properly denied); *State v. Hughes,* 128 *N.J.Super.* 363, 366 (App.Div.), certif. den., 66 *N.J.* 307 (1974) (where ground asserted reasonably could have been put forward during prior proceeding, defendant appealing from conviction of life sentence waived right to challenge grand jury by failing to raise issue prior to trial).

As mentioned, however, the language of the Rules counsels against mechanical application. Implicit in the extension provisions is the recognition that circumstances will exist in which

enforcement of the waiver will be unjust. Thus, where the interests of justice would be served by allowing a challenge to proceed, the courts have exercised their discretion to hear the issues. *See State v. Long*, 198 *N.J.Super.* 32, 38 (App.Div. 1984) (holding on interlocutory appeal that trial court did not abuse its discretion in enlarging the time period within which defendant could bring grand jury challenge. Whether standard be good cause or some lesser burden, materials presented were sufficient to support time extension, particularly considering that the "right to an impartial jury 'is entitled to the most zealous protection in the context of a criminal prosecution in which the defendant faces the death penalty.'" (citation omitted)); *State v. Porro*, 152 *N.J.Super.* 259, 264 (Law Div.1977) ("Although it is true that the time limitations prescribed by our court rules must be honored so as to advance the orderly administration of justice, these rules must maintain a degree of guarded flexibility and adapt where good cause is shown and the interests of justice would be served."), aff'd, 158 *N.J.Super.* 269 (App.Div.), *cert.* den., 439 *U.S.* 1047, 99 *S.Ct.* 724, 58 *L.Ed.*2d 706 (1978).

In the context of the death penalty, we have been particularly careful to avoid slavish adherence to procedural Rules that would bar a defendant's claim that is otherwise meritorious. "Imposition of the penalty of death is 'profoundly different from all other penalties' * * * and, as such, requires more, not fewer, procedural safeguards * * *." *State v. Biegenwald*, 96 *N.J.* 630, 689 (quoting *Lockett v. Ohio, supra*, 438 *U.S.* at 605, 98 *S.Ct.* at 2965, 57 *L.Ed.* 2d at 990), clarified by 97 *N.J.* 666 (1984); *see also State v. Williams*, 93 *N.J.* 39, 61–63, 71 (1983) (recognizing that "[t]he death penalty is the categorical imperative for trial fairness," the Court observed that in evaluating closure applications, judges should be mindful that "the concerns * * * raised in capital cases are especially acute and will entail extraordinary care and attention"); *State v. Jackson*, 43 *N.J.* 148, 156 (1964) (defendant's entitlement to a fair trial free from prejudicial error is particularly acute where lives are at

stake), *cert.* den., 379 *U.S.* 982, 85 *S.Ct.* 690, 13 *L.Ed.*2d 572 (1965).

We conclude that defendant has not waived his jury claims. This is not a case in which defendant offers nothing but unsupported allegations. *Cf. State v. Robinson, supra,* 128 *N.J.Super.* at 529–30 (challenges to grand and petit jury arrays not supported by facts). Rather, he relies on the findings of a trial court in which important questions of statutory violations were raised relevant to defendant's case. This is not an ordinary criminal appeal, it is a capital appeal that implicates all of the heightened concerns of procedural fairness. Moreover, "jury selection is an integral part of the fair process to which every criminal defendant is entitled. It is vital that juries be selected in a manner free from taint and suspicion. To that end the pertinent practice safeguards in the statute must be carefully observed. In capital cases, this responsibility is of the deepest concern." *Ramseur, supra,* 106 *N.J.* at 230 (citations omitted). Sufficient cause exists to grant an enlargement of the time period to allow the defendant to bring this challenge.

### B

 We need not here specify the respects in which the Atlantic County jury selection process was deficient. The details of those deficiencies have been set forth in the reported Law Division opinion in *Long, supra,* 204 *N.J.Super.* at 474–80. Suffice it to say that the defects were procedural and not substantive. They stemmed from the limited ability of technology to accomplish what war once easily accomplished by drawing names from a box.

Some examples of the technological flaws in the system include: (1) the "match-merge" process of culling names duplicated on the voter and driver lists was ineffective because, for example, some people used different names on the different lists; (2) the challenged source list contained 180,000 names of persons between the ages of eighteen and seventy-four when

the census figures totalled only 130,000; (3) the mailing of questionnaires to source-list persons to obtain a qualified list was flawed by the choice of a computer internal number that had the effect of bunching the computer runs, causing people with the same last name and address to experience frequent selection; (4) drawing names from the qualified list was affected by the use of a low interval number resulting in certain portions of the list being "over-selected"; and (5) the use of a sorting device based on the fifth letter of last names produced jurors from the same household at higher frequencies than odds would suggest.

In *Long*, the court considered these identical contentions and concluded that the deviations were neither "purposeful nor ill-intentioned," *id.* at 486, and although it had not been proven that "any cognizable class ha[d] been excluded or that defendant ha[d] suffered any prejudice," the process was "decidedly non-random." *Id.* at 485 (footnote omitted).

The court observed that

those administering the juror selection process were certainly making their best effort to select jurors, from the lists mandated by the Legislature, in an unbiased and all-inclusive manner. The shortcoming here does not represent an invidious discrimination based on race, color, creed, national origin, ancestry, matrimonial status or sex. They simply did not go behind the facially random, that is, unintentional, blind, purposeless or haphazard way in which the computer selection was initiated. Their sincere belief was that the process did not discriminate, did spread the burden across the community and did fulfill the requirements of the law. It is only now, that "random" has been defined with new dimension, and the process used in its pursuit disected [sic] and microscopically examined, that the lack of "randomness" is known and understood. [*Id.* at 488 (citation omitted).]

However, here, as in *Long*, there was no evidence that the panel *as composed* was not representative. There has been no suggestion that the independence of the grand or petit jury was compromised. *Cf. State v. Hart,* 139 *N.J.Super.* 565, 568–69 (App.Div.1976) (assistant prosecutor's conduct "impinged upon the independence of the grand jury and improperly influenced its determination."). Nor was there any indication "that the panel was in any way biased or prejudiced or that 'the grand

jury had before it no substantial or rationally persuasive evidence upon which to base its indictment.'" *Ramseur, supra,* 106 *N.J.* at 232 (quoting *Costello v. United States,* 350 *U.S.* 359, 364, 76 *S.Ct.* 406, 409, 100 *L.Ed.* 397, 403 (1956) (Burton, J., concurring)). In fact the methods used were chosen out of a commitment to improve the juror-selection process rather than an attempt to undermine or to inject invidious discrimination into it. The motor vehicle lists were added especially for that purpose. Now, despite the efforts of the Atlantic County Grand Jury Commission, we and they have learned that the method chosen produces non-random results. This is not the case where the procedures used bore no semblance to the randomness requirements of the selection statutes. *See State v. Wagner,* 180 *N.J.Super.* 564, 566 (App.Div.1981) (in selection of trial jury from general panel, trial court seated first fourteen jurors to enter room in jury box; jurors challenged and excused following questioning were at various rows in the courtroom where trial court started at one point and continued "right down the row"). The procedures used here did not constitute clear statutory or constitutional violations. As we recently said in *Ramseur, supra,* 106 *N.J.* at 233:

> Were we to sense any * * * fundamental injustice, we would not hesitate to call for further proceedings. Although the procedures used obviously implicated the randomness of the selection process, there is no showing that they substantially undermined the randomness principle, and when, as here, the purpose of the judges' actions was to achieve greater racial balance and not impermissibly to exclude members of a cognizable group, the statute does not call for dismissal.

We note further that in *Long,* the court concluded that the relief there granted would be prospective only, declining to apply its new ruling to even the defendant Long himself. 204 *N.J.Super.* at 487–90.

The purpose of the *Long* rule was to correct certain aspects of the Atlantic County jury selection system that affected the randomness of the procedures through assurance of numerical evenness. *Ramseur, supra,* 106 *N.J.* at 231; *Long, supra,* 204 *N.J.Super.* at 483–84. The decision was not aimed at eradicat-

ing—nor, as noted, was there any showing of—invidious discrimination of any kind. Rather the *Long* rule seeks to implement the requirement that jurors be selected in a purely random fashion so that every county resident will have an equal chance of serving. Given the peculiarities of the present situation in which the irregularities in the selection process were the result of an imperfect conception of how to use technology to *implement*, rather than undermine, the randomness requirement, we hold that *N.J.S.A.* 2A:71–2 does not require reversal.

## XIII

The judgments of conviction on all but the thirteenth count—the capital-murder conviction—are affirmed. The judgment of conviction for capital murder is reversed and the cause remanded.

O'HERN, J., concurring.

I agree entirely with the Court's well-reasoned explanation that death would not be the appropriate punishment under New Jersey's capital punishment act when the accused did not intend the death of the victim. I disagree that the Code contemplates such a result but would not, in any event, further complicate our capital murder law by creating a new form of murder not found in the Code. I offer these few suggestions for harmonizing the Code's current definition of murder with the capital punishment act. Much of what I write will be found in the majority opinion but is included here for continuity.

## I

I begin my analysis by recognizing that there is a difficulty in interpreting the Act occasioned by the Legislature's selective inclusion of some, but not all, of the provisions of the Model Penal Code (MPC). We noted this legislative modification of the MPC definition of murder in *State v. Grunow*, 102 *N.J.* 133, 138–39 (1986):

The drafters of the New Jersey Penal Code [originally] proposed four categories of murder: (1) criminal homicide committed purposely, 2C:11–3(a)(1); (2) criminal homicide committed knowingly, 2C:11–3(a)(2); (3) criminal homicide committed "recklessly under circumstances manifesting extreme indifference to the value of human life," 2C:11–3(a)(3); and (4) felony murder, 2C:11–3(a)(4). [*Citing* II *Commentary: Final Report of the New Jersey Criminal Law Revision Comm'n* 50 (1971) [hereinafter *Commentary*].]

The Commission Report would have limited *capital* murder to only two categories: purposeful murder and felony murder. *Commentary* at 168. Murder in New Jersey had previously been divided into two degrees as part of an early reform to mitigate the death penalty, the first degree characterized by the "willful, deliberate and premeditated killing." *N.J.S.A.* 2A:113–2, *repealed by L.* 1978, *c.* 95, 2C:98–2. All other murders were of the second degree and not subject to the death penalty. *N.J.S.A.* 2A:113–4 (repealed 1978). Criminal homicides that were not murder were manslaughter.

Our pre-Code statute did not define murder. Murder was a common-law crime. We seem to have adopted in New Jersey, as elsewhere, the common-law understanding that an unlawful homicide was murder if it resulted from an act of killing accompanied by "one of the following states of mind: (a) an intention to cause the death of or grievous bodily harm to any person or (b) knowledge that the act will probably cause either of these results, even though the actor hopes they may not occur or is indifferent about them, or (c) an intention to commit a felony or to resist a peace officer in the execution of his duty." Wechsler & Michael, *A Rationale of the Law of Homicide: I*, 37 *Colum.L.Rev.* 700, 702–03 (1937) (footnote omitted) [hereinafter Wechsler & Michael]. *See also State v. Gardner*, 51 *N.J.* 444, 458 (1968) (citing Sir James Stephen *Digest of the Criminal Law* (1877) (defining "malice aforethought")).

Although the first two of Stephen's categories are phrased differently, they were difficult to distinguish at common law. Professor Wechsler noted that

[t]he second of Stephen's categories of murder included, as we have said, homicides caused by an act which the actor knows will probably cause death or

grievous bodily harm, a case treated summarily and ambiguously by the earlier writers in so far as it was treated at all. It has commonly been thought to be the case of extremely gross recklessness resulting in death, to be distinguished from negligent homicides that are only manslaughter by the relatively greater danger of the act and the consequently great indifference to the safety of others manifested by it.

[Wechsler & Michael, *supra*, 37 *Colum.L.Rev.* at 709–10 (footnotes omitted).]

As originally introduced, however, through *L.* 1978, *c.* 95, 2C:11–3, the New Jersey Code of Criminal Justice made no provision for any form of reckless *murder,* whether it be "extreme indifference" or through intention to cause "serious bodily injury" to another; it provided only for reckless *manslaughter.* Professor Knowlton, Chairman of the Commission, explained:

The statute departs significantly from the commission report in two respects. The first is the elimination of reckless murder. This is highly desirable since a homicide is murder if it is committed knowingly. The element of "recklessness" requires personal awareness of the risk and a conscious disregard of it, while the term "knowingly" requires the actor to be "practically certain that his conduct will cause such a result." These two factors codify degrees of culpability for homicide: the more stringent one of "knowingly" is more suitable for murder because of its greater sanction; "recklessness" killings are properly made manslaughter.

[Knowlton, *Comments Upon the New Jersey Penal Code,* 32 *Rutgers L.Rev.* 1, 9 (1979) (footnotes omitted.)]

It appears to be the case that between the original enactment of the Code in September of 1978, and its effective date in September 1979, training sessions led observers to conclude that there was too great a gap in culpability between the crimes of murder and manslaughter. Accordingly, in the consensus amendments of 1979, section 2C:11–4 was amended to divide manslaughter into two categories, aggravated manslaughter and reckless manslaughter, depending on the presence of circumstances manifesting extreme indifference to human life. *L.* 1979, *c.* 178 (codified at *N.J.S.A.* 2C:11–4(a)). At the same time, the definition of murder was amended to add the present language that criminal homicide may constitute murder when the actor purposely or knowingly "causes death or *serious bodily injury resulting in death."* *L.* 1979, *c.* 178 (codified at *N.J.S.A.* 2C:11–3(a) (emphasis added). What the Legislature

did was take two of Sir James Stephen's categories of murder that were second-degree murder if not accompanied by willful, deliberate, premediated conduct, and put one of them, the serious bodily injury provision, under the definition of murder and the extreme indifference homicide under a higher degree of aggravated manslaughter, a first-degree offense.

As introduced, our Code made no provision for capital punishment. Hence, the only significance of the additions was, as the Senate Committee's Statement stated:

> By committee amendments, the concept of murder under 2C:11-3 was expanded to include, in addition to those who "knowingly" or "purposely" cause [death], those individuals who "purposely" or "knowingly" cause serious bodily injury which results in death.
>
> By committee amendments, a section 21A amending 2C:11-4 (Manslaughter) was added to the bill. The purpose of the amendment is to create a new offense of "aggravated manslaughter" when the accused causes death under circumstances manifesting extreme indifference to human life.
>
> [Senate Judiciary Committee, Statement to Senate No. 3203 (1979), *reprinted in* 7 *Crim.Just.Q.* 65, 67.]

At the same time, the bill added language to the definition of murder to "insure that the specific higher penalties provided in 2C:11-3(b), rather than the presumptive sentences found in Chapter 44 of the Code, [were] applicable to the offense of murder." *Id.* As enacted, that sentence was thirty years for murder with fifteen years without possibility of parole. One convicted of aggravated manslaughter was then guilty of a first-degree crime, subject to a ten- to twenty-year term of imprisonment with a possible ten year period of parole ineligibility.[1]

When the Legislature restored capital punishment in 1982, it did so by a brief incorporation of the definitions of criminal homicides that were classified as murder and by the additional

---

[1]The maximum sentence for a non-capital murder was later increased up to life imprisonment with thirty years without possibility of parole, *L.*1982, *c.* 111; the maximum sentence for aggravated manslaughter was increased to thirty years with a possible fifteen-year parole bar. *L.* 1986, *c.* 172.

requirement that the act be conducted by one's own hand or that of a hired hand. *N.J.S.A.* 2C:11-3(c).

At this point we must ask whether the Legislature would intend to preserve a form of unintended murder where the actor's only intent is to inflict "serious bodily injury" upon the victim. I think not.

## II

To begin with, *N.J.S.A.* 2C:11-2(a) defines criminal homicide only in terms of death. It states that criminal homicide is committed if the actor "purposely, knowingly, recklessly or, under the circumstances set forth in section 2C:11-5, [death by auto] causes the death of another human being." The actor's state of mind is related to the death. It is clear that this all-inclusive definition of criminal homicide does not embrace that which is arguably set forth in 2C:11-3(a)(1) or (2)—that is, the definition of criminal homicide does not include the situation where the actor purposely or knowingly caused serious bodily injury that happened to result in death. Such a person did not purposely cause death (it was a happenstance); such a person did not knowingly cause death (it was a happenstance). We therefore must start out with a recognition that to interpret the Code that intentionally or knowingly causing serious bodily injury that happens to result in death is murder, albeit non-capital murder, is a conclusion that conflicts with the basic definition of criminal homicide found in 2C:11-2.

We next consider the definition of "serious bodily injury." Serious bodily injury is "bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." *N.J.S.A.* 2C:11-1(b). *See State v. Sloane,* 111 *N.J.* 293 (1988) (stab wound that pierces arm could cause serious bodily injury). If an actor has caused a "protracted loss or impairment of the function of any bodily member," it is an instance of terrible criminal conduct but not one

that necessarily threatens death. We must ask the question whether the Legislature could possibly have intended that someone who breaks another person's arm intentionally should be executed because death happens to result, and we answer "no." That is our basic constitutional conclusion.[2]

The further question is could the Legislature have intended that such an act be non-capital murder with thirty years in prison without parole. Recognizing that the Legislature can more seriously penalize that which we might think less culpable than that which we might think more culpable, we must accept the notion that there is some common understanding about culpability, even without the statute, that entitles us to divine legislative intent.

My conclusion then is that the lesser penalty that the Legislature has prescribed for aggravated manslaughter (which is *more* culpable than this putative non-capital murder), suggests the Legislature did not mean to impose the harsher penalty for this less culpable act. I further conclude that if the Legislature defined as "aggravated assault" precisely the same act (purposely or knowingly causing serious bodily injury to another) as this non-capital murder, except for the happenstance that in the former death did not result whereas in the latter it did, making the former (aggravated assault) a second degree crime (five to ten years) and the latter (non-capital murder) a mandatory thirty year prison term, we are ascribing an almost outrageous intent on the part of the Legislature. *See N.J.S.A.* 2C:12–1(b)(1) (aggravated assault).

---

[2] Of course, the reticulated structure of the Code forbids absurd results. *See N.J.S.A.* 2C:2–3(b). An actor is not criminally culpable for the results of conduct unless the actual result either "be within the design or contemplation" of the actor (sometimes described as "the designed or contemplated result") or involve "the same kind of injury or harm as that designed or contemplated and not be too remote, accidental in its occurrence, or dependent on another's volitional act to have a just bearing on the actor's liability or on the gravity of his offense" (sometimes described as "the remote result"). *N.J.S.A.* 2C:2–3(b).

Plainly read, the crime of non-capital murder would require only that the actor purposely or knowingly inflict serious bodily injury, in terms of the actor's intent and the actor's conduct. The result—death—if the statute is so read, is simply a coincidence, albeit one that is not too remote as to have "a just bearing * * * on the gravity of his offense." *Supra*, at 138 n. 2 (quoting *N.J.S.A.* 2C:2–3(b)). So construed, the provision would enact a "much discredited [Holmesian] theory of liability." Atiyah, *The Legacy of Holmes Through English Eyes* in Holmes and the Common Law: A Century Later, 27, 30 (1983).

Contrast this with aggravated manslaughter, 2C:11–4(a). There the actor "recklessly causes death under circumstances manifesting extreme indifference to human life." One must find that that actor, realizing death was rather probable, and fully aware of that, nevertheless committed the act with a state of mind that said "I couldn't care less, I don't care at all, I don't care in the least bit if this person dies, even though I know that my act possesses a high degree of probability of causing that person's death." The conduct of the actor could be as broad as the scope of human behavior, it could include inflicting injuries, it could include throwing someone out of an airplane or fracturing someone's arm. All of these things go into "serious bodily injury," but it would have to include above all of that the required state of mind that is *almost*, but not quite, the same as purposely causing death or knowingly causing death, *i.e.*, conduct that manifests extreme indifference to the value of human life.[3] To me it is a much more culpable act, certainly more so than simply breaking the victim's arm. Yet aggravated manslaughter carries a sentence of ten to thirty years with

---

[3]*See State v. Rose,* 112 *N.J.* 454 at 484, (1988) (Handler, J., dissenting) (Justice Handler, noting the similarities between "purpose" and "extreme indifference," observed: "[T]he Commentary recognizes the propinquity—indeed, it urges the inseparability—of species of recklessness 'manifesting extreme indifference to the value of human life' and 'knowing' murder; 'extreme indifference' is the formula by which 'recklessness' is 'assimilated to knowledge.' ").

a possible parole bar of fifteen years, while the non-capital murder requires a mandatory thirty-year prison term. This much more culpable act of extreme indifference resulting in death brings on a much less serious penalty (possible fifteen years mandatory) than the less culpable act of inflicting serious injury that results in death (non-capital murder—thirty years mandatory). The Legislature may do it; I would not say it is necessarily unconstitutional, but given our common culture I find it hard to believe the Legislature would have intended it. Finally, the legislative history of the death penalty act suggests to me that the Legislature never intended that the mere infliction of serious bodily injury without knowledge or purpose that death would result could be murder.

The Legislature under 2C:11–3(a) made every murder by one's own conduct eligible for the death penalty if accompanied by aggravating factors. In the sponsor's view that incorporation meant "first degree murder, willful premeditated murder." *Capital Punishment Act: Hearing on S. 112 Before the Senate Judiciary Committee* 1 (1982) [hereinafter *Committee Hearing*] (statement of Sen. Russo). *See also Senate Judiciary Committee Statement to S–112* (1982) ("only a person who actually commits an intentional murder * * * would stand in jeopardy of the death penalty."). Although these are pre-Code concepts, they reinforce the belief that the Legislature did not intend that the "serious bodily injury" feature of 2C:11–3 murder be devoid of relationship to death. Recall that the feature's function at common law was as an evidentiary device to furnish the proof of malice aforethought that distinguished murder. Such conduct helped the jury to understand the actor's state of mind, his culpability for the death, not serve as an independent form of homicide.

Based on all of this I conclude that the insertion of the language "or serious bodily injury resulting in death" in 2C:11–3(a)(1) and (2) is necessarily subject to the internal consistency of the Code and the graduated punishment contemplated thereby. Hence, I would conclude that in those cases in which the

infliction of serious bodily injury on a victim is a probative element in the crime of murder under *N.J.S.A.* 2C:11–3(a)(1) or (2), the jury must be charged that the defendant must have had as well the purpose or knowledge (in the Code's sense of practical certainty), *N.J.S.A.* 2C:2–2(b)(2); *see infra* at 141–142, that death would result.

## III

I am supported in my conclusion by the internal structure of the Code as well. When the Legislature transposed into the Code the previous common-law concepts of second-degree murder, it made these concepts subject to the Code's general framework.

For purposes of this analysis, I shall limit my discussion to knowing murder, although the principles would be similar in the case of purposeful murder. It may be that the culpable mental state was intended to apply only to the intent to inflict the blow. A plain English reading suggests that. But the mental-state provisions of the Code are complex indeed. The Code provides that no person can be guilty of an offense "unless he acted purposely, knowingly, recklessly, or negligently as the law may require, with respect to each material element of the offense." *N.J.S.A.* 2C:2–2(a). The material elements of an offense vary in that they may involve (1) conduct *per se*, (2) the attendant circumstances of conduct, or (3) the result of conduct. The Code defines the culpability status for each. Moreover, "[w]hen the law defining an offense prescribes the kind of culpability that is sufficient for the commission of an offense, without distinguishing among the material elements thereof, such provision shall apply to all the material elements of the offense, unless a contrary purpose *plainly* appears." *N.J.S.A.* 2C:2–2(c)(1) (emphasis added).[4] That the result of the injury be

---

[4]As noted, the legislative history with respect to the 1979 consensus amendments is sparse indeed concerning whether the Legislature intended to create a

death is clearly a material element of the crime of murder. Hence, under *N.J.S.A.* 2C:2–2(c)(1), it would follow that knowledge that death will follow is the requisite mental state for murder unless "a contrary purpose plainly appears." Remember that knowledge is not purpose. The Code is quite specific about how knowledge is to apply to the various elements of an offense. In fact, the Code distinguishes between the state of knowledge required for (1) conduct, (2) attendant circumstances, and (3) the result of conduct.

A person acts knowingly with respect to the nature of his conduct or the attendant circumstances if he is aware that his conduct is of that nature, or that such circumstances exist, or if he is aware of a high probability of their existence. A person acts knowingly *with respect to a result of his conduct* if he is aware that it is practically certain that his conduct will cause such a result. * * *

[*N.J.S.A.* 2C:2–2(b)(2) (emphasis added).]

Under this interpretation, if an actor commits serious bodily injury that results in death, he would be convicted of murder only if he is adjudged to have been practically certain that death would result from his conduct.

The Code, in this way, is self-correcting with respect to the anomaly created by the legislative bifurcation of the two forms of common law second-degree murder, *i.e.,* "serious bodily injury" and "extreme indifference" homicide.

The precise delineation of these mental states of criminal culpability, each drawn from the Model Penal Code and each defined in *N.J.S.A.* 2C:2–2(b), represented an effort, as one of the framers of the Code put it, "to achieve greater individual justice through a closer relation between guilt and culpability, requiring workable definitions of the various culpability factors. These factors must be related precisely to each element of an offense, defense, or mitigation, and all unnecessary limitations upon individual culpability should be eliminated." Knowlton, *supra,* 32 *Rutgers L.Rev.* at 2 (footnote omitted).

---

*less*-morally-culpable form of criminal homicide that would be punished more severely than aggravated manslaughter.

People act "purposely" with respect to a result if their conscious objective is to cause such a result. People act "knowingly" with respect to the result if it is not their conscious objective, yet they are practically certain or aware of a high probability that their conduct will cause the result. * * *

People act "knowingly" with respect to a result if they are nearly certain or aware of a high probability that their conduct will cause the result. If they are aware only of a substantial risk, they act "recklessly" with respect to the result. The narrow distinction lies in the awareness of the *certainty of the risk* —"high probability" versus "substantial risk." The broader distinction is considerably more significant. Purposeful and knowing conduct is viewed as *"wilful,"* while reckless conduct or less is at most "careless."

[Robinson, *A Brief History of Distinctions in Criminal Culpability*, 31 *Hastings L.J.* 815, 818–19 (1980) (footnotes omitted).]

The Code, by closely tying the concepts of knowledge or purpose with respect to the *result* of a homicidal act, equates this conduct with "willful" conduct, which is the conduct that Senator Russo described as one of the characteristics of capital homicide. Our job in construing statutes is to make sense of the whole of a statute insofar as possible and not to construe individual sections in isolation. *See State v. Valentin*, 105 *N.J.* 14, 20–21 (1987). We make better sense of the whole of the homicide provisions of the Code by not creating another form of murder.

In sum, I conclude that because it is highly unlikely that the Legislature would have intended the anomalous construction of the Code that would contemplate two forms of murder, one capital and one non-capital, and because I believe that the Legislature would have intended that the capital murder provisions of the Code be construed to be in accordance with constitutional requirement, I would hold that for an accused to be found guilty of murder under 2C:11–3(a)(1) or (2), the offense that will subject the accused to capital punishment, he must be adjudged by a jury to have had either the conscious object to cause the death of the victim or to have been practically certain or aware of a high probability that the conduct would cause death.

In murder cases in which the infliction of serious bodily injury is a probative factor, the trial court should charge the

jury that whatever the conduct may be that caused death, the jury must find that the defendant have the requisite mental state under the Code—either purpose (conscious object or design) or knowledge (practical certainty) that death will result. In many cases the intent to inflict serious bodily injury, if not demonstrative of such a state of mind concerning the death, will demonstrate that recklessness with respect to the consequence of death manifesting the extreme indifference characteristic of aggravated manslaughter. *See* Wechsler & Michael, *supra*, 37 *Colum.L.Rev.* at 709–10.

Justice GARIBALDI joins in this opinion.

HANDLER, J., concurring in part and dissenting in part.

The Court today reverses defendant's capital murder conviction and death sentence. In doing so, the Court determines that a defendant can be considered death-eligible only if he murdered with the intent to kill, and only if he committed the murder by his own conduct. This narrowing of the scope of the class of death-eligible murders is a significant step toward remedying the constitutional infirmities that burden the capital murder-death penalty statute. Of corollary significance, the Court, in departing as it does from the United States Supreme Court's decision in *Tison v. Arizona,* 481 *U.S.* 137, 107 *S.Ct.* 1676, 95 *L.Ed.*2d 127 (1987), recognizes the unreliability and inadequacy of federal precedent in the development of capital-murder jurisprudence.

I subscribe to the Court's reasoning on these essential points. Moreover, while I concur in the judgment of the Court, I would also reverse because the New Jersey capital murder-death penalty statute is unconstitutional and invalid, both as enacted and as applied. *See, e.g., State v. Ramseur,* 106 *N.J.* 123, 343 (1987) (Handler, J., dissenting). I feel constrained to maintain and repeat this position because of the evolving and unsettled nature of the law governing these unique capital-murder prosecu-

tions. *See, e.g., State v. Rose,* 112 *N.J.* 454 (1988) (Handler, J., dissenting); *State v. Bey (II),* 112 *N.J.* 123 (1988) (Handler, J., dissenting).

I write separately in this case to address two continuing troublesome issues, the status of "knowing" murder as a capital offense and the role of prosecutorial discretion in capi- tal-murder prosecutions. The resolution of these two issues requires, I submit, the exclusion of "knowing" murder, one that lacks intent to kill, from the class of death-eligible murders; it demands also uniform, statewide standards to govern the prose- cutorial discretion in determining whether a case should proper- ly be prosecuted as a capital offense.

I.

The Court now holds, as a matter of state constitutional law, that the intent to kill is an essential element of capital murder, distinguishing capital murder from other murders. Moreover, the imposition of a death penalty for intentional infliction of serious bodily injury that results in death is disproportionate. The majority now rules that this violates the State Constitution. *Ante* at 88–89. I agree.

In the context of this case, this important holding does not rest on the sufficiency or insufficiency of the evidence of intentional murder. As the Court aptly notes, the State's evidence in this case was, arguably, sufficient to support a jury's determination that the defendant murdered the decedent with the intent to kill. We cannot, however, have confidence in that interpretation of the jury's verdict. The confusion in the prosecution of this case about what type of conduct could constitute purposeful or knowing murder and what might con- stitute aggravated manslaughter has rendered the jury's ver- dict suspect. The inclusion of the serious bodily harm provision in the definition of capital murder and in the charge to the jury may have influenced the jury's deliberations in this case be- cause the evidence of defendant's intentions was inconclusive

and because this definition may have de-emphasized the jury's consideration of a non-capital offense, aggravated manslaughter.

I also concur in the majority's determination to find that the "own conduct" requirement must be met by showing that "the defendant *actively and directly participated* in the homicidal act." *Ante* at 97. I believe that the interpretation clearly reflects the Legislature's intent to narrow the class of death-eligible murderers by excluding those who would, pre-Code, have been considered accomplices. I commend this narrowing of the class of death-eligible murders and the ruling that this determination must be made by the jury at the guilt phase of its deliberations. As I have repeatedly stressed, the determination of whether the particular homicide falls within the class of death-eligible murders must be made a constituent part of the process in the determination of guilt, and it must be done apart from and *before* the jury is thereafter directed to consider whether the death sentence is appropriate for the particular defendant. *See State v. Ramseur, supra,* 106 *N.J.* at 387–94 (Handler, J., dissenting); *State v. Bey (II), supra,* 112 *N.J.* at 215–216 (Handler, J., dissenting).

I must, however, stress what may be more than a semantical difference; unlike the majority, I view the own-conduct requirement as a material element of capital murder rather than as a mere "triggering device." *Ante* at 99 (quoting *State v. Moore,* 207 *N.J.Super.* 561, 576 (Law Div.1985)). The Court, in adopting the reasoning of *Moore,* determines that the commission of a homicidal act by the defendant's own conduct is not an element of the offense of murder. There is, however, nothing in the language of *N.J.S.A.* 2C:11–3 suggesting that the own-conduct requirement is anything less than a material element of the offense of *capital* murder. This requirement assuredly satisfies the Code's understanding of "a material element" of a crime as a requirement that relates solely to the crime itself, *N.J.S.A.* 2C:1–14(i), and includes "conduct" that is a part of the "definition of the offense" and also "establishes the required

kind of culpability," *N.J.S.A.* 2C:1–14(h)(1)(a), (b). Since a defendant cannot be convicted of "capital murder" unless it is established that the homicide was by his "own conduct," there is no escape from the conclusion that this requirement is a "material element" of the crime of capital murder. Hence, the "own-conduct" aspect of capital murder is no more, no less a material element of capital murder than the requirements involving "purpose" or "knowledge." What follows from this is that the jury must understand clearly that the own-conduct requirement, as a material element of capital murder, is subject to the State's continuing burden to prove each and every element of the charged crime beyond a reasonable doubt.

The narrowing of the class of death-eligible murders thus achieved by the Court is both essential and constructive. It will go far toward focusing the aim of the capital murder-death penalty statute on the truly egregious murderer, and it will significantly decrease the risk of an arbitrary and disproportionate imposition of the death penalty. Unfortunately, by failing to exclude "knowing" murder from the class of death-eligible murders, the majority fails to cohere the implications of its well-reasoned holding that the culpable state of mind of "intent to kill" is constitutionally indispensable to establish capital murder. In my opinion, the implication of the majority's decision that the State Constitution requires a showing of "intent to kill" for capital murder is that murders committed only with knowledge that death is "practically certain" to result from the acts of the defendant cannot rise to the level of capital murder. Such murders do not, in my view, reflect the greatest level of culpability that would justify the greatest possible penal sanction, namely, death.

This constitutional perception of capital murder would be consistent with New Jersey's prior capital-murder statute in which the death penalty was not authorized for crimes less severe than first-degree murder. *See State v. Ramseur, supra,* 106 *N.J.* at 387–90 (Handler, J., dissenting). Under the former statute, death-eligible murders were those that were

"perpetrated by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing, or [were] committed in perpetrating or attempting to perpetrate certain felonies." *See L.* 1965, *c.* 212, § 1; *R.S.* 2:138–2; *L.* 1917, *c.* 238, § 1, p. 801 (1924 Supp. § 52–107); *L.* 1898, *c.* 235, § 107, p. 824 (C.S. p. 1780, § 107). The former statute's focus on intentional murder required that with the exception of murders during the course of certain felonies and the murder of a law enforcement officer, the State was required to prove three mental operations in order to establish first-degree murder: premeditation, deliberation, and willful execution of the plan. *See State v. Anderson,* 35 *N.J.* 472, 496–97 (1961). All other murder was presumptively second degree murder—a noncapital offense—regardless of the circumstances of the murder. Indeed, under our prior statute even most first-degree murder defendants were not subjected to a death sentence, but could under prevailing practice exercise a *non vult* plea. See discussion *infra* at 154.

By defining first-degree murder in terms of culpability as manifested through mental operations demonstrating pre-meditation or intent, the former statute expressed one of the goals of the new code: "greater individual justice through a closer relation between guilt and culpability ..." Knowlton, *Comments Upon The New Jersey Penal Code,* 32 *Rutgers L.Rev.* 1, 2 (1979). The relationship between culpability, guilt, and the appropriate level of punishment is squarely recognized by this Court. Indeed, the majority explicitly endorses the Supreme Court's statement that "[d]eeply ingrained in our legal tradition is the idea that the more purposeful the conduct, the more serious is the offense, and, therefore, the more severely it ought to be punished." *Tison v. Arizona, supra,* 481 *U.S.* at 156, 107 *S.Ct.* 1687, 95 *L.Ed.*2d at 143. *Ante* at 77. This Court has also stated that "[o]ur system of criminal laws is predicated usually on the imposition of punishment based on the defendant's intent. Indeed, our Code's ranking of crimes by degree places those crimes committed with intentional con-

duct as the highest degree of crime, for which the defendant is most severely punished." *State v. Ramseur, supra,* 106 *N.J.* at 207–08. *Ante* at 77. The legislature itself effectuated this principle through adoption of the separate levels of culpability described in *N.J.S.A.* 2C:2–2(b). In applying this principle to criminal homicide, "[p]urposeful murder, knowing murder, aggravated manslaughter and reckless manslaughter are criminal homicides that lie on a descending scale of culpability." *State v. Grunow,* 199 *N.J.Super.* 241, 250 (App.Div.1975), *aff'd,* 102 *N.J.* 133 (1986). These considerations all point to one basic principle: the severest sanctions should be reserved for actors exhibiting the most culpable mental states.

Although "purposely" and "knowing" are often yoked together relative to other culpability states, they nevertheless are two different measures of criminal intent. In the context of criminal homicide, "purposeful" commission of murder, *N.J.S. A.* 2C:2–2(b)(1), is the most culpable form, closely corresponding to the former *mens rea* requirement of premeditation, *i.e.,* intent to kill. Knowing murder, however, a less culpable state than purposeful murder, contains no requirement of premeditation or willfulness and deliberation, the mental states or qualities that historically have justified the ultimate sanction of the death penalty.

The Court, in refusing to winnow out knowledge from capital murder, in effect, homogenizes distinctly different states of criminal culpability. While, in terms of culpability, the Court's result seemingly equates only purpose and knowledge, it fails to remove recklessness from the equation. Thus, in weighing culpability, what is disquieting about the Court's rejection of any constitutional distinction between purpose and knowledge is its failure to understand that it thereby obliterates the distinction between knowledge and recklessness.

Further, in terms of criminal culpability, the Court's determination permits recklessness to be equated with purpose, which is the critical characteristic of the most serious form of murder.

This is clearly what the Supreme Court did in *Tison* when it adopted *this* philosophy, *viz:*

[T]he reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a risk of death represents a highly culpable mental state, a mental state that may be taken into account in making a capital sentencing judgment when that conduct causes its natural, though also not inevitable, lethal result.

[481 *U.S.* at 157–158, 107 *S.Ct.* at 1688, 95 *L.Ed.*2d at 144.]

Ostensibly the Court repudiates this philosophy when it states disapprovingly that "as a matter of federal proportionality principles ... capital punishment may be imposed on one who ... can be characterized as 'recklessly indifferent to human life.' " *Ante* at 75. Nevertheless, by including "knowing" murder in the class of capital murder, the Court does not truly separate itself from the "federal proportionality principles" that it professes to reject.

There was not any genuine disagreement with the observation made recently, that "[t]he distinction between knowledge and recklessness, between 'practical certainty' of a result and 'conscious disregard' of 'a substantial and unjustifiable risk' of a result, is a subtle one at best," and that "the distinction between 'knowing' murder and 'aggravated manslaughter' turns in close cases ... on the difference between 'practical certainty' that one is inflicting injury with a substantial risk of death and a conscious disregard of a substantial risk of death that manifests 'extreme indifference to the value of human life.' " *State v. Rose, supra,* 112 *N.J.* at 562–563 (Handler, J., dissenting). Because the distinction between knowledge and recklessness is so nebulous, I do not believe it is possible to include a non-intentional but knowing murder as capital murder without creating an intolerable risk that reckless murder will also become capital murder.

Aggravated manslaughter now exists as a lesser-included offense of knowing murder. *See State v. Crisantos (Arriagas),* 102 *N.J.* 265 (1986). Knowing murder itself can incorporate a degree of "indifference" that can, on a given state of facts, serve to make aggravated manslaughter the functional

equivalent of knowing murder. *See State v. Palmer*, 211 *N.J.Super.* 349, 352 (App.Div.1986) (endorsing a definition of the element of aggravated manslaughter of "circumstances manifesting extreme indifference" as conduct *"practically certain* to kill any one who might happen to be in the way." (Emphasis added)). Conversely, on identical evidence, aggravated manslaughter can encompass a quality of indifference that could transform knowing murder into aggravated manslaughter. *See State v. Rose, supra,* 112 *N.J.* at 562–567 (Handler, J., dissenting).

In stressing the similarities between intentional murder and aggravated manslaughter, Justice O'Hern in his concurring opinion observes that the latter requires "[t]hat [the] actor, realizing death was rather probable, and fully aware of that, nevertheless committed the act with a state of mind that said 'I couldn't care less, I don't care at all, I don't care in the least bit if this person dies, even though I know that my act possesses a high degree of probability of causing that person's death.'" *Ante* at 139. The Justice goes on to say: "[t]he conduct of the actor could be as broad as the scope of human behavior" but, to constitute capital murder that conduct "would have to include" a "state of mind that is *almost,* but not quite, the same as purposely causing death or knowingly causing death...." (emphasis added). *Ibid.* The *"almost,* but not quite the same" test might suffice and be acceptable to distinguish murder from manslaughter when the penal consequences entail only incarceration. That test, however, cannot, in my opinion, be used to determine degrees of criminal culpability to justify death as the just penalty for a homicide.

These offenses, knowing murder and aggravated manslaughter, are couched in terms that in any given case can render the two indistinguishable. *See* New Jersey Penal Code, Volume II: Commentary, Final Report of the New Jersey Criminal Law Revision Commission, 1971 (quoted in Cannel, *New Jersey Criminal Code Annotated* (1987), at 245–46). Hence, the inclusion of knowing murder as a capital offense creates a

system that will of necessity function arbitrarily and irrationally because it cannot reliably or consistently exclude homicides that may constitute only aggravated manslaughter and, in terms of underlying criminal culpability, are not truly different from aggravated manslaughter.

Moreover, it does not appear that the inclusion of knowing murder as a form of capital murder was itself expressly or impliedly intended by the Legislature. I have noted the omission in the enactment of the capital murder-death penalty statute of any explanation of why aggravated manslaughter is now an offense distinguishable from knowing murder. *State v. Rose, supra*, 112 *N.J.* at 563 (Handler, J., dissenting). Further, support for the conclusion that knowing murder was not intended to constitute capital murder can be derived from the statement of the sponsor of the capital murder legislation that this State's capital murder statute is "not as broad" as statutes in some other states, in part because defendants are death-eligible only if "found guilty ... of first-degree murder, willful, premeditated murder," a degree of murder closely corresponding only with a "purposeful" state of mind. *Capital Punishment Act: Hearing on S.112 Before the Senate Judiciary Committee* (1982) at 1.

In sum, as noted, the Court rejects *Tison v. Arizona, supra*, 481 *U.S.* 137, 107 *S.Ct.* 1676, 95 *L.Ed.*2d 127, *ante* at 75–77 in which the Supreme Court in effect ruled that it was not essential that the State show intent to kill to obtain a conviction for capital murder. *Id.* at 155, 107 *S.Ct.* at 1687, 95 *L.Ed.*2d at 144. Indeed, according to the Supreme Court, it was sufficient to show that a defendant participate in a murder only with the knowledge that there was a risk of death. *Ibid.* The Court, in accepting a death-penalty scheme that includes non-intentional but knowing murder as a capital murder, thus indirectly endorses the federal philosophy of capital-murder culpability that it purports to repudiate, a philosophy that does not blanche at the inclusion of reckless homicide as a capital offense. In its prior decision, *Enmund v. Florida*, 458 *U.S.* 782, 102 *S.Ct.* 3368, 73

*L.Ed.*2d 1140 (1982), the Supreme Court insisted that capital murder required minimally an *intent* to kill, that this constituted the "highly culpable mental state" required to convert ordinary murder into capital murder. I believe therefore that this Court, in approving *Enmund* and disapproving *Tison*, should acknowledge the sound conceptual and policy basis for a legal understanding of capital murder that requires the intent to kill.

I conclude, consistent with the underlying premises of the majority opinion and with New Jersey's capital murder traditions that as a matter of state constitutional doctrine "knowing" murder should not be included in the class of the death-eligible murders.

## II.

A significant issue in this case, not addressed by the majority, involves the twin concerns of unfettered prosecutorial discretion and disproportionality of sentence. Most recently I commented on this in my dissenting opinion in *State v. Koedatich*, 112 *N.J.* 225, 265–271 (1988). These concerns are closely related to the overly broad death-eligible class of murders attributable to both the lack of a narrow definition of this class and to the problematic application of aggravating factors. The absence of uniform standards governing prosecutorial discretion heightens the uncertainty and inconsistency in the administration of the capital murder statute. Derivatively, it loosens the guidelines, complicates immeasurably the discretionary responsibilities of the jury, and inevitably compounds the risk of arbitrary and capricious death sentences.

This uncertainty and arbitrariness is exacerbated by unstructured plea-bargaining practices. Here, three young men with equal culpability participated in the murder of Paul Matusz. Two of them escaped trial and received custodial terms by pleading guilty to some of the charges brought against them. The defendant did not; because of this, he is the only one who

may have to pay for this shared crime with his life. This demonstrates that the availability of guilty pleas on a random basis and the lack of uniform standards to control prosecutorial discretion engender an intolerable degree of sentence disproportionality.

### A.

What occurred in this case—the plea to lesser, non-capital offenses by co-defendants—is reminiscent of the practice found unconstitutional under our prior capital murder statute. The former New Jersey murder statute was designed so that a plea of *non vult* removed the death penalty from the range of sentences that could be imposed on the defendant. While this statute was in effect, however, the Supreme Court asserted the unconstitutionality of a federal statute that "needlessly encouraged" guilty pleas or jury waivers by forcing defendants to choose between pleading guilty, thus assuring nothing worse than imprisonment, or asserting their right to contest guilt or the degree of guilt, thereby incurring the possibility of the death penalty. *See United States v. Jackson,* 390 *U.S.* 570, 583, 88 *S.Ct.* 1209, 1217, 20 *L.Ed.*2d 138, 148 (1968).

We were slow to recognize the constitutional infirmity of this practice. In 1968, in *State v. Forcella,* 52 *N.J.* 263, 274–81 (subsequent history omitted), we ruled that neither the death penalty nor the *non vult* plea provision of our statute was unconstitutional. However, three years later in *Funicello v. New Jersey,* 403 *U.S.* 948, 91 *S.Ct.* 2278, 29 *L.Ed.*2d 859, reh'g den., 404 *U.S.* 876, 92 *S.Ct.* 31, 30 *L.Ed.*2d 125 (1971), the Supreme Court struck down New Jersey's death penalty in a summary disposition that cited *Jackson.* This Court then declared the New Jersey death penalty unconstitutional, finding that it fell within the area that *Jackson* had found unconstitutional (although the *non vult* plea was continued after 1972, defendants were simply sentenced to life imprisonment). *See State v. Funicello,* 60 *N.J.* 60, 67–68 (*per curiam*), *cert.* den.

*sub nom. New Jersey v. Presha,* 408 *U.S.* 942, 92 *S.Ct.* 2849, 33 *L.Ed.*2d 766 (1972).

*Funicello* recognized that *Jackson* had been narrowed by the Supreme Court's intervening decision in *Brady v. United States,* 397 *U.S.* 742, 90 *S.Ct.* 1463, 25 *L.Ed.*2d 749 (1970). *Brady* held that such "dilemma" statutes did not violate a defendant's fifth or sixth amendment rights if the *non vult* or guilty plea was intelligently and voluntarily made, even if the defendant faced a possible death penalty by contesting guilt. *See also North Carolina v. Alford,* 400 *U.S.* 25, 37–38, 91 *S.Ct.* 160, 167–68, 27 *L.Ed.*2d 162, 171–72 (1970) (upholding statute in which defendant received a lesser penalty in exchange for a guilty plea). The *Brady* majority did not say whether death could be so significant a motivating factor that the fifth amendment was violated, but indicated that the defendant bore a very heavy burden. *See Brady,* 397 *U.S.* at 747, 90 *S.Ct.* at 1468, 25 *L.Ed.*2d at 755, approving and citing, from *Jackson, supra, Laboy v. New Jersey,* 266 *F.Supp.* 581 (D.N.J.1967) (guilty plea held voluntary despite the fact that defendant was greatly upset by prospect of the death penalty).

The federal court's decision in *Brady* does not limit the protections granted by State constitutional sources. Some states have recognized that the prosecutor's use of the power to bargain for guilty pleas in capital murder prosecutions can lead to arbitrary and unjustifiable results. *See, e.g., Commonwealth v. Colon–Curz,* 393 *Mass.* 150, 163–64, 470 *N.E.*2d 116, 124 (1984) (state's newly enacted death penalty law violated the state constitution because the death penalty could only be imposed after a jury trial, thus coercing guilty pleas and impermissibly violating a defendants' rights to demand a jury trial and against self-incrimination); *State v. Frampton,* 95 *Wash.*2d 469, 627 *P.*2d 922 (1981) (where, pursuant to statute, the death penalty is imposed upon conviction following a plea of not guilty, but is not imposed when there is a plea of guilty, that statute is unconstitutional); *Spillers v. State,* 84 *Nev.* 23, 436 *P.*2d 18 (1968) (death penalty scheme unconstitutional be-

cause it impermissibly burdened the defendant's right to trial by jury since death penalty could be imposed as a result of jury verdict of guilty of rape).

Following the invalidation of the death penalty provisions of the former statute, this Court dealt with the issue of whether the former statute still unnecessarily coerced *non vult* pleas from defendants guilty only of manslaughter. In *State v. Corbitt*, 74 *N.J.* 379 (1977), *aff'd*, *Corbitt v. New Jersey*, 439 *U.S.* 212, 99 *S.Ct.* 492, 58 *L.Ed.*2d 466 (1978), the petitioner unsuccessfully argued, on the basis of *Jackson*, that any system under which the defendant received a lesser penalty in exchange for a guilty plea was unconstitutional. This Court noted that "[t]he criminal process ... is replete with situations requiring 'the making of difficult judgments' as to which course to follow," *Corbitt, supra*, 74 *N.J.* at 398 (quoting *McGautha v. California*, 402 *U.S.* 183, 213, 91 *S.Ct.* 1454, 1470, 28 *L.Ed.*2d 711 (1971)), and that such dilemmas were never thought to invade constitutional rights.

Significantly, however, the Court in *Corbitt* was considerably less sanguine about the dilemma when one choice involved the death penalty. The Court concluded:

Finally, it is our considered view that *Jackson* today is authority only for a situation where a defendant faces the prospect of a possible death sentence if convicted as against the alternative of merely a prison term if he pleads guilty. We have hereinabove stressed the language of *Jackson* emphasizing the awful pressure exerted upon a defendant whose choice of a course of action may mean his death. At the time of *Jackson*, the Court was undoubtedly already sensitive to the considerations which were to lead to the later broad invalidation of death penalties in *Furman v. Georgia*, 408 *U.S.* 238, 92 *S.Ct.* 2726, 33 *L.Ed.*2d 346 (1972). *Cf. Whitherspoon v. Illinois, supra*, 391 *U.S.* 510, 88 *S.Ct.* 1770, 20 *L.Ed.*2d 776 [1968].

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

In summary of the foregoing, we conclude: (1) the authority of *Jackson* is confined to the case of a choice between trial and plea of guilty when a possible consequence of the former, and only of the former, is the death penalty; (2) alternatively, if the authority of *Jackson* goes beyond situation (1), any encouragement or inducement of a defendant to plea *non vult* under our statute and thereby waive his right to trial is not the result of a needless or unnecessary procedural device but a highly useful and desirable one, and the encouragement

is therefore not an impermissible infringement of defendant's Fifth Amendment rights.

[74 *N.J.* at 399–400.]

Although this Court was interpreting and limiting *Jackson, supra,* it ignored *Brady's* subsequent narrowing of *Jackson* in the death penalty context. On appeal, the United States Supreme Court, in a 6–3 decision, affirmed *Corbitt,* noting that:

[a]lthough we need not agree with the New Jersey court that the *Jackson* rationale is limited to those cases where a plea avoids any possibility of the death penalty ... it is a material fact that under the New Jersey law the maximum penalty for murder is life imprisonment, not death.

[*Corbitt v. New Jersey, supra,* at 217, 99 *S.Ct.* at 496, 58 *L.Ed.*2d at 473.]

The undue pressure in the context of a capital case involving the death penalty that the Court acknowledged and criticized in *Corbitt* was present in this case. It was indeed used by the prosecutor to obtain the guilty pleas of the co-defendants. Facing the death penalty in a jury trial, they assured themselves of custodial sentences by pleading guilty. However, the vice is not that the guilty pleas of these co-defendants were unconstitutionally coerced, but rather that the sentences that have emerged from this prosecution are so unequal and disparate: the plea bargain results directly in custodial terms for the co-defendants and indirectly in the death sentence for the defendant. This practice is of deep concern because there are no standards whatsoever to guide the prosecutor, and thus the courts, in determining whether what occurred here is fair, consistent, and rational. In the absence of guided discretion, the result strongly bespeaks of intolerable disproportionality.

B.

This case is further illustrative of the propensity toward disproportionality that inheres in uncontrolled prosecutorial discretion. This concern increases in this case because of the borderline nature of the evidence supporting a capital murder prosecution. The perception of disproportionality is strengthened by the growing empirical support from statistical evidence

that the death penalty is being administered in an arbitrary and capricious manner.

In several capital murder appeals, the Public Defender has brought to our attention statistical evidence gathered in analyzing the administration of the capital murder-death penalty statute. This study, entitled "The Reimposition of Capital Punishment in New Jersey: Homicide Cases from 1982–1986," by Leigh Bienen, Assistant Deputy Public Defender, and Neil Alan Wiener, Senior Research Associate at the Sellin Center for Studies in Criminology and Criminal Law at the University of Pennsylvania (hereinafter Study or Report), was acknowledged by the Court in *State v. Koedatich, supra,* 112 *N.J.* at 256. The Study is instructive. Among other things, it points out a clear differential in prosecutorial practices in our various counties. According to the Public Defender's Study, the county-to-county differences suggest that a "death-possible" case, one in which at least one statutory aggravating factor could have been alleged, was much more likely to be prosecuted as death-eligible in certain counties than in others.[1] Of particular relevance to this case is the suggestion that the county-to-county disparity also relates to plea-bargaining practices.[2] This correlation, if true, between pursuing prosecution aggressively while offering few plea bargains, and prosecuting relatively few death-possible homicides while settling many by means of a plea offer, suggests that homicides are being prosecuted not solely on the basis of the nature of the crime and the defendant, but also on the basis of

[1]For example, "a death-possible" case was prosecuted as death-eligible in Monmouth County 70% of the time, whereas in Essex County only 23% of death-possible cases were prosecuted as death-eligible; in Hudson and Camden Counties the rates were 24% and 28%, respectively. *Study,* Interim Report Part I, at TABLE CP4.

[2]Thus, according to the Study, the chances that a plea bargain would be offered in a given case were significantly higher in Hudson and Camden Counties than in Monmouth County. Only 25% of such cases were given a plea bargain in Monmouth County, whereas 74% and 63% of such cases were pled out in Camden and Hudson Counties, respectively. *Id.* at TABLE PT4.

political or budgetary or moral considerations that vary from county to county. See discussion, *infra* 166. In the absence of clear uniform standards governing capital murder prosecutions, such unchecked discretion will continue to lead to unacceptable and anomalous results.

The Public Defender's Study is an indication that the absence of controlled prosecutorial discretion poses real, not imaginary, risks. The Study provides us at least initially with a reasonably objective framework within which to think about and confront the complex issue of uncontrolled prosecutorial discretion as an aspect of proportionality.[3] The Study may have shortcomings, but the data, particularly with reference to county-to-county

---

[3]The Study relies on the defense attorneys' designation of a case as "death-possible." According to the Preliminary Report of the Public Defender, the data base was compiled from interviews with defense counsel. The interviews were intended to "record precise information on the characteristics of the defendant and victim, the circumstances of the homicide, the legal result, and the stages of case processing." The interviewing process is described as follows:

When a case is completed the defense attorney is interviewed in person by the field attorney using the structured interview schedule. The defense attorney is interviewed with the case file before him.... The field attorneys ask for a copy of the indictment or accusation, the judgment sheet and the verdict sheet, and they also ask for a copy of the presentence report and the initial police report.... These documents are then filed by case study number and used for verification....

In addition to recording the data points on the structured interview schedule, the field attorneys ... probe on the individual circumstances of each case.... If the case was not a capital case, but there was a factual basis for serving a notice of factors, why, in the defense attorney's opinion, was the case not designated a capital case by the prosecutor. What were the important issues in the case. What was the nature of the evidence. How credible were the State witnesses. Were there plea offers.... How strong was the prosecution's case, and how was the case structured prior to trial or plea. Was attorney conducted voir dire used, and was there significant pretrial publicity. What were the defense strategies. What was the prosecutor's theory of the case. Did the defendant make a statement and was the statement admitted. What was important in this particular homicide case. Why did the case result in this particular disposition.

[*Study*, Preliminary Report (January 1987) at 57–59.]

discrepancies, point to the need for controls on prosecutorial discretion. *See State v. Koedatich, supra,* 112 *N.J.* at 269–270 (Handler, J., dissenting).

The Study uses a data base of 703 homicides; [4] of the 703, prosecutors served a notice of aggravating factors

> in cases involving 131 defendants (18.6 percent of the 703), for 94 of whom ... the case went to trial as a capital case before a judge or jury (the factor was neither dismissed by the judge nor withdrawn by the prosecutor). Of these 94 cases, 69 (73.4 percent) resulted in a capital conviction for death eligible murder followed by a penalty phase trial before a judge or jury. Of these 69 cases, 25 (36.2 percent) resulted in the death sentence being imposed. Overall, of the 703 homicide cases, 18.6 percent [131 cases] were recommended for the death penalty by the prosecutors serving a formal notice of statutory aggravating factors (cases were designated death-eligible), 13.4 percent (94 cases) resulted in a capital trial, 9.8 percent (69 cases) went to penalty phase ... and 3.6 percent ... resulted in the death sentence being imposed.

*Study,* Interim Report Part I, "Characteristics of the New Jersey Homicide Cases" at 5. The Public Defender's data also purport to show, however, that *404* of the '703 cases (57.5 percent) were death-possible because there was at least one statutory aggravating factor that could have been alleged. Only 131 of the

---

[4]The Study offers a statistical comparison of "all cases of homicide, except vehicular manslaughter, where the homicide occurred after August 6, 1982, the effective date of the reimposition of capital punishment in New Jersey." The criteria for inclusion in the data base are "formal charge for a homicide offense by the prosecutor's office and a final disposition of that charge at the trial court level." *Study,* Interim Report Part I, at APPENDIX A–1—Methodology. The specific data on the case, including the assessment of whether a factual basis existed for serving a notice of aggravating factors, is assembled by interviewing "the attorney, private counsel or public defender, who represented the defendant at trial or at plea and sentencing." *Id.*

404 death-possible cases (32.4 percent) were charged as capital murder prosecutions.[5]

Thus, according to this data, there are 273 cases in which the prosecutor had a factual basis for seeking the death penalty but declined to do so. The Study suggests that one factor that correlates with the decision to prosecute is the policy of the prosecutor of the county in which the prosecution is to occur; these policies differ from county to county. Another factor is the race of various classes of victims and defendants. See discussion *infra* at 163–164.

The Report does suggest that county prosecutors have adopted differing philosophies; as a result, there are no uniform prosecutorial standards. The lack of prosecutorial uniformity in the absence of uniform statewide standards should not be surprising. The issue was discussed at length in *State v. Willie E. Smith*, 202 *N.J.Super.* 578 (Law Div.1985), in which the court specifically challenged the county prosecutor to explain the basis on which discretionary decisions were made to prosecute capital cases. The prosecutor's explanation was less than satisfactory, and serves to highlight the need for greater control over prosecutorial discretion.[6]

---

[5]A reliable indicator of "death-eligible" cases could be simply whether cases *are* like ones in which a notice of aggravating factors is served. The Public Defender's Study, however, has allowed "death-possible" characteristics of a case to be defined essentially by the defense counsel in a given case, and the Study uses these "death-possible" data to make the serious charge that from 1982–1986, of 404 cases in which a factual basis existed for serving a notice of aggravating factors, prosecutors actually served such a notice on only 131 defendants. The validity of the implication of this statistic—that the odds are great that at least some cases in which the death sentence was sought and obtained are factually indistinguishable from cases in which the penalty was not even sought, and thus that the system is operating arbitrarily—is dependent on the accuracy of the data on how many death-possible cases existed.

[6]The *Smith* case is highly instructive and of more than passing interest. The defendant, a juvenile charged with capital murder (the legislature's amendment proscribing execution of juvenile offenders later mooted the capital issue), *see State v. Bey (I)*, 112 *N.J.* 45 (1988), challenged the Essex County Prosecutor's exercise of discretion in seeking the death penalty in his case. To support his

claim, Smith brought

> to the court's attention 15 other recent homicide indictments ... [E]ach of these indictments charges the defendant with purposeful or knowing murder by his or her own conduct. Each also includes a count charging that the victim of the murder was also the victim of a robbery. In each of these cases, it was factually plausible for the prosecutor to seek the death penalty. Unlike Smith, however, none of these 15 other defendants was served with notice of [aggravating factors]. Thus, the prosecutor made the decision to treat Smith's case as a capital case, but declined to seek the death penalty against similarly situated defendants.

*Smith, supra,* 202 *N.J.Super.* at 591. Judge Cocchia acknowledged the "broad discretionary powers" with which a prosecutor is vested. *Id.* at 592 (citing *State v. Laws,* 51 *N.J.* 494, 510–11 (1968), *cert.* den., 393 *U.S.* 971, 89 *S.Ct.* 408, 21 L.Ed.2d 384; *State v. Hermann,* 80 *N.J.* 122 (1979); *State v. Conyers,* 58 *N.J.* 123, 146 (1971) (it is within the prosecutor's discretion not to seek the death penalty)). The court also acknowledged that "[a]s a general proposition, the conduct of a prosecutor is presumed to be valid," *State v. McCrary,* 97 *N.J.* 132, 142 (1984), but insisted that "[n]owhere is judicial intrusion into the realm of prosecutorial discretion more appropriately exercised or likely to be necessary than in capital criminal proceedings." *Smith, supra,* 202 *N.J.Super.* at 592 (citing *McCrary, supra,* 97 *N.J.* at 141). The court rejected the prosecutor's argument that "so long as there was an adequate factual basis for serving Smith with notice of the aggravating factor ... he cannot be said to have acted arbitrarily or capriciously.... This argument ... confuses arbitrary and capricious prosecution with groundless prosecution." *Id.* 202 *N.J.Super.* at 593. Arbitrary, the court declared, " 'means depending on will or discretion, that is *not governed by any fixed rules or standards.'* " *Id.* (quoting *Canada Dry Ginger Ale, Inc. v. F & A Distrib. Co.,* 28 *N.J.* 444, 456 (1958)). The court concluded:

> Even now, almost three years after the reenactment of the death penalty, the guidelines by which the prosecutor determines whether to proceed with a homicide case as a capital or noncapital cause remains [sic] obscure. Indeed, in oral argument ... the attorney for the State admitted that she had no notion as to how the Essex County Prosecutor's Office chooses homicide cases for capital treatment. How then is a defendant ... to meet his burden of demonstrating that the decision of the prosecutor ... is arbitrary ... where the defendant has no comprehension of the criteria and procedure by which that vital decision is made? ... The defendant ... the public ... and the court, which must be sufficiently informed about the decision-making process so as to be able to ensure that it is free of any randomness, vagary or discrimination, are all entitled to some understanding of how the prosecutor selected cases for capital treatment.
> [*Id.* 202 *N.J.Super.* at 594.]

Accordingly, the court ordered "that the prosecutor submit in writing a statement setting forth the criteria and procedure by which the Essex County Prosecutor's Office selects homicide cases for capital prosecution." *Ibid.* The Prosecutor's Office responded with an unsigned, undated memorandum

The concerns deriving from the statistical disparities among counties within this State is heightened in this case because defendant was prosecuted by the Atlantic County Prosecutor's Office. The Study suggests that with the exception of Monmouth County, this Office is far more likely to serve a notice of aggravating factors in a death-possible case than any other county in the State. Close to 60 percent (59%) of death-possible cases became death-eligible in Atlantic County. *Study,* Interim Report Part I, at TABLE CP4. In comparison, consolidation of the relevant statistics for Essex, Hudson, Camden, Mercer, and Passaic Counties reveals that in these five counties an average of only 25 percent of death-possible cases became death-eligible. *Id.* This seemingly wide disparity, coupled with the arguably tentative nature of the evidence supporting the capital-murder prosecution in this case, raises serious concerns of arbitrariness and disproportionality.

C.

The borderline nature of the evidence supporting capital murder prosecution in this case, as well as the lack of standards to control the prosecutor's discretion, is even more troubling in

---

that provided none of the requested information. According to a brief filed in this case, the court responded in a letter: "The Court finds the statement submitted to be flagrantly inadequate.... The Court is displeased with what it perceives to be a cavalier response on the part of the Prosecutor's Office.... indeed, it is difficult to believe that the attorneys for the State legitimately anticipated that so cursory and deficient a statement would be acceptable to the Court." The Prosecutor's Office followed with a more detailed description of its internal procedures in capital cases. According to the revised memorandum, the decision whether to prosecute a given homicide as a death-penalty case depends on the Assistant Prosecutor's assessment that one or more aggravating factors can be proven.

It is clear that no explicit comparison is made among homicides; decisions are made on a case-by-case basis. According to arguments presented to this Court on behalf of the Attorney General in recent capital murder appeals, there is no commitment by that office to the need for uniform standards, nor is there any sense that non-uniformity among prosecutors constitutes any kind of a problem in the administration of the death penalty statute. This provides independent empirical support for the Public Defender's thesis that there exists a high probability of arbitrary prosecution on a case-by-case and county-by-county basis, stemming from an absence of uniform prosecutorial standards.

light of the fact that defendant is black and his victim white. I acknowledge that there is no actual evidence of any racial bias or invidious discrimination in this case. Nevertheless, the statistical evidence indicates that we should not disregard the potential for racial bias.

As noted in *State v. Koedatich, supra,* 112 *N.J.* at 266–267 (Handler, J., dissenting), the Supreme Court in *McCleskey v. Kemp,* 481 *U.S.* 279, 107 *S.Ct.* 1756, 95 *L.Ed.*2d 262 (1987), rejected petitioner's claim, based on statistical studies, that the Georgia capital punishment system violates equal protection guarantees and the eighth amendment by discriminating in application according to the race of the victim.[7] The Supreme Court felt that because the studies showed no discrimination in McCleskey's individual case, this foreclosed his equal-protection claim. I strongly disagree that we should be influenced or persuaded by the federal Court's analysis. *State v. Koedatich, supra,* 112 *N.J.* at 267 (Handler, J., dissenting). Our State Constitution, in light of our pronounced and consistent concern about the subtle evils of discrimination, demands the most scrupulous assessment of such claims. *State v. Rasmeur, supra,* 106 *N.J.* at 426 (Handler, J., dissenting).

The Public Defender's Study indicates that the race of the victim may be of some significance in whether a case is prosecuted as a capital-murder offense, with cases involving a white victim more likely to progress to the death-eligible class than those involving black or Hispanic victims.[8] The data, according to the Public Defender, also suggests that cases are designated

---

[7]The studies there indicated that a black murderer of a white person is more likely to be sentenced to death than a black murderer of a black person, and that prosecutors seek the death penalty in 70% of the cases involving black defendants and white victims and 15% of the cases involving black defendants and black victims. *McCleskey v. Kemp, supra,* 481 *U.S.* at 285, 107 *S.Ct.* at 1763, 95 *L.Ed.*2d at 275.

[8]According to the Study, cases involving white victims comprise 40.5% of all death-possible cases but increase their percentage share substantially to 53.1%

death-eligible in a manner that is influenced by the race of the defendants and victims, with a black defendant/white victim homicide more likely to be designated death-eligible than a white defendant/white victim homicide.[9] Indeed, the Interim Report of the Public Defender concluded its discussion of the racial statistics as follows:

> At this initial point of examination of case progression probabilities, there is some indication, then, of differences in the comparative probabilities that homicide defendants will move more deeply into the New Jersey capital case processing system based on the race characteristics of the defendant and the victim.
>
> [*Study*, Interim Report Part I, "Research Findings" at 10.]

These statistical differences, indicating some correlation between the race of victim and defendant and the decision by a prosecutor to serve a notice of aggravating factors in a death-possible case, are of greater concern in this case because the statistical disparity in Atlantic County is more pronounced than it is statewide. *Supra* at 163–64. Although the information is tentative, the study reveals that *all* (100%) of the death-possible cases involving a black defendant/white victim pattern became death-eligible, whereas only 25% of those involving a black defendant/black victim or 20% of those homicides involving a white defendant/white victim became death-eligible. *Study*,

---

of the cases that are death-eligible. This increase is to be contrasted with cases involving a black victim, which comprise 44.8% of all death-possible cases, but only 38.5% of death-eligible cases. Similarly, cases involving Hispanic victims comprise 14.7% of death-possible cases, but only 8.4% of death-eligible cases. Because the odds that a case involving a white victim would advance from death-possible to death-eligible were substantially greater than in cases involving Hispanic or black victims, the Study points to some racial disparity in the plenary exercise of prosecutorial discretion over seeking the death penalty in death-eligible cases. *Study*, Interim Report Part I, at TABLE CP2.

[9] Black defendant/white victim cases had the highest probability of being death-possible (.85) followed, in decreasing order, by white defendant/white victim (.62), black defendant/black victim (.52), and Hispanic defendant/Hispanic victim (.50). White victim cases, regardless of whether the defendant was black or white, exhibited the highest probability of advancing to the death eligible stage. *Id.* at TABLE CP3B.

Interim Report Part I, at TABLE CP11B. As noted, there are difficulties with the data presented, particularly in that the critical determination of whether a case was "death-possible" is heavily dependent on information furnished by defense counsel. *Supra* at 161 n. 5. Nevertheless, in light of uncontrolled prosecutorial discretion and the arguably tentative nature of the evidence supporting capital murder in the instant case, this rather emphatic difference must cause apprehension.

Most important, the question of prosecutorial discretion as it relates to the potential for racial bias cannot be utterly disregarded or discounted. Dissenting in *McCleskey v. Kemp, supra,* Justice Blackmun stated that "[t]he Court's emphasis on the procedural safeguards in the system ignores the fact that there are none whatsoever during the crucial process leading up to trial," 481 *U.S.* at 366, 107 *S.Ct.* at 1805, 95 *L.Ed.*2d at 326, implying that the substantial discretion afforded prosecutors during the process prior to trial might be the cause of the racial disparities shown in the statistics before the Court. As explained in Gross & Mauro, "Patterns of Death: An Analysis of Racial Disparities in Capital Sentencing and Homicide Victimization," 37 *Stan.L.Rev.* 27, 106–07 (1984): "Since death penalty prosecutions require large allocations of scarce prosecutorial resources, prosecutors must choose a small number of cases to receive this expensive treatment. In making these choices they may favor homicides that are visible and disturbing to the majority of the community, and these will tend to be white-victim homicides." *See McCleskey, supra,* 481 *U.S.* at 294 n. 13, 107 *S.Ct.* at 1803 n. 13, 95 *L.Ed.*2d at 322–23 n. 13 (Blackmun, J., dissenting). Thus, I would urge the Court, in the context of this case, to seriously examine the problem of prosecutorial discretion as it may relate to the difficult issue of racial disparity.

### D.

Prosecutorial discretion in this case is troublesome not only with respect to race, but also with respect to the apparent lack

of proportionality evinced by the dramatically differing sentences received by Gerald and his two co-defendants. In the ordinary criminal setting, we can countenance some degree of sentencing disparity. In the context of capital sentencing, however, a system that affords prosecutors the leverage to force defendants to choose between imprisonment and a possible death sentence is no improvement over the prior unconstitutional system that forced defendants to choose between a *non vult* plea and a possible death sentence. *See State v. Funicello, supra,* 60 *N.J.* 60 (1972).

In *State v. Ramseur,* I expressed the view that under state constitutional and fundamental fairness doctrines our capital murder-death penalty statute did not provide sufficient guidance to overcome the genuine risk of arbitrary and capricious applications. 106 *N.J.* at 405–06. I pointed out that the global statutory definition of murder and the fusion of the guilt and sentencing determinations, with the simultaneous application of statutory aggravating factors to determine both death eligibility and the death sentence, robbed the statute of coherence and objectivity. *Ibid.* I emphasized that the absence of guided prosecutorial discretion and mandatory effective proportionality review exacerbated the risk of arbitrariness. *Ibid.* I reiterated these views in *State v. Koedatich, supra,* 112 *N.J.* at 264–271.

I continue to urge that guided prosecutorial discretion is integral to a valid death penalty scheme. As was noted by Justices Blackmun, Marshall, and Stevens in dissent in *McCleskey v. Kemp, supra,* "the establishment of guidelines for Assistant District Attorneys as to the appropriate basis for exercising their discretion as to the various steps in the prosecution" is needed in the interests of consistency. 481 *U.S.* at 365, 107 *S.Ct.* at 1805, 95 *L.Ed.*2d at 325–26 (Blackmun, J., dissenting). In the absence of a comprehensive recasting of the statute to overcome its current constitutional defects, guided prosecutorial discretion will serve at least to reduce, even if it cannot eliminate, the risk of arbitrary application and disproportionate sentencing.

## III.

I join in the Court's decision to reverse defendant's conviction and death sentence. I endorse its reasoning that under our State Constitution it is impermissible to permit an offender to be convicted of capital murder and sentenced to death without the intent to kill. I therefore agree that one whose state of mind is only to cause serious bodily injury that proves fatal should not be exposed to the death sentence. I also concur in the Court's interpretation of the "own conduct" requirement. I would, moreover, make expressly certain that under the State Constitution only offenders who intend to kill, not merely kill with knowledge of the fatal consequences of their acts, should be exposed to the death sentence.

In addition, I emphasize that the Court should find the capital murder-death penalty statute unconstitutional because of the lack of uniform standards to guide prosecutorial discretion and the failure to develop such standards in order to complement and assure proportionality of sentencing.

Accordingly, I concur in part and dissent in part.

O'HERN, GARIBALDI and HANDLER, JJ., concurring in the result.

*For reversal and remandment*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, O'HERN, POLLOCK, GARIBALDI and STEIN—7.

*For affirmance*—None.